Kathy Bazoian Phelps (155564)
**DIAMOND MCCARTHY LLP**
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Phone: (310) 651-2997
Email: kphelps@diamondmccarthy.com

Karen K. Diep (305587)
**DIAMOND MCCARTHY LLP**
150 California Street, Suite 2200
San Francisco, CA 94111
Phone: (415) 692-5200
Email: kdiep@diamondmccarthy.com

*Special Litigation Counsel for*
*Michael G. Kasolas, Chapter 7 Trustee*
*For Fox Ortega Enterprises, Inc.*
*Dba Premier Cru*

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re<br><br>FOX ORTEGA ENTERPRISES, INC., dba PREMIER CRU<br><br>Debtor. | Case No. 16-40050-WJL<br><br>Chapter 7 |
| MICHAEL G. KASOLAS, Chapter 7 Trustee for Fox Ortega Enterprises, Inc. dba Premier Cru,<br><br>Plaintiff,<br><br>vs.<br><br>WAYNE NICHOLSON,<br><br>Defendant. | Adversary No. 18-04019<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR ORDER ADJUDICATING FACTS EXISTING WITHOUT CONTROVERSY**<br><br>Date: February 27, 2019<br>Time: 10:30 a.m.<br>Place: 1300 Clay Street, Courtroom 220<br>    Oakland, CA 94612<br>Judge: William J. Lafferty |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................... 1

   A.   Factual Background .......................................................................................... 1

   B.   Premier Cru Was a Fraudulent Scheme Orchestrated by John Fox. ........................ 2

   C.   Frustrated and Skeptical Customers Publicly Criticized the Company
        and In Some Instances, Sought Legal Action Against Premier Cru
        and John Fox. .................................................................................................. 5

   D.   Premier Cru Was In A Precarious Financial Condition At the Time of
        the Wine Transfers. .......................................................................................... 7

   E.   Defendant Is Sophisticated in Wine Transactions, Was Aware of Premier Cru's
        Inability to Deliver Promised Wines and Is Not Entitled to a Good Faith Defense ........ 7

II.   LEGAL STANDARD .................................................................................................. 11

III.  LEGAL ARGUMENT ................................................................................................ 12

   A.   The Wine Transfers Were Actual Fraudulent Transfers Under Bankruptcy
        Code Section 548(a)(1)(A) and California Civil Code Section 3493.04(a). ............ 12

   B.   The Elements of Actual Fraudulent Transfer Have Been Satisfied ........................ 13

      1.   The Wine Transfers were Transfers of the Debtor's Property to the Defendant. .......... 13

      2.   The Transfers Were Made With Actual Intent to Hinder, Delay,
           or Defraud Creditors ................................................................................. 14

         a)   The Ponzi scheme Presumption Applies. ............................................ 14

         b)   Undisputed Facts Establish A Confluence of Badges of Fraud ............. 17

   C.   Defendant Cannot Establish a Defense Under Section 548(c) of the Bankruptcy
        Code and Section 3438.08(a) of the Civil Code .................................................. 20

   D.   The Trustee Is Entitled To Prejudgment Interest. ............................................... 24

   E.   An Order Adjudicating Facts Existing Without Substantial Controversy
        Is Appropriate ................................................................................................ 25

IV.   CONCLUSION .......................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Collins*,
2010 WL 1141158 (S.D.N.Y. 2010) ........................................................................ 16

*Auza v. United Development, Inc.*,
319 Fed. App'x 685 (9th Cir. 2009) ...................................................................... 16

*Bank of Texas v. Patel*,
2017 WL 2985133 (S.D. Cal. July 12, 2017) ......................................................... 21

*Barclay v. MacKenzie (In re AFI Holding, Inc.)*,
525 F.3d 700 (9th Cir. April 16, 2008) ................................................................... 15

*Brandt v. nVidia Corporation (In re 3DFX Internative, Inc.)*,
389 B.R. 842 (2008) ............................................................................................. 13

*Brown v. Third National (In re Sherman)*,
67 F.3d 1348 (8th Cir. 1995) ................................................................................. 22

*Children's Hospital and Medical Center v. Bonta*,
97 Cal.App.4th 740 (9th Cir. 2002) ....................................................................... 24

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC
(In re Bayou Group, LLC)*,
439 B.R. 284 (S.D.N.Y. 2010) ............................................................................... 23

*Donell v. Kowell*,
533 F.3d 762 (9th Cir. 2008) ........................................................................ *passim*

*Ezra v. Seror (In re Ezra)*,
537 B.R. 924 (B.A.P. 9th Cir. 2015) ................................................................. 17, 18

*Filip v. Bucurencui*,
129 Cal.App. 4th 825 (2005) ................................................................................. 18

*Hayes v. Palm Seedlings Partners–A
(In re Agric. Research & Tech. Group, Inc.)*,
916 F.2d 528 (9th Cir.1990) .......................................................................... *passim*

*In re Acequia, Inc.*,
34 F.3d 800 (9th Cir. 1994) .................................................................................... 13

*In re Bernard L. Madoff Inv. Secs. LLC*,
445 B.R. 206 (S.D.N.Y. 2011) ............................................................................... 20

*In re Cohen*,
142 B.R. 720 (Bankr. E.D. Pa. 1992) .................................................................... 19

*In re Coombs*,
193 B.R. 557 (S.D. Cal. 1996) ............................................................................... 19

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT

Case 18-04011 Doc 19 Filed 01/29/19 Entered 01/29/19 Page 3 of 30

*In re Dereve,*
   381 B.R. 309 (Bankr. N.D. Fla. 2007) .................................................................19

*In re Dreier LLP,*
   2014 WL 47774 (S.D.N.Y. Jan. 3, 2014) ...........................................................16

*In re IFS Fin. Corp,*
   417 B.R. 419 (Bkrtcy.S.D.Tex. 2009) ................................................................16

*In re Kaiser,*
   722 F.2d 1574 (2d Cir. 1983) .............................................................................19

*In re Lake States Commodities, Inc.,*
   253 B.R. 866 (Bank. N.D. Ill. 2000) .................................................................22

*In re Meyer,*
   307 B.R. 87 (N.D. Ill. 2004) ..............................................................................19

*In re National Audit Defense Network,*
   367 B.R. 207 (Bankr. D. Nev. 2007) .................................................................16

*In re Norvergence, Inc.,*
   405 B.R. 709 (D. N.J. 2009) ..............................................................................16

*In re Pringle,*
   495 B.R. 447 (9th Cir. 2013) ......................................................................17, 19

*In re Russo,*
   1 B.R. 369 (Bankr. E.D.N.Y. 1979) ..................................................................20

*In re Singh,*
   2015 WL 1887939 (Bankr. E.D. Cal. Apr. 22, 2015) .......................................15

*In re Slatkin,*
   310 B.R. 740 (C.D. Cal. 2004) ..........................................................................17

*In re United Energy Corp.,*
   944 F.2d 589 (9th Cir. 1991) .............................................................................13

*McFarland v. GECC (In re Int'l Mfg. Grp., Inc.),*
   538 B.R. 22 (Bankr. E.D. Cal. 2015) .................................................................21

*Merrill v. Abbott* (*In re Indep. Clearing House, Co.*),
   77 B.R. 843 (D. Utah 1987) ..............................................................................17

*MFS/SunLife Trust-High Yield Series v. Van Dusen Airport Servs. Co.,*
   910 F. Supp. 913 (S.D.N.Y. 1995) ...................................................................20

*Nautilus v. Yang*
   11 Cal.App.5th 33 (2017) ..................................................................................21

*Plotkin v. Pomona Valley Imports, Inc. (In re Cohen),*
   199 B.R. 709 (9th Cir. BAP 1996) .........................................................14, 15, 22

iii

Case 18-04019 Doc 19 Filed 11/29/18 Page 4 of 33

*Ryan Beck & Co. v. Campbell*,
  2003 WL 22282380 (N.D. Ill. Oct. 2, 2003) ...................................................................20

*Schneider v. City of San Diego*,
  285 F.3d 784 (9th Cir. 2002) ...........................................................................................25

*Slatkin v. Neilson (In re Slatkin)*,
  525 F.3d 805 (9th Cir. 2008) ..............................................................................14, 15, 24

*United States v. Johnston*,
  245 F. Supp. 433 (W.D. Ark. 1965) .................................................................................20

**Rules**

11 U.S.C. § 54(D) ...................................................................................................................14

11 U.S.C. § 548(a)(1)(A) .................................................................................................13, 24

**Statute**

Cal. Civ. Code § 3439.04(a) ................................................................................12,14, 20

Cal. Civ. Code § 3439.04(a)(1) .............................................................................................18

Cal. Civ. Code § 3439.04(b) .................................................................................................18

Cal. Civ. Code § 3439.06(a) .................................................................................................13

Cal. Comm. Code § 2501(1)(b) ............................................................................................13

Cal. Comm. Code § 2105(2) .................................................................................................13

iv

# I.    INTRODUCTION

Defendant Wayne Nicholson ("Defendant") knew that Premier Cru was operating a Ponzi scheme and, in August 2013, Defendant plainly called it that. As a result of Defendant's discovery of the fraud and Defendant's threats of both criminal fraud and civil litigation, Premier Cru then delivered Defendant very valuable wines. The Motion seeks the avoidance and recovery of the value of the wines shipped to Defendant after Defendant learned of the fraudulent scheme and threatened Premier Cru. The value of wines transferred after that time totals $153,586.84, as set forth in detail on Exhibit "17" attached to the Declaration of Brian Nishi (the "Wine Transfers"). The values are the amounts that Premier Cru paid to purchase those wines on the open market. The Wine Transfers to Defendant were part of a fraudulent scheme run by Premier Cru involving the loss of tens of millions of dollars. The Trustee now seeks to avoid these fraudulent transfers so that the value can be reclaimed for the benefit of Premier Cru's creditors through this Motion for Partial Summary Judgment on the First and Second Claims for Relief to avoid the Wine Transfers on an actual fraudulent intent theory.[1]

## A.    Factual Background

1.    The Trustee is the duly appointed Chapter 7 trustee for the bankruptcy estate of Premier Cru. On January 8, 2016, Premier Cru entered bankruptcy proceedings (the "Petition Date"), at which time the Trustee was appointed by the Court.

2.    In 1980, John Fox ("Fox") co-founded Premier Cru with Hector Ortega ("Ortega") in Oakland, California. *See* Request for Judicial Notice in Support of Motion for Partial Summary Judgment ("RJN"), Ex. 1 (Plea Agreement), at p. 2. Ortega, did not actively participate in running the business. *See id.*, Ex. 1, at p. 3. Fox served as Premier Cru's President and on his own, made all significant business decisions. Specifically, Fox: (1) hired all the employees; (2) managed the finances of the company, including the payment of Premier Cru's bills and expenses; (3) managed

---

[1] The Trustee reserves the right to seek subsequent relief on the remaining Claims for Relief, including seeking summary judgment on other transfers of wine and cash on an actual fraudulent transfer theory or a constructive fraudulent transfer theory as to all transfers.

Case 18-04019   Doc 1   Filed 01/31/18   Entered 01/31/18 17:36:17   Page 6 of 30
PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT

obtaining business loans and other financing from banks or individuals to fund Premier Cru's business. *See* Plea Agreement, at p. 3.

3.　　Premier Cru was in the business of selling wine (*see* Declaration of Kathy Bazoian Phelps ("Phelps Decl."), Ex. 5 (Defendant's Responses to Plaintiff's Requests for Admissions ("Defendant's RFA"), at No. 20) and generally sold wine in two ways. *See* Plea Agreement, at p. 2. First, Premier Cru had a physical retail store where customers could purchase wine that was physically in stock. *See id*. Second, Premier Cru sold wine for which it did not yet physically have possession. *See id.* This wine was referred to as "pre-arrival" wine or "wine futures." *Id.*

4.　　Premier Cru sold pre-arrival wine through a website operated and maintained by Premier Cru or through salespeople who worked in the Premier Cru offices and reported directly to Fox. *See* Plea Agreement, at pp. 2-3. The "Terms and Conditions" associated with the sale of pre-arrival wine provided as follows:

> The term "Pre-Arrival" is applied to wines we have purchased (typically abroad) that have not arrived yet. Depending on the particular wine, the arrival time is typically 6+ months to over two years (in the case of Bordeaux Futures, for example).
>
> Many new releases of highly desirable, limited-production wines (ie – Burgundy, Rhone, Italian, etc.) are offered on a "Pre-Arrival" basis by our suppliers. These offerings typically take 6 to 18 months to arrive and are often the only way to source the wines before they sell out (and at optimal prices). We send an email notification when your wine arrives.

*See* Declaration of Brian Nishi ("Nishi Decl."), at ¶ 6. The majority of Premier Cru's revenue was derived from pre-arrival sales. *See* Plea Agreement, at p. 3.

**B.　　Premier Cru Was a Fraudulent Scheme Orchestrated by John Fox.**

5.　　On or about August 11, 2016, Fox entered into a guilty plea in his criminal case [*United States v. John Fox*, Case No. CR 16-281 JD, N.D. Cal] and executed the Plea Agreement in which he admitted that he operated Premier Cru as a fraudulent scheme. *See generally* Plea Agreement. In his Plea Agreement, Fox admitted that through Premier Cru's sale of pre-arrival wine, he "devised a scheme to defraud, and a scheme for obtaining property by means of false and

fraudulent pretenses, representations and omissions, through Premier Cru's sale of pre-arrival wine." Plea Agreement, at p. 3.

6.      In particular, Premier Cru's pre-arrival wine business was based on the premise that Premier Cru would contract to buy wine from Europe and would then sell the wine to its customers through Premier Cru's website and salespeople. *See id.,* at p. 3.

7.      Premier Cru either directly or indirectly represented to customers that the pre-arrival wines that were listed on Premier Cru's website, contained in Fox's email messages to customers, or sold by salespeople in Premier Cru's offices were wines that Premier Cru had actually already purchased. *See* Plea Agreement, at p. 3. Premier Cru also represented to customers, through its website as well as other sources, that Premier Cru would deliver these wines to customers within a time period of approximately six months to two years after customers had paid for the wine. *See id.*

8.      These representations were false and driven by Fox, who knew that they were false at the time that he made them or caused his salespeople to make. Instead, Fox knew that he could not or would not obtain many of the pre-arrival wines sold by Premier Cru largely for two reasons in which he failed to inform his customers, lenders, and employees. *See id.*

9.      First, Fox falsified purchase orders for wine that he had not contracted to purchase and entered them into Premier Cru's inventory for sale. *See id.* Fox first began creating fraudulent purchase orders for pre-arrival wine in approximately 1993 or 1994. The percentage of the purchase orders entered for pre-arrival wine that were entirely or partially fraudulent increased over time, such that by 2010, it constituted a significant portion of the business. *See* Plea Agreement, at p. 6. These falsified purchase orders took two forms – either purchase orders that were entirely false, wherein Fox had contracted to purchase the wine but fraudulently increased the number of bottles covered by the contract. *See id.* Fox deliberately priced these wines at prices below the market price knowing that he had not and would not need to actually pay for this from any vendors. *See* Plea Agreement, at pp. 3-4. Once entered into Premier Cru's inventory system, these wines became available for sale on Premier Cru's website, were advertised through email, or could be sold by salespeople in Premier Cru's offices. *See* Plea Agreement, at p. 3.

10.    Based on Fox's misrepresentations, customers paid Premier Cru to purchase wines believing that Premier Cru had actually purchased them and would eventually deliver them. *See id*, at p. 4. Fox admitted in his Plea Agreement that he attempted to sell approximately $ 20 million worth of such falsified wine through Premier Cru from 2010 to 2015. *See id.* at p. 4. The Debtor's records reflect that the amount of altered or falsified wine transactions was significantly higher in this time period. *See* Nishi Decl., at ¶ 7.

11.    Second, in other instances, Fox actually did contract with Premier Cru's foreign suppliers on behalf of Premier Cru to purchase wine, generally with the promise to pay those foreign suppliers within 30 days. *See* Plea Agreement, at p. 4. In many of these instances, Fox knew that Premier Cru would not be able to payment within 30 days, or ever, because Fox had (1) embezzled funds from Premier Cru's business accounts that Fox should have used to pay Premier Cru's suppliers and (2) "**diverted money coming in from current customers to obtain wine for prior customers who never received their wine.**" *Id*. (emphasis added). In other words, Premier Cru was a Ponzi scheme orchestrated by Fox.

12.    Fox embezzled Premier Cru's business accounts and American Express card to pay various personal expenses such as his wife's personal credit card and the purchase and leasing of expensive cars, in addition to his salary and partner draw. *See* Plea Agreement, at p. 4.

13.    Fox knew at the time that he embezzled these funds that they made it impossible for Premier Cru to fulfill all its obligations to deliver wine to customers and to purchase wines from its suppliers, yet he continued to sell wine to customers knowing the falsehood of his representations about whether and when the wine would be delivered. *See id.*

14.    The diversion of funds to purchase wine for prior customers overtime led to many customers complaining to Premier Cru about not receiving the wine for which they had paid. *See id.*, at p. 4. Fox directly or indirectly lied to these customers offering various falsified excuses and promises for wine that he knew was not going to be delivered. *See id.*, at pp. 4-5. Fox also instructed his salespeople or other employees to tell customers things Fox knew were false. *See* Plea Agreement, at p. 5.

15. When customers complained repeatedly or forcefully, Fox arranged to deliver wine to them, even if he had not previously purchased or acquired the wine for which they had paid. *See id.* He often did this by delivering to those customers wine for which other customers had paid or, in many cases, by purchasing the wine from other suppliers, usually at prices much higher than those for which he had sold the wine in the first place. *See id.* In fact, a substantial amount of money in Premier Cru's bank accounts went to purchase wine in this manner. *See id.*

16. Fox took these and other actions to conceal his ongoing fraud to lull customers into a false sense that Premier Cru was a legitimate business, to cause these customers to continue to purchase wine from Premier Cru, and to prevent them from complaining to law enforcement authorities. *See* Plea Agreement, at p. 5. Fox also concealed all of the above from Premier Cru's lenders, by falsifying Premier Cru's financial records, and the lenders extended credit to Premier Cru as a result of misrepresentations Fox made and the falsified records he created. *See id.*

**C.    Frustrated and Skeptical Customers Publicly Criticized the Company and In Some Instances, Sought Legal Action Against Premier Cru and John Fox.**

17. Long before Defendant was himself calling this a Ponzi scheme, many of Premier Cru's customers had publicly become frustrated, unpersuaded, and dissatisfied with Fox's constant excuses for delay and promises of delivery and themselves had openly referred to Premier Cru as a fraud and a Ponzi scheme. Several customers realized that they were not alone with the incessant delays and excuses by learning of other customers' exact situations directly from them or by reading on-line forums, such as Yelp and Wine Spectator. By way of example, one customer wrote: "[i]t's not just the reviews [on Yelp] and at other forums (Wine Spectator, for instance), I have personally heard from 2 independent wine merchants with the exact same problem with Premier Cru, so my experience is not an isolated incidence [sic]." *See* RJN, Ex. 3 (printout of Yelp reviews of "Premier Cru Fine Wines"), at p. 3.

18. Customers shared their disbelief and skepticism with the company's "nonsensical" excuses or "stories" regarding delayed deliveries and warned others about ordering "wine futures." One customer on September 20, 2010, advised: "Careful ordering anything they do not have in stock. They will tell you various nonsensical stories about where wine is for months and you can

5

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

wait over a year for future. The next year's vintage will already be in wine stores all around the country and they will still not have fulfilled your order for the last year . . . They will keep and use your money for over one year." *See* RJN, Ex. 4 (printout of Yelp reviews of "Premier Cru Fine Wines"), at p. 5. Another customer on April 6, 2012 warned: "DON'T BUY WINE FUTURES FROM PREMIER CRU!!!!! These folks simply take your money then dump you . . . Today I cannot get them to ship any of the 2005, 2006, 2007 or 2008 wine futures ordered and paid for as much as six years ago. Other retailers long since delivered their orders. Premier Cru makes up stories, promises to ship, then doesn't[.]" *See* RJN, Ex. 4, at p. 8.

19.     Some customers even experienced delay in receiving refunds after canceling their order. On December 16, 2011, one customer complained: "They said they couldn't credit me but would send a check within the week. The check didn't come." *See id.,* Ex. 4, at p. 4.

20.     Many customers even considered Premier Cru's a fraudulent scheme and in fact, a Ponzi scheme. One customer on April 20, 2013, claimed: "NOWHERE was there ANY apology for this trip down a "wine Ponzi." *See id.*, Ex. 3, at p. 4. On August 3, 2013, another customer claimed that Premier Cru "should be reported" and it was "like a wine Ponzi Scheme." *See id.,* Ex. 3, at p. 5. Two months later, one customer wrote on November 10, 2013:

> They lie about everything. They have no shame to make promises that; it is always someone else fault and we will get our wines next month. And this goes on month after month after month after month. They are shameless people who I think are running a Ponzi scheme, living on other peoples money. . . I learned a lot about how they operate during this time, the reason the prices they offer are lower is they are doing some sort of Ponzi scheme . . .

*See* Ex. 3, at p. 6. One customer advised on April 15, 2014: "**DO NOT ORDER WINE FROM THIS ESTABLISHMENT!!!!!! THEY ARE CROOKS!!!**" *See* Ex 3, at p. 8 (emphasis added).

21.     Eventually several customers considered legal action. As one customer wrote on October 11, 2013, "[t]his is by far the biggest pyramid scam you can imagine . . . I am currently weighing my legal options. *See* Ex. 3, at p. 6. In fact, at least five customers filed lawsuits against Premier Cru, as early as December 2014, for, among other things, **fraud, conversion, unfair business practices** in connection with their promised and paid for wines. *See* Exhibit 2 (Five Filed

Complaints against Premier Cru in the Northern District of California and Superior Court of California, Alameda County (emphasis added)).

**D.      Premier Cru Was In a Precarious Financial Condition at the Time of the Wine Transfers.**

22.     At the time of Premier Cru's bankruptcy, approximately 4,500 customers had not received pre-arrival wine for which they had paid. *See* Plea Agreement, at p. 6. These individuals were victims of Fox's scheme in which he operated through Premier Cru. *See id.* Furthermore, at the time of Premier Cru's bankruptcy, customers had paid at least approximately $45 million for wines that they had not received. *See id*. But Premier Cru experienced financial concerns *well before* the Petition Date.

23.     Fox's own admissions illustrate Premier Cru's precarious financial condition, including (a) Premier Cru not being able to pay foreign suppliers within 30 days, *or ever* (*see* Plea Agreement, at p. 4 (emphasis added)); (b) the embezzlement of funds that made it ***impossible*** for Premier Cru to fulfill all its obligations to customers and obtain the wines it had actually contracted to purchase (*see id.* (emphasis added)); and (c) a substantial amount of money in Premier Cru's bank accounts used to purchase what appears to be hush wine at higher prices for disgruntled customers who had already paid (*see id.*, at p. 5).

24.     Premier Cru presently has one or more creditors whose claim arose either before or after the transfers to the Defendant. *See* Claims Register, Case No. 16-40050-WJL (2,354 claims filed against the estate) and Claim No. 467-1 (example of an existing and unsecured creditor).

**E.      Defendant Is Sophisticated, Was Aware of Premier Cru's Inability to Deliver Promised Wines and Is Not Entitled to a Good Faith Defense.**

25.     The Wine Transfers to Defendant were transfers made as part of Premier Cru's fraudulent scheme. Defendant Nicholson had a longstanding business with Premier Cru since 1986. Phelps Decl., Ex. 6 (Email from Nicholson to Michael Glasby, dated March 28, 2013), at Nicholson000015. As set forth below, that relationship took a significant turn for the worse in 2013 when Defendant could not get his wines from Premier Cru, and he became convinced of a fraud.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

26.     It is undisputed that Premier Cru made transfers of property of the Debtor to the Defendant over the course of the fraudulent scheme, and after a point in time when Defendant knew that Premier Cru was running a fraud. This Motion is limited to the transfers made to Defendant after that point in time. *See* Nishi Decl., Ex. 17.

27.     Defendant has extensive knowledge and experience with wines, including purchasing and collecting wines from Premier Cru and other wine sellers. By way of example, Defendant (a) maintains or maintained a wine cellar (Phelps Decl., Ex. 7 (Email from Nicholson to Premier Cru representative, dated January 17, 2011 at Nicholson000003); (b) possesses or possessed highly desirable wines (*see id.,* Ex. 5 (Defendant's RFA), at No. 10 (Defendant admits that first growth Bordeaux wines and several other wines purchased from Premier Cru are "considerably highly desirable wines by wine collectors."); (c) understands the value of original wooden cases ("OWCs") and thus, demands that they are included with his the shipment of his wines (*see id.* Ex.8 (Email from Nicholson to Premier Cru representative, dated November 15, 2010) ("Please make sure you shipping dept. includes the OWC's.") at Nicholson000001) and Ex 9 (Email from Nicholson to Premier Cru, dated April 10, 2011) at Nicholson000007 ("[A]ny change you still have the OWC they came in? Will pay to ship if so, please advise.")); and (e) read or reads wine "blogs" or websites by critics (*see id.*, Ex. 10 (Email from Nicholson to Premier Cru representative, dated April 11, 2011) at Nicholson000010 ("Just FYI, here is the thread from Jancis Robinson detailing her daily progress through the ***primeurs***." (emphasis included)).

28.     By August 2013, Defendant was well aware of issues with Premier Cru. As set forth below, Premier Cru was not delivering, and had not delivered wines to him within the period he expected the wines would be delivered. *See* Phelps Decl., Ex. 5 (Defendant's RFA), at No. 11. Additionally, the public record was replete with allegations of fraud and Ponzi scheme with respect to Premier Cru when Defendant received the Wine Transfers after Defendant himself had labeled it a Ponzi scheme in August 2013.

29.     As early as February 2011, Defendant began experiencing delayed (over a month) responses from Premier Cru regarding inquiries: "Still never had any response to this issue, you

were going to check with one of the owners and get back to me...." *See* Phelps Decl., Ex. 13 (Email from Nicholson to Michael Glasby, dated February 24, 2011) at Nicholson000005.

30.     Defendant emailed Michaela Glasby, a Premier Cru employee, on May 28, 2013, regarding his frustration and knowledge of Premier Cru's false statements:

> I'm sure you can understand this. I truly wish the firm would clean up its act, and not subject customers like me to the extreme stress, anxiety and aggravation that these utterly unacceptable, unprofessional, inexcusable and **deceitful practices** that ensnared me into these future purchases have caused.
>
> I am already dealing with a lot of stress and responsibilities elsewhere in my professional life, and I truly did not need this betrayal of trust and the additional mental anguish. I had trusted Premier Cru, due to longstanding business going back to 1986. Yours was the last firm I would have expected to have these futures problems with, which explains why the bulk of my 2009 Bordeaux purchases were with you. **To be essentially be defrauded into parting with hundreds of thousands of dollars, under false pretenses** that your firm had already purchased and owned these wines, is a position that I am absolutely not enjoying being in, and I look for this utter nightmare to end.

*See* Phelps Decl., Ex. 6 (Email from Nicholson to Michael Glasby, dated March 28, 2013) at Nicholson000014 - 000015 (emphasis added).

31.     Defendant expressed similar frustrations to one of Premier Cru's representatives: "I'm getting very tired, extremely tired in fact, of having to repeatedly call or email your outfit." Phelps Decl., Ex. 14 (Email from Nicholson to Premier Cru representative, Michael Glasby, dated June 26, 2013) at Nicholson000017.

32.     A delay with Defendant's refund even led him to question Premier Cru's cash needs, since the company appeared "desperate for funds": "And what now, you believe that if you just ignore me, I'll go away? The credit has STILL not appeared on my bank statement. What, is Premier Cru so desperate for funds they are hesitate to process a refund?" Phelps Decl., Ex. 14 (Email from Nicholson to Michael Glasby, dated June 26, 2013) at Nicholson000017.

33.     For Defendant, store credit was not an option: "This is the last time I will ask politely for the refund. Again, no, I do NOT want 'store credit.' Given the appallingly sleazy conditions surrounding the monies your outfit already owes me, to suggest I should add to that yet

additional debt I'm due is rather absurd, don't you think?" Phelps Decl., Ex. 14 (Email from Nicholson to Michael Glasby, dated June 26, 2013) at Nicholson000017.

34.     Defendant threated to sue Premier Cru for failure to deliver wines in August of 2013 (*see* Phelps Decl., Ex. 5 (Defendant's RFA), at No. 3) by sending an email to Fox and another Premier Cru representative on August 15, 2013 with subject a line: "**WARNING: LAWSUIT AND CRMINAL FRAUD CHARGES PENDING**." *See* Phelps Decl., Ex. 5 (Defendant's RFA), at No. 4)(emphasis added). Defendant unequivocally (a) called Premier Cru a "**PONZI SCHEME**" and (b) promised to file a civil suit for "**FRAUD**" and press "**CRIMINAL CHARGES**" against Fox (and his staff)," if Premier Cru did not make Defendant "WHOLE" relative to the amounts previously paid to it by him. *See* Phelps Decl., Ex. 15 (Email from Nicholson to Fox and Glasby, dated August 15, 2013) at Nicholson000018) (emphasis added); Ex. 5 (Defendant's RFA), at No. 4.

35.     When Fox failed to ship the OWC's with Defendant's last shipment, Defendant did not believe that the OWCs existed for the bottles and that Fox was delaying to buy more time to "scrounge" them up:

> It is additionally disturbing to get this info that somewhere you have the OWC's but didn't ship. This makes absolutely no sense . . . and the logic to withhold shipment till next week is inexplicable to anyone with any experience at all in buying wine. It instead seems clear the OWC's for these bottles don't exist, and you're scrounging some up in the meantime.

*See* Phelps Decl., Ex. 12 (Email from Nicholson to Fox, dated October 15, 2013) at Nicholson000047.

36.     More delay prompted Defendant to send another email on October 29, 2013, inquiring the status of his wines: "John [Fox], where is the rest of my stuff? Below, on Oct. 11, you said they would be here around Oct. 18 . . . Please let me know when I will have in my possession the rest of my outstandings with you." Ex. 11(Email from Nicholson to Fox) at Nicholson000081.

37.     Defendant **knew** that other customers were also experiencing delay with the shipment of their wines. In fact, Defendant emailed Premier Cru, on behalf of a "very, very good friend," demanding that his friend's wines be shipped immediately to him: "Stewart McSherry in Los Angeles also needs to have ****ALL**** of the rest of his stuff with you shipped to him

immediately, if not sooner" and that his friend had accepted the "baloney false reassurances for so very long" of one Premier Cru's representatives. Phelps Decl., Ex. 16 (Email from Nicholson to Fox, dated January 10, 2014) at Nicholson000111. Defendant also advised Fox "[n]o more games, no more string-alongs, no more excuses" and that Defendant, was "no so nice, not by any stretch of the imagination" and that "there's no point taking [Premier Cru] staff's entreaties to be 'patient', because [Defendant was] fully aware [] that [Premier Cru would] only take advantage of it." . Phelps Decl., Ex. 16 (Email from Nicholson to Fox, dated January 10, 2014) at Nicholson000111.

38. It was imperative for Defendant that he received all his wines, despite glaring "red flags," so that he was no longer "exposed" to Premier Cru. *See* Phelps Decl., Ex. 12 (Email from Nicholson to Fox, dated August 26, 2013) at Nicholson000050 ("Understandably, I need to get out of this exposure position as soon as possible.") and *id.* (Email from Nicholson to Fox, dated October 15, 2013) at Nicholson000047 ("Since I am exposed to your firm . . . ").

39. As set forth in detail herein, Defendant could have and should have discovered the complaints and other public postings about Premier Cru's financial problems and the allegations of fraud long before the Wine Transfers were made.

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable in this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment shall be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. Rule Civ. Proc. 56. A party seeking summary judgment must first establish by reference to the pleadings, judicially noticed matters, or discovery responses that there are no genuine disputes concerning the material facts upon which a claim or defense lies, and that the moving party is entitled to judgment as a matter of law. Fed. Rule Civ. Proc. 56(c). If the movant makes the showing, the burden shifts to the respondent to come forward with evidence, in specific and admissible form, to demonstrate that a triable issue exists. Fed. Rule Civ. Proc. 56(e).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

# III. LEGAL ARGUMENT

## A. The Wine Transfers Were Actual Fraudulent Transfers Under Bankruptcy Code Section 548(a)(1)(A) and California Civil Code Section 3439.04(a).

The Trustee seeks the avoidance and recovery of the Wine Transfers under 11 U.S.C. §§ 544, 548, 550 and California Civil Code § 3439.04. "Under both the [C]UFTA and Bankruptcy Code § 548, the trustee has the burden of proving the elements of a fraudulent transfer by a preponderance of the evidence." *Brandt v. nVidia Corporation (In re 3DFX Internative, Inc.)*, 389 B.R. 842, 863-64 (2008).

Section 548 provides, in relevant part, that a trustee may avoid any transfer of an interest of the debtor in property that was made on or within two years before the date of the filing of the bankruptcy petition as an actual fraudulent transfer. 11 U.S.C. § 548(a)(1)(A). To avoid transfers outside this two year time period, § 544(b) of the Bankruptcy Code permits a bankruptcy trustee to avoid any transfer of a debtor's property that would be avoidable by an unsecured creditor under applicable state law. *See In re Acequia, Inc.,* 34 F.3d 800, 809 (9th Cir. 1994). One creditor of any amount will suffice for the purposes of § 544(b). *Id.* at 809-10. California's fraudulent transfer statutes are similar in form and substance to the Bankruptcy Code. *In re United Energy Corp.,* 944 F.2d 589, 594 (9th Cir. 1991). *Compare* 11 U.S.C. § 548(a)(1) *with* Cal. Civ. Code § 3439.04(a) (allowing a transfer to be avoided when the debtor acted with "actual intent to hinder, delay, or defraud" an entity or creditor, or where indicia of constructive fraud are present). Section 3439.04 extends the avoidance provides a reach back of seven (7) years prior to the Petition Date.

To prevail on an actual fraudulent transfer claim under both Bankruptcy Code and California's equivalent statute, a trustee must show that the debtor made a transfer with actual intent to hinder, delay, or defraud any entity to which the debtor was or became indebted. *See* 11 U.S.C. § 548(a)(1)(A) and § 3439.04(a).

Here, as Fox noted in his Plea Agreement, at least one unsecured creditor (i.e., foreign suppliers and customers) exists allowing for the Wine Transfers made by the Debtor to Defendant within seven years before the Petition Date avoidable under Sections 3439.04(a) and 3439.08(a). *See* Plea Agreement, at pp. 4 and 6; *see also* Claim No. 467-1. As demonstrated below, the Trustee

12

has met the requisite elements for avoiding the Wine Transfers as actual fraudulent transfers under the Bankruptcy Code (for transfers within two years and California's UFTA for all of the transfers.

**B.  The Elements of Actual Fraudulent Transfer Have Been Satisfied**

    **1.  The Wine Transfers Were Transfers of the Debtor's Property to Defendant.**

It is undisputed that Premier Cru made transfers of property of the Debtor to the Defendant over the course of the fraudulent scheme. Specifically, Premier Cru made the Wine Transfers set forth in Exhibit "17." *See* Answer, at ¶ 25 and 36.

A "transfer" under the Bankruptcy Code is defined as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) - property; or (ii) an interest in property. 11 U.S.C. § 54(D). California's definition of a "transfer" is nearly the same. *Compare with* Cal. Civ. Code § 3439.03(m) (a "transfer" is "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money[.]").

As for the timing of a transfer, § 548(d) provides that "a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee." Similarly, the CUVTA provides that: "A transfer is made . . . with respect to an asset that is not real property or that is a fixture, when the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien otherwise than under this chapter that is superior to the interest of the transferee." Cal. Civ. Code § 3439.06(a).

Here, the date of the "transfer" is the shipping date, when the bottle of wine was both identifiable and in existence. "Goods must be both existing and identified before any interest in them can pass." Cal. Comm. Code § 2105(2).  Importantly, "identification" under the UCC can occur only "when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers." Cal. Comm. Code § 2501(1)(b).  The wines transferred were not in existence or in the Debtor's control when the Defendant made payment (as is indicated by the Debtor's extensive delays and excuses in delivering wines to Defendant), so title could not and did

not pass until the wines were acquired by the Debtor and shipped to Defendant. Fox fraudulently represented that Premier Cru had already purchased the pre-arrival wines when he took money from Defendant and other customers. See Plea Agreement, at pp. 3-4. These wines were neither "in existence" nor could they be "identified" for purposes of the UCC at the time Defendant provided payment to Premier Cru because the entire transaction was a sham. Rather, these wines were "both existing and identified" only when Premier Cru acquired the wines and they were actually shipped to Defendant.

### 2. The Transfers Were Made With Actual Intent to Hinder, Delay, or Defraud Creditors.

The inquiry is the same under § 548(a)(1) of the Bankruptcy Code and § 3439.04(a) of California's Civil Code in determining that Fox's sales were actually fraudulent as having been made *with actual intent* either to hinder or to delay or to defraud creditors. *See Cohen v. Pomona Valley Imports, Inc. (In re Cohen)*, 199 B.R. 709, 716 (B.A.P. 9th Cir. 1996) (referencing 11 U.S.C. § 548(a)(1) and Cal. Civ. Code § 3439.04(a)). "The focus in the inquiry into actual intent is on the state of mind of the debtor. Neither malice nor insolvency are required." (*Cohen.* at 716-17). "Actual intent" is found by the existence of a Ponzi scheme or a confluence of "badges of fraud."

#### a) The Ponzi scheme Presumption Applies.

The Ninth Circuit has consistently held that the mere existence of a Ponzi scheme is sufficient to establish the actual intent to hinder, delay, or defraud creditors under 11 U.S.C. § 548(a) and California Civil Code § 3439.04(a), or another state's equivalent fraudulent transfer statute. *See, e.g., Slatkin v. Neilson (In re Slatkin)*, 525 F.3d 805, 814 (9th Cir. 2008) (examining 11 U.S.C. § 548(a) and Cal. Civ.Code § 3439.04(a)); *Barclay v. MacKenzie (In re AFI Holding, Inc.)*, 525 F.3d 700, 703, 2008 WL 1734583, at *3 (9th Cir. April 16, 2008); *Hayes v. Palm Seedlings Partners–A (In re Agric. Research & Tech. Group, Inc.)*, 916 F.2d 528, 534–35 (9th Cir.1990); *Plotkin v. Pomona Valley Imports, Inc. (In re Cohen)*, 199 B.R. 709, 717 (9th Cir. BAP 1996).

Courts frequently rely on a guilty plea or plea agreement to find the existence of fraudulent intent and Ponzi scheme. *E.g., AFI Holding,* 525 F.3d at 704 (Defendant's "plea demonstrates the existence of fraudulent intent and a Ponzi scheme"); *In re Singh,* 2015 WL 1887939, at *12 (Bankr.

14

Case: 12-04000 Doc# 25 Filed: 01/19/18 Entered: 01/19/18 16:01:07 Page 19 of 30

E.D. Cal. Apr. 22, 2015) ("[B]ased on the debtor's guilty plea and plea agreement[,] the court finds there is conclusive evidence that the debtor was operating a Ponzi scheme."). In fact, the Ninth Circuit court in *Slatkin* specifically held "a debtor's admission, through guilty pleas and a plea agreement admissible under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's fraudulent intent" and "precludes relitigation of that issue." *Slatkin*, 525 F.3d at 814. The *Slatkin* court held that the plea agreement is admissible under Federal Rule of Evidence 807 in granting summary judgment. *Slatkin. Id.* at 812.

Here, there is no genuine issue of material fact that Fox's guilty plea, which is admissible under Rule 807 of the Federal Rules of Evidence, clearly demonstrates the existence of fraudulent intent and a Ponzi scheme. Specifically, Fox admitted that he (1) "devised a scheme to defraud, and a scheme for obtaining property by means of false and fraudulent pretenses, representations and omissions, through Premier Cru's sale of pre-arrival wine" and (2) "diverted money coming in from current customers to obtain wine for prior customers who had never received their wine." Plea Agreement, at pp. 3-4.

Premier Cru's scheme meets the definition of a Ponzi scheme. The flow of funds in Premier Cru's scheme for which Fox was sent to prison bore the hallmark signs of a Ponzi scheme – i.e., the funds paid by later customers of the debtor are used to pay promised dividends to earlier customers. Although Premier Cru sold wine and was not an investment program, "[c]ase law has revealed that a clever twist on the Ponzi concept will not remove a fraudulent scheme from the definition of Ponzi."[2] The mere fact that the alleged business in question involved the sale of physical goods

---

[2] *Forman v. Salzano* (*In re Norvergence, Inc.*), 405 B.R. 709, 730 (Bankr. D. N.J. 2009; *In re Dreier LLP*, 2014 WL 47774, at *9 (S.D.N.Y. Jan. 3, 2014) ("At bottom, the label Ponzi scheme applies to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud.") (internal quotations omitted); *Auza v. United Development, Inc.*, 319 Fed. App'x 685 (9th Cir. 2009) (affirming the bankruptcy court's finding that the debtor operated a Ponzi scheme where the debtor "made payments to lenders from money obtained from later lenders, rather than from business profits."); *In Armstrong v. Collins*, 2010 WL 1141158, * 23 (S.D.N.Y. 2010) (citing *Norvergence, Inc.*, 405 B.R. at 730 ) (addressing this same argument, noting that "even assuming

does not preclude applying the label of a Ponzi scheme. The label of "Ponzi scheme" is also not the only method in which a debtor can defraud its creditors. As a result, courts have found actual intent in instances where the underlying fraud was not labelled as a Ponzi scheme.[3] One court specifically addressing the issue stated the following:

> Though the Fifth Circuit cases considered fraudulent organizations deemed "Ponzi schemes," this Court makes no findings regarding when and if the Interamericas Companies became a Ponzi scheme. The Fifth Circuit's reasoning applies whether the organization neatly fits within a judicially constructed definition of a Ponzi scheme or was a fraudulent scheme that had some, but perhaps not all, attributes of the traditional Ponzi scheme. When an organization perpetuating a fraud makes a transfer necessary for continuation of the fraud, the transfer is made with the actual intent to defraud.

*In re IFS Fin. Corp.*, 417 B.R.419, 439 n. 15 (Bkrtcy.S.D.Tex. 2009) (emphasis added)

Moreover, the logic of the Ponzi scheme presumption and resulting finding of intent to defraud applies with equal force to the fraud orchestrated by Fox. As one oft cited court stated:

> One can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi *Merrill* scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, . . . and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.

*Merrill v. Abbott* (*In re Indep. Clearing House, Co.*), 77 B.R. 843, 861 (D. Utah 1987) (emphasis added); *In re Slatkin,* 310 B.R. 740, 748-49 (C.D. Cal. 2004).[4]

---

[the fraudster] did not premise or represent high rates of return, this does not mean that he was not running a Ponzi scheme.").

[3] *See e.g., In re National Audit Defense Network*, 367 B.R. 207, 219-22 (Bankr. D. Nev. 2007) (finding actual intent to defraud even where trustee's expert stated the debtor "was not a Ponzi scheme"); *see also Agric. Research*, 916 F.2d at 535-36 (9th Cir. 1990) ("'knowledge that a transaction will operate to the detriment of creditors is sufficient for actual intent.'") (quoting *In re Am. Prop. Inc.*, 14 B.R. 637, 643 (Bankr. D. Kan. 1981)).

[4] The Ponzi scheme presumption also permits a presumption of insolvency during the time in which the Ponzi scheme was operating. *Donell v. Kowell*, 533 F.3d at 770-71 (9th Cir. 2008) (presumption that that a debtor who is running a Ponzi scheme is insolvent).

16

In this present case, Fox's scheme involved a bargain price up front for wine for which there was a one-time return in the form of delivery of the wine, which was purchased by Premier Cru with funds of subsequent customers. Fox's Plea Agreement is sufficient to establish his knowledge that future wine sales to Premier Cru's customers would necessarily go unfulfilled. More specifically, Fox knew that he would be unable to make required payment to his suppliers or to deliver wines to customers and thereby satisfy Premier Cru's obligations "because (1) [he] embezzled money from Premier Cru's business accounts that [he] should of used to pay Premier Cru's suppliers or (2) [he] diverted money coming in from current customers to obtain wine for prior customers who had never received their wine." Plea Agreement at p. 4. Whether termed as a Ponzi scheme or some other form of fraud, the Plea Agreement conclusively establishes that Premier Cru made the identified transfers *with the actual intent* to hinder, delay, or defraud its creditors.

### b) Undisputed Facts Establish a Confluence of Badges of Fraud

Even if the undisputed facts regarding the fraud were somehow insufficient to establish intent on the basis of a Ponzi scheme presumption, there are numerous badges of fraud sufficient to establish fraudulent intent. It is well settled that "[b]ecause direct evidence of intent is rare, courts tend to infer the existence of an intentional fraudulent transfer from the circumstances surrounding the transfer." *In re Pringle*, 495 B.R. 447 (9th Cir. B.A.P. 2013); *Ezra v. Seror (In re Ezra)*, 537 B.R. 924, 930 (B.A.P. 9th Cir. 2015). To facilitate this process, California's UFTA enumerates eleven non-exclusive "badges of fraud" for courts to consider in deciding whether the requisite intent existed that include:

1. Whether the transfer or obligation was to an insider;
2. Whether the debtor retained possession or control of the property transferred after the transfer;
3. Whether the transfer or obligation was disclosed or concealed;
4. Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
5. Whether the transfer was of substantially all of the debtor's assets.
6. Whether the debtor absconded;
7. Whether the debtor removed or concealed assets;

8. Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

9. Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred;

10. Whether the transfer occurred shortly before or shortly after a substantial debt was incurred; and

11. Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

Cal. Civ. Code § 3439.04(b). No single factor necessarily is determinative, and no minimum or maximum number of factors dictates a particular outcome. *Ezra*, 537 B.R. at 931. In fact, the presence of only one or two factors may be enough to support a finding of intentional fraud. *See Filip v. Bucurencui*, 129 Cal. App. 4th 825, 834 (2005).

Here, Fox has admitted to his fraudulent intent, and the Trustee has presented substantial evidence regarding a number of "badges of fraud" to establish "actual intent" under Section 3439.04(a)(1) of the Civil Code:

(a) Premier Cru was insolvent throughout the Relevant Period with liabilities far exceeding its assets. (*See* Plea Agreement, at p. 4) at the time of Wine Transfers (Answer, ¶¶ 25-27, 37) (*see Donell v. Kowell*, 533 F.3d at 770-71 (9th Cir. 2008));

(b) Premier Cru had incurred and was continuing to incur substantial debt by incurring new fraudulent wine obligations throughout the Relevant Period while it made transfers to creditors, like the Defendant (*see* Plea Agreement, at p. 4);

(c) Premier Cru attempted to conceal the nature of the transactions with creditors by falsifying records (*see* Plea Agreement, at p. 3), making excuses regarding delay of wine shipments, and eventual cash settlement payments rather than delivering promised wine (*see id.,* at pp. 4-5);

(d) Debtor concealed the nature of the transactions by: (i) making false statements that it had purchased wines from its suppliers; (ii) promising delivery of wines but failing to fill orders; (ii) entering into buy back agreements with no intention of fulfilling those agreement; (iv) promising cash payments and then delaying or failing to make the payments; (v) delivering checks that bounced; and (iv) otherwise making efforts to conceal the fraud through false statements to customers regarding the status of their orders;

(e) Transfers to the Defendant were made while Premier Cru was under constant threat of potential lawsuits and at a time when complaints had actually been filed[5] (*see* Plea Agreement, at p. 5; Exhibit "2");

(f) Premier Cru concealed and removed assets by (i) delivering wine to complaining customers that other customers had paid for (*see* Plea Agreement, at p. 5) and (ii) transferring large sums of money for Fox's personal benefit (*see id.*, at p. 4);

(g) Premier Cru made these obligations and transfers in exchange for less than reasonably equivalent value by pricing wines below market price, and with regard to the Defendant, the amount received Defendant was not reasonably equivalent to the value of the wine they received (*see* Nishi Decl., Ex. 17);

(h) Premier Cru's patterns, series of transactions, and course of conduct and cumulative effect whereby it acquired funds from new customers to fulfill obligations to existing creditors, including the Defendant, were designed to defraud creditors (*see* Plea Agreement, at pp. 3-4). No other inference is rational;[6]

(i) The general chronology of events and the transactions under inquiry indicate the intent to defraud as the purpose of the fraudulent transactions was to provide liquidity to fuel the fraud and for Fox's improper diversions and embezzlement. *See* Plea Agreement, at p. 4. In fact, Premier Cru's fraudulent pre-arrival wine transactions naturally increased because of its need for more and more cash to pay for prior obligations (*see id.*, at p. 6);

(j) Premier Cru's conduct was both exceptional and peculiar by falsifying accounting records, making false statements to customers, and generally utilizing payments from later customers to fulfill obligations owed to prior customers (*see id*, at pp. 3-4);

(k) Premier Cru made significant misrepresentations by falsifying statements, concealing facts, and conducting its business under false pretenses. Specifically, Premier Cru made misrepresentations about: (a) its financial condition (*see* Plea Agreement, at p. 5); (b) its contractual relationships with suppliers and right to receive the wines in question (*see id*., at p. 4); (c) its inventory balances (*see id.*, at p. 3); and (d) the purported reason for delays in wine delivery (*supra*, Parts I.C and D);

---

[5] *In re Pringle*, 495 B.R. 467.

[6] *E.g., In re Coombs*, 193 B.R. 557, 564 (S.D. Cal. 1996); *In re Kaiser*, 722 F.2d 1574, 1583 (2d Cir. 1983); *In re Meyer*, 307 B.R. 87, 91-92 (N.D. Ill. 2004); *In re Cohen,* 142 B.R. 720, 728 (Bankr. E.D. Pa. 1992); *In re Dereve*, 381 B.R. 309, 326 (Bankr. N.D. Fla. 2007).

(l) Premier Cru's transactions with the Defendant and its other customers were questionable and not in ordinary course for a legitimate business[7] as wine retailers do not, in the ordinary course of business, intentionally misrepresent their inventory and ability to fulfil sales orders (*Id.*);

(m) Premier Cru entered into the transactions involved in its fraud under secrecy and haste, and the transactions were unusual.[8] Specifically, Premier Cru disguised its pre-arrival sales using falsified documentation and misrepresentations to its customers (*see* Plea Agreement, p. at pp. 3-4. Furthermore, Premier Cru acted with haste in fulfilling fraudulent orders for those customers that complained repeatedly or forcefully (*see id.*, at 5);

(n) Premier Cru, through Fox, was aware that it would not be able to fulfill orders to its customers (*see* Plea Agreement, at p. 4).[9]

The evidence presented clearly establishes that Premier Cru, through Fox, had the requisite intent to hinder, delay, or defraud creditors under both Bankruptcy Code 548(a)(1) and Section 3439.04(a) of the Civil Code.

**C.    Defendant Cannot Establish a Defense Under Section 548(c) of the Bankruptcy Code and Section 3438.08(a) of the Civil Code.**

Section 548(c) creates an exception to the liability of the initial transferee of a fraudulent transfer where the transferee takes the property in (1) good faith and (2) for value. *See* 11 U.S.C. 548(c)("[A] transferee . . . of such a transfer . . . that takes for value and in good faith has a lien on or ma retain any interest transferred . . . to the extent that such transferee gave value to the debtor in exchange for such transfer[.]") California's defense statute is similar in form and substance to the Bankruptcy Code's defense against fraudulent transfer provisions. *Compare* 11 U.S.C. § 548(c) *with* Cal. Civ. Code § 3439.08(a) (providing a safe harbor/good faith exception to transferees who took in good faith and for reasonably equivalent value).[10] The transferee defendant bears the burden

---

[7] *Ryan Beck & Co. v. Campbell*, 2003 WL 22282380, at *7 (N.D. Ill. Oct. 2, 2003); *In re Saba Enters., Inc.*, 421 B.R. 626, 643 (Bankr. S.D.N.Y. 2009); *United States v. Johnston*, 245 F. Supp. 433, 441 (W.D. Ark. 1965).

[8] *In re Bernard L. Madoff Inv. Secs. LLC*, 445 B.R. 206, 223 n. 15 (S.D.N.Y. 2011); *Saba Enters., Inc.*, 421 B.R. at 643; *In re Russo*, 1 B.R. 369, 382 (Bankr. E.D.N.Y. 1979); *MFS/SunLife Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995).

[9] *Van Dusen Airport*, 910 F. Supp. at 935.

[10] The good faith value defenses under the Bankruptcy Code and the California Civil Code are essentially similar, with one minor difference. Bankruptcy Code § 548(c) uses the phrase "for

20

of proof to show that it is entitled to protection. *See Agric. Research*, 916 F.2d at 535 (burden is on the transferee for invoking Sections 548(c)); Cal. Civ. Code § 3439.08(f)(1).

"[G]ood faith is not susceptible of precise definition," and the analysis, being intensely factual, must be made on a case-by-case basis. *McFarland v. GECC (In re Int'l Mfg. Grp., Inc.)*, 538 B.R. 22, 33 (Bankr. E.D. Cal. 2015) (citing). What is clear is that a defendant, such as Nicholson, that has actual knowledge of the fraudulent activity of the debtor cannot establish a good faith defense. The legislative committee's intent makes clear that "[k]nowledge of the facts rendering the transfer voidable would be inconsistent with the good faith that is required of a protected transferee." Cal. Civ. Code § 3439.08, Comment (1); *but see, e.g. Nautilus v. Yang,* 11 Cal.App.5th 33, 44 (2017); *Lewis v. Superior Court,* 30 Cal. App.4th 1850, 1858 (1995) (two outlier cases requiring require a deliberate wrongful conduct on part of the transferee).

"Whether a transfer is voidable under [Section 3439.08(a)] is a question purely of California law. Therefore, a federal court construing the statute must predict what the California Supreme Court would rule if presented with the issue." *Bank of Texas v. Patel*, 2017 WL 2985133, at *4 (S.D. Cal. July 12, 2017). The California Supreme Court has yet to rule on the precise definition of good faith. Federal courts considering the issue under California law have held that a transferee lacks good faith if he or she has actual knowledge of facts which would suggest to a reasonable person that the transaction was fraudulently made.[11]

Courts consider whether"[f]acts that should have put a reasonable person on notice of a fraudulent scheme, which would have been discovered through a diligent inquiry, constitute bad

---

value" while California Civil Code § 3439.08(a) uses the phrase "for a reasonably equivalent value."

[11] *See, e.g.*, *Brace v. Speier (In re Brace),* 2017 WL 1025215, at *8 (B.A.P. 9th Cir. Mar. 15, 2017); *Burkart v. Bisessar (In re Singh)*, 2015 WL 1887939, at *13 (Bankr. E.D. Cal. Apr. 22, 2015); *Sec. & Exch. Comm'n v. Capital Cove Bancorp LLC*, 2015 WL 9701154, at *6 (C.D.Cal. Oct. 13, 2015); *Guzman v. Pinch (In re Guzman)*, 2011 WL 478978, at *4 (Bankr. N.D. Cal. Feb. 4, 2011); *Cybermedia, Inc. v. Symantec Corp.,* 19 F. Supp. 2d 1070, 1076 (N.D. Cal. 1998)*; In re Cohen*, 199 B.R. 709, 719 (B.A.P. 9th Cir. 1996). *But see Damian v. A Mark Precious Metals*, 2017 WL 6940515 (C.D. Cal. 2017) (dismissing defendant's motion to dismiss without a finding on good faith).

faith in receiving fraudulent transfers." *Agretech*, 916 F.2d at 539. Courts analyze whether the transferee had information or received "red flags" that should have placed the transferee on inquiry notice of the fraudulent scheme or the insolvency of the debtor. *See Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 314 (S.D.N.Y. 2010). "Facts sufficient to warrant a finding of inquiry notice [under California's UFTA] are also sufficient to defeat the good faith that is essential to the § 548(c) safe harbor." *Plotkin*, 199 B.R. at 720.

Courts have found that certain facts trigger inquiry notice[12]: (a) the debtor's possible insolvency; (b) returned checks for insufficient funds; (c) the promise of exorbitant returns; and (d) conduct that is inconsistent with industry standards. "Such inquiry notice suffices on the rationale that some facts suggest the presence of others to which a transferee may not safely turn a blind eye." *Cohen*, 199 B.R. at 719 (citing *Bonded Fin. Servs.*, 838 F.2d at 893). The defendant's level of sophistication bears upon the ability to establish good faith defense. *E.g., Global Money Management, L.P. v. McDonnold*, No. 06CV34, 2008 WL 11337623, at * 7 (S.D. Cal. Feb. 27, 2008) (considering sophistication in determining whether defendant exercised good faith); *In re Lake States Commodities, Inc.*, 253 B.R. 866, 878 (Bank. N.D. Ill. 2000). Here, Defendant cannot prove the requisite elements for this defense.[13]

Defendant unequivocally (a) called Premier Cru a "**PONZI SCHEME**" and (b) promised to file a civil suit for "**FRAUD**" and press "**CRIMINAL CHARGES**" against Fox (and his staff)," on August 15, 2013. *See* Phelps Decl., Ex. 15 (Email from Nicholson to Fox and Glasby, dated

---

[12] *See e.g., Brown v. Third National (In re Sherman)*, 67 F.3d 1348 (8th Cir. 1995) (" A] transferee does not act in good faith when has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency"); *Jobin*, 84 F.3d at 1338–39 (Checks for payments on investments returned for insufficient funds or postdated); *Agric. Research.*, 916 F.2d at 539 (transfer received "was grossly in excess of the value" transferee had provided); *Model Imperial*, 250 B.R. at 779 (bank transferee's conduct "was inconsistent with industry practice and in violation of its own written policies and procedures").

[13] Even if Defendant could establish a good faith defense as to some of the transfers, Defendant would still remain liable for the amount of the transfer that exceeds the amount of value paid in by Defendant. *See Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008).

August 15, 2013) at Nicholson000018 (emphasis added) and Ex. 5 (Defendant's RFA), at No. 4. In fact, just three months prior to these statements, Defendant also accused Premier Cru of "deceitful practices" and that he was "essentially defrauded into parting with hundreds of thousands of dollars, under false pretenses[.]" *See id.*, Ex. 6 (Email from Nicholson to Michael Glasby, dated March 28, 2013) at Nicholson000014 – 000015.

Defendant's own words reveal his knowledge of the fraud. He had the subjective knowledge contemplated by the California legislature in enacting the good faith defense. Separately, the Defendant cannot satisfy an objective standard. The overwhelming facts and circumstances would have placed a reasonable person with Defendant's sophistication (*see, supra,* ¶ 28) on inquiry notice of a fraudulent scheme. The red flags were numerous including, among other things: (a) The publicly available information about fraud allegations, including public postings and filed complaints: (b) Defendant's own negative experiences with Premier Cru's inability to deliver the promised wines, and delays and excuses from Premier Cru (*see* Phelps Decl., Ex. 5 (Defendant's RFA), at 2 (admitting that Premier Cru did not always deliver wines to him within the period expected to receive them); (c) Premier Cru's delayed delivery with other customers (*see id.*, Ex. 16 (Email from Nicholson to Fox, dated January 10, 2014) at Nicholson000111); and (d) Premier Cru's delay with refunding customers (*see id.*, Ex. 14 (Email from Nicholson to Premier Cru representative, Michael Glasby, dated June 26, 2013) at Nicholson000017).

A reasonable inquiry as of August 2013 and a quick internet search would have revealed substantial public allegations of fraud and Ponzi scheme on the part of Premier Cru. Defendant would have discovered that Premier Cru was a fraudulent scheme if he conducted a diligent inquiry. If Defendant had reviewed online forums, such as Yelp, he would discovered that he was not the only one experiencing constant delayed deliveries (*see* RJN., Ex. 3, at p. 3) and problems with issuing refunds (*see id.*, Ex. 3, at p. 4). Defendant would have also learned of other customers' warnings each other of Premier Cru's nonsensical excuses (*see* RJN, Ex. 4, at pp. 5, 8). Most importantly, he would have discovered that other customers considered Premier Cru to be a wine

Ponzi scheme (*see id.*, Ex. 3, at pp. 5, 6 and *see id.*, Ex. 4, at p. 4) and/or pyramid scheme (*see id.*, Ex. 3, at p. 6) and its employees "crooks" (*see id.* Ex. 3, at p. 8). Defendant would have also seen that other customers considered legal options or remedies (*see id.*, Ex. 3, at p. 6) and in fact did file lawsuits against Premier Cru and/or Fox for, among other things, fraud, conversion, unfair business practices in connection with their promised and paid for wines (*see* RJN, Ex. 2). In addition, if Defendant had contacted the foreign importers that Fox blamed as the cause behind the delay in shipping Defendant's wines, he would have discovered that his orders were fabricated or inaccurate. *See id.* Ex. 1, at p. 4. Therefore, a diligent inquiry by the Defendant would have revealed the Debtor's fraudulent business practices or scheme.

As set forth herein, Defendant clearly cannot establish a good faith defense as to the Wine Transfers as he was well on notice of the fraudulent scheme, having labeled it a "Ponzi scheme" himself. Therefore, the entirety of the Wine Transfers is avoidable.

### D. The Trustee Is Entitled To Prejudgment Interest.

Prejudgment interest on the fraudulent transfers is appropriate. *In re Slatkin*, *supra*, 525 F.3d at 820 (pursuant to Cal. Civ. Code § 3288, trial court has discretion to award prejudgment interest on fraudulent transfers avoided under California's UFTA); *see also Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008) (once the trial court has identified the avoidable transfers, it has the discretion to permit recovery of prejudgment interest on the fraudulent transfers from the date each transfer was made). The statutory rate of interest is seven percent (7%). *Children's Hospital and Medical Center v. Bonta*, 97 Cal.App.4th 740, 775 (2002) (under California law, where prejudgment interest is awarded on tort and other non-contractual claims the rate is 7% per annum).

The Trustee requests an award of prejudgment interest so that the estate may receive full and fair compensation. Prejudgment interest would compensate the estate for the time value of the lost use of the funds, to the benefit of the creditors of the estate. *See Schneider v. City of San Diego*, 285 F.3d 784, 789 (9th Cir. 2002) (purpose of prejudgment interest is to compensate for the loss of use of money due as damages, thereby achieving full compensation for the injury those damages are intended to redress).

At the applicable seven percent (7%) rate of interest, the total accrued prejudgment interest on the claim from and after the date each of the Wine Transfers was made is $57,210.33 if calculated through February 28, 2019. *See* Richard Pierotti Declaration ("Pierotti Decl."), ¶ 4. For each day after February 28, 2019, an additional per diem amount of $29.46 would accrue. *Id*. With prejudgment interest included as of February 28, 2019, the Trustee requests that the Court enter a judgment in the total amount of not less than $210,797.94 against Defendant ($153,586.84 principal judgment plus $57,210.10 in prejudgment interest).

### E. An Order Adjudicating Facts Existing Without Substantial Controversy Is Appropriate.

Rule 56(d) of the Federal Rules of Civil Procedure provides that if summary adjudication is not rendered upon the whole case or for all of the relief requested and a trial is necessary, the court shall, if practicable, ascertain what material facts exist without substantial controversy and what material facts are actually in good faith controverted, by examining the pleadings and the evidence before it and interrogating counsel. It provides that the court shall thereupon make an order specifying the facts that appear without substantial controversy.

If for some reason this Court declines to grant partial summary adjudication to the Trustee and against the Defendant on Counts I and II with respect to the Wine Transfers. The Trustee requests that the Court enter an order adjudicating that the facts, which are set forth in paragraphs 1 through 39 herein, exist without substantial controversy.

## IV. CONCLUSION

The Trustee respectfully requests the Court enter Partial Summary Judgment in his favor and against Defendant in the principal amount of $153,586.84 plus all allowable prejudgment interest or alternatively, for an order adjudication facts existing without substantial controversy.

Dated: January 29, 2019

DIAMOND MCCARTHY LLP

By: */s/ Kathy Bazoian Phelps*
KATHY BAZOIAN PHELPS
Attorneys for Michael Kasolas,
Chapter 7 Trustee for Fox Ortega
Enterprises, Inc. dba Premier Cru