Kathy Bazoian Phelps (155564)
**DIAMOND MCCARTHY LLP**
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Phone: (310) 651-2997
Email: kphelps@diamondmccarthy.com

Karen K. Diep (305587)
**DIAMOND MCCARTHY LLP**
150 California Street, Suite 2200
San Francisco, CA 94111
Phone: (415) 692-5200
Email: kdiep@diamondmccarthy.com

*Special Litigation Counsel for*
*Michael G. Kasolas, Chapter 7 Trustee*
*For Fox Ortega Enterprises, Inc.*
*Dba Premier Cru*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| In re<br><br>FOX ORTEGA ENTERPRISES, INC., dba PREMIER CRU<br><br>Debtor. | Case No. 16-40050-WJL<br><br>Chapter 7 |
| MICHAEL G. KASOLAS, Chapter 7 Trustee for Fox Ortega Enterprises, Inc. dba Premier Cru,<br><br>Plaintiff,<br><br>vs.<br><br>WAYNE NICHOLSON,<br><br>Defendant. | Adversary No. 18-04019<br><br>**PLAINTIFF'S SUPPLEMENTAL BRIEF:**<br><br>**(1) IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT OR ALTERNATIVELY FOR ORDER ADJUDICATING FACTS EXISTING WITHOUT SUBSTANTIAL CONTROVERSY; AND**<br>**(2) IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Date: March 27, 2019<br>Time: 10:30 a.m.<br>Place: 1300 Clay Street, Courtroom 220<br>Oakland, CA 94612 |

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    THE PONZI SCHEME PRESUMPTION .........................................................1

   A.   The Plea Agreement Establishes the Ponzi Scheme Presumption Over
      the Pre-Arrival Wine Business ........................................................................2

   B.   The Transfers Were Made in Furtherance of the Ponzi scheme ...............4

   C.   Legitimate Business Does Not Eliminate Application of the Ponzi scheme
      Presumption .......................................................................................................5

      1.   No Legitimate Operations Despite Representations....................................6

      2.   Unprofitable Legitimate Business Operations............................................7

      3.   Profitable Legitimate Business Operations ................................................8

   D.   The Philosophy of Finn v. First Alliance Bank Does Not Apply to CUVTA.......................9

III.   REASONABLY EQUIVALENT VALUE IS MEASURED AT THE
      TIME THE DEBTOR SHIPPED THE BOTTLES OF WINE ...................12

   A.   Reasonably Equivalent Value is Measured at the Time of the Transfers. ...........................13

IV.    DEFENDANT'S VERSION OF THE GOOD FAITH STANDARD DOES
      NOT APPLY. ....................................................................................................15

V.     THIS IS NOT A SEVEN-YEAR PREFERENCE ACTION...........................20

VI.    CONCLUSION .................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

Cases

*Annod Corp. v. Hamilton & Samuels*,
  100 Cal.App.4th 1286 (2002) ...............................................................................18, 20

*Broach v. Gen. Capital Auto Lease, Inc. (In re Lucas Dallas, Inc.)*,
  185 B.R. 801 (B.A.P. 9th Cir. 1995) ...................................................................14

*Donell v. Kowell*,
  533 F.3d 762 (9th Cir. 2008) ...............................................................................15

*Finn v. All. Bank*,
  838 N.W.2d 585 (Minn. Ct. App. 2013)...............................................................13

*Finn v. Alliance Bank*,
  860 N.W.2d 638 (Minn. 2015) .......................................................................11, 12

*Gowan v. The Patriot Grp., LLC (In re Dreier, LLP)*,
  452 B.R. 391 (Bankr. S.D.N.Y. 2011).................................................................16

*Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phelger & Harrison LLP)*,
  408 B.R. 318 (Bankr. N.D. Cal. 2009) ................................................................14

*Hayes v. Palm Seedlings Partners-A (In re Agric. Research,*
  *& Tech. Grp., Inc.)*, 916 F.2d 528 (9th Cir. 1990) ...............................................6

*In re AVI, Inc.*,
  389 B.R. ...............................................................................................................21

*In re Bernard L. Madoff Investment Securities LLC*,
  424 B.R. 122 (Bankr. S.D.N.Y. 2010)...............................................................7, 8

*In re Goodwin*,
  115 B.R. ...............................................................................................................21

*In re Independent Clearing House Co.*,
  77 B.R. 843 (D. Utah 1987).....................................................................11, 12, 15

*In re Slatkin*,
  525 F.3d 805 (9th Cir. 2008) .................................................................................2

*In re Taubman*,
  160 B.R. 964 (Bankr. S.D. Ohio 1993) ...............................................................10

*In re Twin Peaks Fin. Servs., Inc.*,
  516 B.R. 651 (Bankr. D. Utah 2014)....................................................................10

*Janvey v. Golf Channel, Inc.*,
  487 S.W.3d 560 (Tex. 2016) ................................................................................11

*Jobin v. McKay (In re M & L Bus. Mach. Co.)*,
  84 F.3d 1330 (10th Cir. 1996) .............................................................................15

*Lewis v. Superior Court*,
  30 Cal.App.4th 1850 (1994) ..........................................................................18, 19

*McFarland v. GECC (In re International Manufacturing Group, Inc.)*,
  538 B.R. 22 (Bankr. E.D. Cal. 2015)...................................................................22

*Nautilus, Inc. v. Yang*,
  11 Cal.App.5th .................................................................................................19, 20

*Rafoth v. Bailey (In re Baker & Getty Fin. Serv., Inc.)*,
  88 B.R. 792 (Bankr. N.D. Ohio 1988)..................................................................16

*Rieser v. Hayslip* (*In re Canyon Systems Corp.*),
   343 B.R. 615 (Bankr. S.D. Ohio 2006) ........................................................................8
*Samson v. U.S. West Comm'n* (*In re Grigonis*),
   208 B.R. 950 (Bankr. D. Mont. 1997) ......................................................................14
*SEC,*
   *v. Credit Bancorp. Ltd*, 290 F.3d 80 (2d Cir. 2002) ................................................3
*Torres v. Eastlick* (*In re N. Am. Coin & Currency, Ltd.*),
   767 F.2d 1573 (9th Cir. 1985) ..............................................................................4, 5
*Wing v. Layton*,
   957 F. Supp. 2d 1307 (D. Utah, July 12, 2013) ........................................................8

Statutes

Cal. Civ. Code 3439.01 ..................................................................................................12
Cal. Civ. Code § 3438.08 ...............................................................................................12
Cal. Civ. Code § 3439.06 ...............................................................................................12
California Civil Code § 3439 ..........................................................................................21
California Civil Code § 3439.08 ...............................................................................17, 18
Minn. Stat. §§ 513.41-513.51 .........................................................................................13

Other Authorities

2015 U.S. Dist. LEXIS 142704 (W.D. Tex. Oct. 20, 2015) ...........................................10
*Nat'l Consumer Mort. LLC*,
   2013 U.S. Dist. LEXIS 5986 (D. Nev. Jan. 14, 2013) .............................................10
*Osherow v. Nelson Hensley & Consol. Fund. Mgmt., L.L.C. (In re Pace)*,
   2011 Bankr. LEXIS 1807 (Bankr. WD. Tex. May 16, 2011) ....................................14
*SEC. v. Helms*,
   2015 U.S. Dist. LEXIS 110758, at *41 (W.D. Tex. Aug. 21, 2015) .........................10
*SEC v. Mgmt. Solutions, Inc.*,
   2013 U.S. Dist. LEXIS 120277, at *72 (Aug. 22, 2013) ..........................................10
*Smith v. Am. Founders Fin. Corp.*,
   2006 U.S. LEXIS 74865, at *26 (S.D.Tex. Sept. 29, 2006) ......................................14

Plaintiff Michael G. Kasolas, the Chapter 7 Trustee ("Plaintiff" or "Trustee") for Fox Ortega Enterprises, Inc. dba Premier Cru ("Premier Cru" or the "Debtor"), hereby submits his Supplemental Brief (1) In Support of Plaintiff's Motion for Partial Summary Judgment or, Alternatively, for Order Adjudicating Facts Existing Without Controversy; and (2) In Opposition to Defendant's Motion for Judgment on the Pleadings.

## I.     __INTRODUCTION__

This Supplemental Brief is filed following lengthy briefing and oral argument in connection with cross-motions relating to allegedly fraudulent transfers of wine valued at $153,586.84 (the "Transfers"). There is no factual dispute that: (1) the Transfers were made; (2) the Transfers were all pre-arrival wines; (3) the Transfers were made following written declarations made by the Defendant that Premier Cru was running a "Ponzi scheme" and was engaged in "criminal fraud"; and (4) the Transfers were made after Defendant made threats of legal action in light of Premier Cru's failure to deliver promised wines to Defendant.

The crux of the dispute between the parties is whether the Trustee has established that the Transfers were made with actual fraudulent intent either through the use of the Ponzi scheme presumption as applied to the pre-arrival wine Transfers or, alternatively, through a badges of fraud analysis. Assuming that the Trustee has met his burden on one or both of those alternative theories of proof of actual fraudulent intent, the balance of the issues relate to the standard of good faith to be applied and whether the undisputed facts establish that there is no basis on which the Defendant could establish a good faith defense. Issues relating to reasonably equivalent value are not necessary for determination on an actual fraudulent intent theory if the Defendant cannot establish good faith.

## II.     __THE PONZI SCHEME PRESUMPTION__

There are a number of issues regarding the application of the Ponzi scheme presumption to the facts of this case. As a preliminary matter, the Trustee asks the Court to narrow its focus to the transfers at issue – nine (9) transfers of one hundred and forty-one (141) bottles of pre-arrival wine. Although there has been much discussion over whether it is appropriate to apply the Ponzi scheme

presumption over an entire business, including potentially legitimate transactions as well as over admittedly fraudulent transactions, such a discussion is outside of the scope of the relief requested in the Trustee's Motion. The Trustee is not requesting the establishment of a Ponzi scheme presumption over all transfers made by Premier Cru – just over the transfer of pre-arrival wines which the Debtor admitted was "a significant portion of the business."

### A. The Plea Agreement Establishes the Ponzi Scheme Presumption Over the Pre-Arrival Wine Business

The Trustee's request is based largely on the admissions contained in the Plea Agreement of John Fox. Those admissions establish the hallmark signs of a Ponzi scheme. As a matter of law, a plea agreement can establish a sufficient factual basis for actual fraudulent intent. *In re Slatkin*, 525 F.3d 805, 813-814 (9th Cir. 2008). In *Slatkin*, the Ninth Circuit went even further and held that Slatkin's plea agreement precluded the defendants from further litigating the issue of his fraudulent intent in making the transfers at issue. The court stated:

> [A] debtor's admission, through guilty pleas and a plea agreement admissible under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's fraudulent intent under 11 U.S.C. § 548(a)(1)(A) and California Civil Code § 3439.04(a)(1), and precludes relitigation of that issue.

*Slatkin*, 525 F.3d at 814 (citations omitted).[1]

The components of a Ponzi scheme are set forth in the Plea Agreement, which establishes the fraudulent and Ponzi scheme nature of the pre-arrival business. Particular bottles of wine and transfers cannot be picked out of the fraudulent enterprise as being distinctly "legitimate." The Defendants suggests that his bottles should be exempted from any finding of Ponzi scheme presumption, arguing among other things that there is no specific evidence that his transfers are part of a Ponzi scheme. The Defendant agrees, however, that all of the transfers are of pre-arrival wine. He did not introduce any evidence to refute the admissions in the Plea Agreement that establish the elements of a Ponzi scheme over the pre-arrival wine business.

---

[1] The Trustee refers this Court to the Trustee's Reply to Defendant's Evidentiary Objections [Dkt. No. 52], at pp. 1-4.

In a fraudulent scheme, courts treat similarly situated parties in a pro rata or otherwise equitable fashion. "Courts have favored pro rata distribution of assets where, as here, the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders." *SEC v. Credit Bancorp. Ltd*, 290 F.3d 80, 88-89 (2d Cir. 2002). *Pro rata* distribution to similarly situated victims is strongly preferred. *Id* Similarly, transfers of bottles of wine were made to similarly situated pre-arrival wine customers, who pre-arrival wines that were part of the admitted scheme. A bottle by bottle analysis of is not required or necessary, and is not practicable. In distributions schemes, courts have treated all of the property, like the bottles of wine here and the customers' cash, as a part of the fraud so that similarly situated creditors are treated on an equal basis.

Another analogous situation is courts' analysis of the assertion of a constructive trust over property of a fraudulent schemer. The Ninth Circuit has directed the bankruptcy courts to use their equitable powers sparingly with respect to constructive trusts where one creditor seeks priority and to differentiate itself when all creditors are similarly situated:

> A constructive trust is . . . a remedy, flexibly fashioned in equity to provide relief where a balancing of interests in the context of a particular case seems to call for it. . . . We necessarily act very cautiously in exercising such a relatively undefined equitable power in favor of one group of potential creditors at the expense of other creditors, for ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws.

*Torres v. Eastlick* (*In re N. Am. Coin & Currency, Ltd.*), 767 F.2d 1573, 1575 (9th Cir. 1985) (citations omitted). To pick one bottle of wine out of the fraud because there is not a particular label on that one bottle identifying it as having been made with actual fraudulent intent would be highly inequitable where the fraudulent scheme of which that bottle was a part has been established. This was a scheme in which the Debtor has admitted the pervasive nature of the fraud and the Transfers are indisputably part of the fraud. Defendant has not introduced any evidence to the contrary.

## B.    The Transfers Were Made in Furtherance of the Ponzi scheme

There is no question that the Transfers were part of the pre-arrival wine fraudulent scheme and were made in furtherance of that scheme. Whether the Transfers were made in furtherance of the Ponzi scheme is an issued tied closely with whether the Transfers were made with actual fraudulent intent pursuant to the badges of fraud analysis. As set forth in the Trustee's papers (Opp. to Defendant's Mot. Summary Judgment [Dkt. No. 45], pp. 18-22), there is ample undisputed evidence demonstrating that the Transfers were made in furtherance of the scheme or, alternatively, that a badges of fraud analysis demonstrates the fraudulent circumstances surrounding the Transfers. The sole basis of the Defendant's challenge to the undisputed evidence is the request that his bottles be exempted from any fraudulent finding because he contends there is no evidence of fraudulent intent specifically tied to the Transfers. The Defendant's argument, however, ignores both the very substantial, and undisputed, evidence specifically tying his Transfers to the fraud and the common knowledge that transfers very rarely, if ever, come with an admission that they were made with actual fraudulent intent. The surrounding circumstances tell the whole story:

- All of Defendant's "pre-arrival wines" fall squarely within Fox's fraudulent scheme. They are wines that Premier Cru could not and did not deliver to Defendant for extremely long periods of time.

- The Plea Agreement makes clear that by 2010, John Fox was running a massive fraudulent scheme through the pre-arrival wine business, which is the exact time frame in which Premier Cru was dodging, delaying and ignoring the Defendant.

- Premier Cru employees dodged Defendant when Defendant called or emailed them about his bottles of wine. By way of example, in an email from Defendant to Premier Cru, he stated that he was "getting very tired, extremely tired in fact, of having to repeatedly call or email" the company. Phelps Decl. ISO Mot. Summary Judgment, Ex. 16 [Dkt. No. 28-12].

- Defendant knew Premier Cru was engaged in fraudulent conduct, accusing Premier Cru of "criminal fraud" and of desperately holding on to Defendant's money. In an email from Defendant to Premier Cru, he acknowledged that he was essentially "defrauded into parting with hundreds of thousands of dollars, under false pretenses that [Premier Cru] had already purchased and owned[.]" *Id.* at Ex. 6 [Dkt. No. 28-2]. Defendant also stated: "The credit has STILL not appeared on my bank statement. What, is Premier Cru so desperate for funds they are hesitate to process a refund?" *Id.* at Ex. 14 [Dkt. No. 28-9].

- When Defendant complained, repeatedly and forcefully, Premier Cru arranged to deliver wine to him. Plea Agreement, at p. 5. Specifically, Premier Cru shipped one hundred and

forty-one (141) bottles of wine to Defendant after August 15, 2013, when Defendant threatened to press civil and criminal charges. *See* Nishi Decl., Ex. 20 [Dkt. No.45-2].

- John Fox admitted to delivering wines to customers who complained to try to prevent them from going public with the fraud Plea Agreement, at p. 5. The delivery of hush wines to Defendant falls squarely within Premier Cru's fraudulent conduct. The only conclusion is that Premier Cru transferred the wines to placate Defendant and keep him from going to law enforcement and thus, unraveling Premier Cru's scheme.

- The value of the wine actually delivered to Defendant sent to Defendant after August 15, 2013 was much higher than the price that Defendant paid to purchase those wines. *See* Nishi Decl., Ex 20 [Dkt. No.45-2].

## C. *Legitimate Business Does Not Eliminate Application of the Ponzi scheme Presumption*

The Court has inquired whether it is appropriate to apply the Ponzi scheme presumption in a business with some legitimate transactions and, if so, how to do so. The Trustee reiterates that this question need not be addressed in this case because 100% of the Transfers relate to the admitted fraudulent pre-arrival business, and none of the Transfers involve the retail store business, which may or may not be legitimate. Therefore, no proportional analysis, commingling analysis or other analysis need be undertaken where 100% of the Transfers were made through the fraudulent pre-arrival wine business. Plea Agreement, p. 6.

Moreover, the pre-arrival wine business is hopelessly commingled with no clear ability to pick through it, bottle by bottle (*see* Nishi Decl. [Dkt. No. 45-1], at ¶12), to determine which bottle might have been a "legitimate" transaction, particularly where thousands of customers thought that they were the "legitimate" buyer only to learn that their supposed "legitimate" bottle of wine had been oversubscribed by Premier Cru. As set forth in the Trustee' papers, case law clearly demonstrates that some legitimate business does not eliminate the Ponzi scheme presumption where the business is hopelessly commingled and legitimate business cannot separately be segregated and considered independent of the fraudulent activity. Moreover, courts have consistently held that a Ponzi scheme can exist even where an entity produces legitimate revenue. *See e.g., Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.),* 916 F.2d 528 (9th Cir. 1990) (a Ponzi scheme exists if the revenues of the legitimate business are insufficient

to pay the claims of creditors and investors, such that the schemer must solicit new investors to meet the claims of old investors).[2]

The Defendant suggests that the Court create a new rule involving an undefined mathematical calculation that should be applied to determine what portion of the business is fraudulent versus legitimate.[3] No case law is presented to support this proposition, nor is any percentage of legitimate business recommended by the Defendant for this requested new rule. No court has established a bright line rule regarding proportional fraudulent and legitimate components of a business. Some courts have analyzed whether legitimate, self-sustaining business operations can be carved out and separated from the fraudulent scheme. Courts that have considered the intersection of fraudulent and legitimate businesses in the context of Ponzi scheme findings have evaluated the particular circumstances of the cases. The general categories of analysis are as follows.

### 1. No Legitimate Operations Despite Representations

A classic Ponzi scheme is one in which there is no legitimate business operation whatsoever and the scheme is a total fraud. The scheme run by Bernard L. Madoff is one of the most recognizable Ponzi schemes in which the front of a legitimate business operation hid the fact that there were no legitimate operations whatsoever. Madoff's company supposedly made consistent returns as an investment advisor and custodian of securities based on his "split-strike conversion strategy." *See In re Bernard L. Madoff Investment Securities LLC,* 424 B.R. 122 (Bankr. S.D.N.Y. 2010). In fact, however, Madoff never invested customer funds and there was no trading activity whatsoever. *Madoff,* 424 B.R. at 128. Here, the Trustee acknowledges that some wines were actually delivered to some customers who paid money for those wines, which differentiates this

---

[2] The Trustee refers this Court to additional authority cited in his Opposition to Defendant's Motion for Summary Judgment [Dkt No. 45], at pp. 14-15.

[3] Defendant attempts to misconstrue Plaintiff's discovery responses to conclude that "85%" of the Debtor's business relates to the retail wine store and not to the pre-arrival wine business. This conclusion is apparently reached by taking a likely fictitious gross sales figure of $137,793,351 and comparing it to $20 million. The Plaintiff's discovery responses reflect, on their face, that the gross sales figures are based on faulty records and are not tied to actual sales. *See* Exhibit B to Declaration of Miriam Hiser, Plaintiff's Responses to Defendant Wayne Nicholson's Second Set of Interrogatories [Dkt. No. 40-5], at p. 5. The Defendant's mathematical calculation is therefore flawed.

case slightly from *Madoff*; however the pre-arrival wine sales were admittedly part of Premier Cru's fraudulent scheme.

### 2. Unprofitable Legitimate Business Operations

Even in cases where there are some legitimate business operations – either because the company is actually doing some of what it says it is doing or because there is a related legitimate business – some courts have found that the entirety of the business operations can be considered a Ponzi scheme. The key factor in this analysis is whether the underlying business venture yielded sufficient funds to pay expenses and pay the promised returns to investors. *See, e.g.*, *Wing v. Layton*, 957 F. Supp. 2d 1307, 1315 (D. Utah, July 12, 2013) ("seemingly legitimate business activity does not insulate companies from a finding that they were operated as part of a Ponzi scheme. As the Receiver points out, ponzi schemes sometimes use legitimate operations to attract investors, but this does not insulate those operations from the taint of the Ponzi scheme."); *see also Rieser v. Hayslip* (*In re Canyon Systems Corp.*), 343 B.R. 615, 632 (Bankr. S.D. Ohio 2006).

The Premier Cru scheme clearly falls in this category of mixed business operations that were wholly unprofitable, leading to tens of millions of dollars of claims. In Premier Cru, the fraudulent pre-arrival wine business was undoubtedly unprofitable and the retail instore business was clearly not enough to fund the fraudulent pre-arrival wine business since the Debtor filed bankruptcy with tens of millions of dollars of liability to wine customers. The evidence in the record clearly reflects that there are unpaid claims of $59,196,509.76 (see Claims Docket), despite the inflated sales records of $137,793,351 (*See* Exhibit B to Hiser Decl., Plaintiff's Responses to Defendant Wayne Nicholson's Second Set of Interrogatories [Dkt. No. 40-5], at p. 5). There can be no question that Premier Cru was running an unprofitable business that could not generate sufficient revenue to fund its fraudulent business.

It is interesting to note that, even if Defendant were correct that the retail instore business of Premier Cru were 85% of the total business (of which there is no evidence and a conclusion which Plaintiff strongly disputes), Defendant will have established that the instore retail business was also fraudulent and unable to fill over $50 million in orders that are reflected in the filed claims in this

case. Either way, and no matter how the business is split between pre-arrival wines and instore sales, Premier Cru incurred a substantial amount of debt because it was running a fraud and was unable to fulfill the promises it made to its customers. There was not sufficient legitimate business that was able to fund either any legitimate business or the fraudulent business.

Additionally, courts also consider other factors such as the fact that the funds from both Ponzi and legitimate sources were commingled.

> To operate this scheme, the Debtor induced investors, including those she knew from all her business activities, to participate by promising high rates of return and representing to them that they would receive favorable real estate transactions and favorable tax treatment. Funds received by the Debtor from these investors were not segregated into any separate accounts; but, instead, these funds were deposited into any of the Debtor's unrestricted accounts and commingled without distinction with other funds held by the Debtor. Likewise, without distinction, the Debtor expended these funds using them to pay promised returns and personal and business-related expenses, including payroll, rent, and interest payments on bank notes. Funds paid to prior investors were not financed by any business ventures or from any other "legitimate" source but were financed from new investors' monies. Notably, no investment of any magnitude and no profits from any of her businesses existed to contribute a material amount, if any at all, to the repayment of investor monies.

*See, e.g.*, *In re Taubman*, 160 B.R. 964, 978-79 (Bankr. S.D. Ohio 1993). All funds were commingled in this case and, rather than using funds from one part of the business to fund the other, John Fox instead stole funds from the bank accounts of Premier Cru for his own benefit.

### 3. Profitable Legitimate Business Operations

A Ponzi scheme can be found even in circumstances where a legitimate business generated profits. "Engaging in some legitimate business operations does not counteract the existence of a Ponzi scheme because the distributions made to investors were nevertheless funded by other investors' money." *SEC. v. Helms*, 2015 U.S. Dist. LEXIS 110758, at *41 (W.D. Tex. Aug. 21, 2015), *adhered to on reconsideration*, 2015 U.S. Dist. LEXIS 142704 (W.D. Tex. Oct. 20, 2015). "The extent of a debtor's legitimate business operations is relevant to determining whether the Debtor's business operations constituted a Ponzi scheme, but it is not relevant once it is determined that, notwithstanding some legitimate business operations, the Debtor was operating a Ponzi

scheme." *In re Twin Peaks Fin. Servs., Inc.,* 516 B.R. 651, 655 (Bankr. D. Utah 2014); *see also In re Nat'l Consumer Mort. LLC*, 2013 U.S. Dist. LEXIS 5986 (D. Nev. Jan. 14, 2013) ("[N]o genuine issue of fact remains that the legitimate business was dwarfed by Favata's massive Ponzi scheme, and NCM was insolvent from its inception and throughout its existence.").

In other cases, however, courts have found that "if an investment scheme generates sufficient funds from legitimate sources to pay investors, it is unlikely that the scheme is a fraudulent Ponzi scheme."[4] Those are not the facts here. First, Defendant has entirely mischaracterized and misconstrued the facts relating to the proportion of the retail store business (which is not necessarily even legitimate business). Second, even if Defendant were correct in its assessment of how much of the business was pre-arrival versus instore, Defendant's conclusion of 85% instore only bolsters the argument that Premier Cru was running a fraud such that the scheme could not generate sufficient funds from any legitimate business sufficient to pay clams. Finally, such an analysis is entirely irrelevant to consideration of the fraudulent portion of the business that involved the pre-arrival wines. The Transfers at issue are from the admittedly fraudulent portion of the business.

### D. The Philosophy of Finn v. First Alliance Bank Does Not Apply to CUVTA.

The Defendant argues that California law does not allow for a Ponzi scheme presumption and, in doing so, ignores the consistent case law in the Ninth Circuit to the contrary and relies solely on Minnesota and Texas state law decisions. The Court has already made clear its skepticism that the well-settled law in the Ninth Circuit and the practice in California should be overturned because of a Minnesota Supreme Court decision that was decided on different philosophical and factual grounds. [5] The court in *Finn v. Alliance Bank*, 860 N.W.2d 638 (Minn. 2015), found that the Minnesota state fraudulent transfer statutes did not allow for a Ponzi scheme presumption under that state's laws. That court's rationale, as well as the underlying facts in that case, is inapplicable to the facts in this case and to the intent of the CUVTA.

---

[4] *SEC v. Mgmt. Solutions, Inc.*, 2013 U.S. Dist. LEXIS 120277, at *72 (Aug. 22, 2013).

[5] This brief will not address *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560 (Tex. 2016) cited by Defendant as that decision left the Ponzi scheme presumption as to actual fraudulent intent fully in place and applicable, so the decision does not support the proposition for which it was cited by Defendant.

1    As a preliminary matter, it is important to remember the rationale and philosophy behind

2 the Ponzi scheme presumption itself, finding its early roots in *In re Independent Clearing House*

3 *Co.*, 77 B.R. 843, 860 (D. Utah 1987). Fraudulent intent can be inferred from a Ponzi scheme

4 because "no other reasonable inference is possible. A Ponzi scheme cannot work forever." The

5 perpetrator continues to run the scheme, knowing that the scheme will eventually collapse. It is that

6 very knowledge that people at the end will not be paid that constitutes actual intent to defraud in

7 the eyes of the law.

8    The admitted facts in Premier Cru, reflect that exact philosophy and the cases fits squarely

9 in the intent behind the Ponzi scheme presumption: (a) Premier Cru was admittedly not able to pay

10 foreign suppliers within 30 days, **or ever** (*see* Plea Agreement, at p. 4 (emphasis added)); (b) the

11 embezzlement of funds that made it **impossible** for Premier Cru to fulfill all its obligations to

12 customers and obtain the wines it had actually contracted to purchase (*see id.* (emphasis added));

13 and (c) a substantial amount of money in Premier Cru's bank accounts used to purchase "hush"

14 wine at higher prices for disgruntled customers who had already paid (*see id.*, at p. 5). Additionally

15 the claims register in the bankruptcy case contains thousands of claims arising over the course of

16 the scheme for undelivered wines after funds had been paid to Premier Cru for the purchase of

17 wines.

18    *Finn v. Alliance Bank* is not only an outlier decision, but the facts and rationale on which it

19 relies do not have any application under California state law. From a statutory standpoint, the court

20 in *Finn* was unpersuaded there was any basis to allow a presumption to supplant actual evident and

21 astutely observed that "the word 'Ponzi' [did] not appear in the Minnesota Statutes, and [the

22 Minnesota Uniform Fraudulent Transfer Act] [did] not address 'schemes.'" *Finn*, 860 N.W.2d at

23 646-67.

24    As a threshold matter, the genesis of the California statute and the Minnesota standard are

25 entirely different. The legislative comments outright acknowledges the Bankruptcy Code as the

26 genesis of various provisions of the CUVTA and federal courts in the Ninth Circuit have

27

28

consistently recognized the Ponzi scheme presumption arising under the Bankruptcy Code (and UFTA). The Minnesota MUFTA arises under Minnesota common law.

Under the California statute, (1) the terms "claim," "debt," "lien," and "transfer" derived from the Bankruptcy Code (*see* legislative committee comments, Cal. Civ. Code 3439.01); (2) "[t]he provision for postponing the time a transfer is made until its perfection is an adaption of Section 548(d)(1) of the Bankruptcy Code" (Cal. Civ. Code § 3439.06, comment 1); (3) "[s]ubdivision (b) [of Section 3438.08] is derived from Section 550(a) of the Bankruptcy Code (Comment 2, Cal. Civ. Code § 3438.08(b)); (4) "[s]ubdivision (d) is an adaption of Section 548(c) of the Bankruptcy Code (Comment 4, Cal. Civ. Code § 3438.08(d)). In a similar vein, the legislative comments also cites to the Bankruptcy Code when illustrating the application the CUVTA. *See* Cal. Civ. Code § 3438.08, comment 3 (citing to Section 550(d) of the Code when explaining the measure of recovery of a defrauded credit limited to the value of the asset transferred at the time of the transfer). On the other hand, the Minnesota statute does not have similar ties or philosophy as are present in the Bankruptcy Code or California statute. Neither Minnesota's UVTA nor its comments make a single reference to the Bankruptcy Code. *See* Minn. Stat. §§ 513.41-513.51. The Minnesota statue is more concerned with codifying Minnesota common law. *Finn v. All. Bank*, 838 N.W.2d 585, 594 (Minn. Ct. App. 2013), *aff'd as modified*, 860 N.W.2d 638 (Minn. 2015) ("[T]he MUFTA merely codifies actual-fraud claims that existed at common law.")

Additionally, as set forth in the Trustee's Reply to the Motion for Summary Judgment, *Finn* is factually distinguishable from the case at hand. Plaintiff's Reply to Defendant's Opposition to Mot. for Partial Summary Judgment [Dkt. No. 51], at pp. 6-8. In summary, the transfers in *Finn* "'took place almost completely outside the fraud-pervasive part of that debtor's business operations, the roost for the Ponzi scheme as traditionally considered.'" *Id.* at 466. In this case, the transactions are an intertwined, commingled part of the admitted fraudulent pre-arrival wine scheme of Premier Cru Plea Agreement, at p. 3. Thousands of customers purchased pre-arrival wine from Premier Cru based on Fox's fraudulent misrepresentations or omissions. *See id.*, at p. 6.

Defendant has admittedly received, at the very least, 141 bottles of "pre-arrival wines," the type of wine Fox admitted to being the centerpiece of his fraudulent scheme. *See* Phelps Decl. ISO Mot. for Summary Judgment, Ex. 5 (Defendant's RFA) [Dkt. No. 28-1], at No. 8. Further, the 141 bottles of wine at issue were delivered or transferred to the Defendant immediately after his threat of a criminal and civil suit against Fox and Premier Cru. *See* Nishi Decl. ISO Mot. For Summary Judgment, Ex. 17 [Dk. No. 29-1] and Phelps Decl. ISO Mot. for Summary Judgment, Ex. 15 [Dkt. No. 28-11]. The value of these bottles of wine (i.e., the amount Premier Cru paid) far exceeded the price the Defendant paid to the Debtor, which is consistent with Fox's admission that purchased "hush" wine at a higher price than those for which he had sold to customers. The wines that are subject to the Trustee's Motion fall well within Fox's fraudulent scheme through the sale of pre-arrival wine.

## III. REASONABLY EQUIVALENT VALUE IS MEASURED AT THE TIME THE DEBTOR SHIPPED THE BOTTLES OF WINE

The concept of reasonably equivalent value is of limited application in this matter. The Trustee's Motion seeks a finding on actual fraudulent transfers, and reasonably equivalent value is not an element of such a claim. Additionally, while a lack of reasonably equivalent is an enumerated badge of fraud, it is but one of an infinite number of potential badges, and only one of several in this case. Also, without good faith, value is not a consideration as a defense. The Trustee will nevertheless address the Court's questions regarding the timing of the measurement of reasonably equivalent value and the appropriate measure of value in this case.

Courts in the Ninth Circuit find that the question is not whether the defendant gave reasonably equivalent value, but instead whether the debtor received reasonably equivalent value. *See Broach v. Gen. Capital Auto Lease, Inc. (In re Lucas Dallas, Inc.)*, 185 B.R. 801, 807 (B.A.P. 9th Cir. 1995). The "totality of the circumstances" is generally assessed to determine reasonable equivalence – not just fair market value. *Smith v. Am. Founders Fin. Corp.*, 2006 U.S. LEXIS 74865, at *26 (S.D.Tex. Sept. 29, 2006); *Osherow v. Nelson Hensley & Consol. Fund. Mgmt., L.L.C. (In re Pace)*, 2011 Bankr. LEXIS 1807 (Bankr. WD. Tex. May 16, 2011). This is certainly the case when the transfer involves nondurable consumer goods. *See Samson v. U.S. West Comm'n*

*(In re Grigonis)*, 208 B.R. 950, 956-54 (Bankr. D. Mont. 1997). "Reasonable equivalence does not require exact equality in value, but means 'approximately equivalent' or 'roughly equivalent.'" *Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phelger & Harrison LLP),* 408 B.R. 318, 341 (Bankr. N.D. Cal. 2009).

### A.    Reasonably Equivalent Value is Measured at the Time of the Transfers.

Courts in the Ninth Circuit have consistently evaluated the reasonably equivalent value provided at the time of the transfer. In fraud cases, the REV provided is not the original value paid or invested, but is the value of the waiver of the restitution claim which is relinquished *at the time the transfer is made*. A restitution claim exists because, "[o]ne who has been fraudulently induced to enter into a contract may rescind the contract and recover the benefits that he has conferred on the party who has defrauded him." *Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1342 (10th Cir. 1996); *Merrill v. Abbott (In re Indep. Clearing House, Co.)*, 77 B.R. 843, 857 (D. Utah 1987).

Courts have found that reasonably equivalent value is exchanged by the investor for the return of principal because the investor is deemed to have acquired a restitution claim at the time of the investment, which is then arguably exchanged when the investor receives a transfer of funds paying back that investment. "Payments up to the amount of the initial investment are considered to be exchanged for 'reasonably equivalent value,' and thus not fraudulent, because they proportionately reduce the investors' rights to restitution." *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008); *Jobin v. McKay* (*In re* M & L Bus. Mach. Co.), 84 F.3d 1330, 1342 (10th Cir. 1996) (finding that an investor in Ponzi scheme gave reasonably equivalent value in exchange for payments received from the debtor where he had a "colorable claim to recover the amounts that he invested" on theories of restitution and rescission; the transfer payments reduced the creditor's right to full return of its money.).

In *Wyle v. C.H. Rider & Family*, the trustee sought to avoid payments to unwitting investors in a Ponzi scheme arguing that the investors did not give reasonably equivalent value for the payments, and thus, the payments should be set aside as fraudulent transfers. The bankruptcy court

agreed but the BAP reversed and held that he investors acquired rescission claims at the time they entered into a contract to purchase certain solar modules, a gimmick that was part of the fraudulent scheme. These rescission claims gave investors rights of restitution, and these rights could be exchanged for the transfers. The Ninth Circuit concluded that the investors exchanged reasonably equivalent value when their rights to restitution were proportionally reduced by the payments or transfers they received. The court, however, stated in a footnote that the case did not "involve investors who received more from the debtor than the amounts of their respective total investments," and "[s]uch excess amounts would be avoidable because the debtor would not have received reasonably equivalent value for them."[6]

Here, Defendant acquired a rescission claim at the time he paid a total of $130,157.06 for the bottles of wine at issue. The rescission claim gave the Defendant a right to restitution, and this right could be exchanged for the delivery or transfer of the bottles of wine. Defendant exchanged reasonably equivalent value when his right to restitution was proportionally reduced by the delivery of the bottles of wines. However, the Defendant received more from Premier Cru than the $130,157.06 Defendant paid. The value of the wines transferred was $153,586.84 *See* Nishi Decl. ISO Opp. to Mot. For Summary Judgment, Ex. 20 [Dk. No. 45-1] (bottles of wine were shipped to Defendant between October 30, 2013 and January 23, 2014). When customers complained repeatedly or forcefully, like Defendant here, Premier Cru arranged to deliver wine to them even if it had never actually contracted to buy the wine for which they had paid and often did this by: (1) delivering to those customers wine for which other customers had paid, or (2) in many cases, purchasing the wine from other suppliers, usually at prices much higher than those for which he had sold the wine in the first place. Plea Agreement, p. 5. The amount Premier Cru, through Fox, paid for each of these bottles of wine far exceeded the value of the wines received by Defendant.[7]

---

[6] *Gowan v. The Patriot Grp., LLC (In re Dreier, LLP)*, 452 B.R. 391, 439-40 (Bankr. S.D.N.Y. 2011) (finding that debtors received reasonably equivalent value under § 548 in exchange for all transfers to investors in Ponzi scheme that do not exceed investors' principal undertaking, but to the extent that an investor received more than he gave to debtors, debtors did not receive reasonably equivalent value); *see also Rafoth v. Bailey* (*In re Baker & Getty Fin. Serv., Inc.*), 88 B.R. 792 (Bankr. N.D. Ohio 1988).

[7] Exhibit "18" [Dkt. No. 29-1] to the Nishi Declaration was submitted to establish the fair market value of the wine Transfers on the date closest to the date of the Transfers that the Trustee could identify. Defendant's statements at the hearing regarding Mr. Nishi's Declaration relating to the actual bottles of wine misconstrued Mr. Nishi's statements.

In what appeared to be recognition that it is the time of the transfer that is relevant, at the hearing on the Trustee's Motion for Summary Judgment, Defendant argued that contract law should apply to measure the value he provided. Defendant contends that contract law provides that his damages are the full value of the cover price for the wine. The cover price is the value of the wine at the time that it was transferred to him, which the Trustee contends is $153,586.84. In responding to the restitution methodology used by courts to calculate reasonably equivalent value at the time of the transfer, Defendant contends that the claim he waived when he received the wine Transfers is the cover price of the wine and that the cover price should be the measure of reasonably equivalent value, not merely the actual value that Defendant paid. Defendant's argument fails, among other reasons, because his "breach of contract" claim under his theory of damages and reasonably equivalent value calculations is an unsecured claim in a Chapter 7 bankruptcy case with over $50 million in filed clams. If Defendant is requesting that the waiver of his breach of contract claim be used as the measure of reasonably equivalent value, the value of an unsecured claim of $153,586.84 sharing pro rata with over $50 million other claimants  will be substantially less than the value he actually paid. Defendant's argument about reasonably equivalent value fails both because his claim arises from the Debtor's fraud and because, even if contract law were relevant, his claim has a value of substantially less than 100% in this bankruptcy case.

## IV.    DEFENDANT'S VERSION OF THE GOOD FAITH STANDARD DOES NOT APPLY.

Defendant called Premier Cru's business a Ponzi scheme and accused Premier Cru of "criminal fraud." He had actual knowledge that this was a fraud. In an effort to distract the Court from those very relevant and condemning facts, Defendant largely ignores the facts and law that defeat his good faith defense and tries to divert the Court's attention to an analysis of why inquiry

---

Paragraph 13 of Mr. Nishi's Declaration in Opposition to Defendant's Motion does not state that the purchase orders attached as Exhibit "18" were the actual bottles of wine transferred to Defendant. Rather, his statement relates to the timing of when the Defendant's wines were segregated for purposes of shipment. The Trustee is not required to trace the particular bottles of wine transferred from a particular source and did not do so, or intend to do so, here. Exhibit "18" is submitted to establish the amount paid by Premier Cru on the open market for the types of wines transferred to Defendant, using a date that was the closest in time to the Transfers. Defendant has offered no evidence to refute these valuations of the wines.

notice should not apply. The Defendant has argued that the standard of good faith is something different from that established in *Cohen* and the Ninth Circuit decisions cited in the Trustee's papers, promoting an argument based on three decisions of the California Court of Appeal that suggest that a more subjective, actual knowledge of or complicity in the transferor's intent to defraud is the standard for finding lack of good faith by the transferee under California Civil Code § 3439.08. First, Defendant's myopic reading of the comments to § 3438.08 of the Civil Code that "active participation" in the fraudulent scheme or "collusion" with the transferor is required for a showing of lack of good faith wholly ignores the remaining text. As set forth in the Trustee's papers (Plaintiff's Reply [Dkt. No. 51], p. 13), the legislative comment must be read in its entirety:

> "As used in this subdivision and in subdivision (d), "good faith" means that the transferee acted without actual fraudulent intent and that he or she did not collude with the debtor or otherwise actively participate in the fraudulent scheme of the debtor. **The transferee's knowledge of the transferor's fraudulent intent may, in combination with other facts, be relevant on the issue of the transferee's good faith of the transferor or of the transferor's insolvency**.

Comment 1, Cal. Civ. Code § 3439.08 (emphasis added). Thus, Defendant cannot unilaterally lower this standard so that he can meet his burden of showing good faith. Defendant made it known with clarity that he was aware of the transferor's fraudulent intent.

Second, the decisions, *Lewis v. Superior Court*, 30 Cal.App.4th 1850 (1994), *Annod Corp. v. Hamilton & Samuels*, 100 Cal.App.4th 1286 (2002), and *Nautilus, Inc. v. Yang*, 11 Cal.App.5th 33 (2017), are not binding on the Bankruptcy Court, as the *Cohen* and other Ninth Circuit and Ninth Circuit Bankruptcy Appellate Panel decisions are. Further, the holdings, when applied to the facts presented in those cases, are inapposite and do not represent the standard applicable to the claims and Defendant's good faith defense here.

*Lewis*, *Nautilus* and *Annod* illustrate the saying that "bad facts make bad law." In both *Lewis* and *Nautilus*, one question for the courts was whether a document recorded in the County records, in one case an unindexed *lis pendens* and in the other a judgment lien that was missed by a title company, in connection with the transfer of an interest in real property provided the notice or knowledge to the transferee sufficient to preclude the transferee from claiming good faith status. In *Lewis*, the transferees had no actual knowledge of the recorded document until after the transfer,

and no actual knowledge of prior misconduct by the transferor. In both cases, the transferees were arm's length transferees of an interest in real estate who acquired their interests in the properties with institutional title insurance, and in conformity with usual steps in similar real estate real estate transactions.

In *Lewis*, the *lis pendens* was not indexed by the County Recorder until after the transferees took title to the property. The buyers had no knowledge of the *lis pendens* or the litigation giving rise to it, and the *lis pendens* was subsequently expunged. Further, the buyers of the property made millions of dollars in renovations to the property after their purchase closed. Though the Court in *dicta* describes the standard for the good faith defense under the fraudulent transfer statute as a subjective standard, the statements were not necessary to the decision and were made in a case factually inapposite to that against Defendant. In effect, the holding in *Lewis* is that the constructive notice imparted under the real estate recording laws of a prior recorded document alone does not give the transferee notice of the avoidability of the transfer so as to preclude that transferee from satisfying the good faith defense under section 3439.08.

In *Nautilus*, the transferee was a reverse mortgage lender which had no notice of a prior recorded abstract of judgment before it received the transfer of its interest in the real property. The fraudulent transferor accomplished the transfer in that case in two steps. The two brothers originally held title to the property as joint tenants when Nautilus obtained an $8 million judgment against one of the brothers. The two brothers in separate transfers transferred title to the property to their father, who then obtained the reverse mortgage. The title company missed the abstract of judgment recorded against the property, the reverse mortgage was funded and paid off two other liens on the property, and when the transfer was subsequently discovered by Nautilus, Nautilus sued under fraudulent transfer and other theories.

The Court in *Nautilus* surveyed the standards for the good faith defense articulated by the courts in *Lewis* and *Annod,* certain federal court decisions, and the legislative comments, and concluded:

> a transferee cannot benefit from the good faith defense if that transferee had fraudulent intent, colluded with a person who was engaged in the fraudulent conveyance, actively participated in the

fraudulent conveyance, or had *actual knowledge of facts showing knowledge of the transferor's fraudulent intent.*

*Nautilus, Inc. v. Yang*, 11 Cal.App.5th at 49 (emphasis in original).

The Court in *Nautilus*, as in *Lewis,* was focused on articulating a standard that would not be interpreted as an "inquiry notice" concept but would focus on facts actually known by the transferee indicating the transfer was avoidable because of the transferor's fraudulent intent, particularly based on the facts of that case where a lien had been recorded but had not been discovered by the title company. *Nautilus*, 11 Cal.App.5th at 46. The evidence presented by the defendant showed that two of the potential badges of fraud highlighted by the plaintiff were under the circumstances consistent with industry norms in reverse mortgage financing (the transfer was made to a family member and without consideration shortly before the financing was requested). *Nautilus*, 11 Cal.App.5th at 47. The defendant also presented evidence that it had investigated the senior mortgage file and found no current delinquency on the senior loan and no indication the property was distressed. *Id.* Further, the Court found that the existence of one judgment lien against the property for a relatively small amount that had not been satisfied did not obligate the reverse mortgage lender to inquire into other litigation, and the Court did not find that the lender was obligated to conduct an independent inquiry into the transferor just because the transferor was involved in prior litigation. *Id.* at 48. In fact, though the Court rejected an "inquiry notice" standard in that case, the lender in *Nautilus* did look into issues that could have been red flags and was satisfied they were consistent with "normal, not fraudulent" circumstances in reverse mortgages. *Id.* at 49.

The *Annod* decision also is distinguishable and concerned substantially different circumstances. There, a landlord of a law firm that went out of business sued individual attorneys of the firm for fraudulent transfers. The landlord argued that the firm's partners who were continuing to work and receive their regular draws had received actual fraudulent transfers, as they were being paid their salaries knowing the firm was not paying its rent. The Court refused to allow the draw payments to be avoided as fraudulent transfers, agreeing with the trial court that the lawyers acted in good faith in simply receiving their regular draws in exchange for their work for

the firm, despite the firm's looming insolvency and rent delinquency. In so holding, the Court noted, "*Annod* cites no authority for the proposition that accepting partnership compensation with the knowledge that lease payments are overdue is tantamount to the participation in a fraudulent scheme. Similarly, *Annod* cites no authority to the effect that a partner is prohibited from receiving a partnership draw authorized by the relevant partnership documents if the partnership cannot make its rent payments." *Annod Corp. v. Hamilton & Samuels*, 100 Cal.App.4th at 1299-1300. The unique facts of *Annod* make it improper to draw any broader interpretation of "good faith" beyond that factual context.

These three California decisions are compatible with the formulation of the good faith standards articulated in decisions in the Ninth Circuit, including *Cohen* and others cited above. *Cohen*'s formulation of the good faith standard specifically requires "enough knowledge of the actual facts" to warrant investigation, just as the reverse mortgage lender in *Nautilus* examined the facts of which it had actual knowledge but concluded they did not suggest something nefarious or fraudulent. Other decisions also address the facts actually known to the transferee which either directly show fraudulent intent or other facts indicating the transfer is avoidable or suggest "something is wrong." *In re AVI, Inc.*, 389 B.R. at 736 (citing *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 897–98 (7th Cir.1988)). *See also In re Goodwin,* 115 B.R. at 677 ("knowledge of sufficient facts"). Even where the decisions refer to "inquiry notice," they do so in the context of facts known to the recipient of the fraudulent transfer that would indicate potential voidability of the transfer based on fraud or other suspicious conduct by the transferor.

Where the recipient has actual knowledge of facts that are suspicious and warrant investigation, which would have led to knowledge of the fraud or insolvency of the transferor, the transferee is not in good faith. In any event, Defendant himself called this a "Ponzi scheme" and "criminal fraud." He was on actual notice of the fraud. Defendant cannot meet the standard of proof of good faith established in *Cohen* and other binding authority here.

## V.     THIS IS NOT A SEVEN-YEAR PREFERENCE ACTION.

Count II is brought by the Trustee, pursuant to California's Uniform Fraudulent Transfer Act ("CUFA"), California Civil Code § 3439. The claims seek to avoid and recover actual fraudulent transfers made by the Debtor within the seven years preceding its filing of a bankruptcy petition on January 8, 2016. The Court raised inquiry about whether the fraudulent transfer claims are essentially a preference claim with a 7 year reach back. There are fundamental differences between preference and fraudulent transfer law. A preference claim relates to a particular creditor who was paid ahead of others and may have done so by racing to the courthouse. One creditor simply may have been paid ahead of another legitimate creditor. A fraudulent transfer case focuses on the debtor, its intent, and the diminishment of the debtor's estate. *See McFarland v. GECC (In re International Manufacturing Group, Inc.)*, 538 B.R. 22, 26-27 (Bankr. E.D. Cal. 2015) (court distinguishes fraudulent transfer and preference issue). Here, at the time of Premier Cru's bankruptcy, approximately 4,500 customers did not received pre-arrival wine for which they had paid. Those who did receive transfers, such as Defendant, took value out of the Debtor's estate. The fraudulent transfer claim is brought not because Defendant was preferred over another creditor, but because Defendant received value out of the estate to the detriment of all creditors. Because the Defendant cannot establish a good faith defense, he does not get the benefit of the "value" component of the defense. Under fraudulent transfer law, the prior satisfaction of an outstanding obligation is avoidable, without credit for value paid, even where the transferee was a creditor at the time of the transfer. Those are the facts here, and Defendant received the Transfers to the detriment of all creditors of the estate at a time when he was not in good faith.

## VI.     CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court grant Plaintiff's Motion for Partial Summary Judgment or, Alternatively, for Order Adjudicating Facts Existing Without Controversy.

Dated: April 26, 2019                              DIAMOND MCCARTHY LLP

By: */s/ Kathy Bazoian Phelps*
KATHY BAZOIAN PHELPS
Attorneys for Michael Kasolas, Chapter 7 Trustee