

1

2      The following constitutes the order of the Court.
       Signed: April 23, 2021

3

4

5      _____
       **William J. Lafferty, III**

6      **U.S. Bankruptcy Judge**

7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                     OAKLAND DIVISION

11

12  In re                      )   Lead Case No. 16-40050 WJL
                               )
13  FOX ORTEGA ENTERPRISES,    )   Chapter 7
    INC., dba PREMIER CRU,     )
14                             )
                 Debtor.       )
15  _____ )
                               )   Adversary Proceeding No. 18-04019
16  MICHAEL G. KASOLAS,        )
    Trustee,                   )
17                             )
                 Plaintiff,    )   HEARING HELD
18                             )
            v.                 )   DATE:        February 3, 2021
19                             )   TIME:        10:30 a.m.
    WAYNE NICHOLSON,           )   LOCATION:    220
20                             )                1300 Clay Street
                 Defendant.    )                Oakland, CA 94604
21  _____ )                VIA VIDEOCONFERENCE

22                          **OPINION**

23  William J. Lafferty, III, U.S. Bankruptcy Judge

24      This matter came for hearing via videoconference on

25  February 3, 2021, on the Motion for Partial Summary Judgment, or,

26  Alternatively, for Order Adjudicating Facts Existing Without

27  Controversy (for convenience hereafter, the "Second MSJ") brought

28  by the Trustee, Michael G. Kasolas (the "Trustee" or "Plaintiff,"

as the context may require).  Second MSJ, ECF No. 114.  Kathy
Bazoian Phelps and Karen Diep of Diamond McCarthy LLP appeared for
the Trustee.  David Rosendorf of Kozyak Tropin & Throckmorton, P.A.
and Jane Kim of Keller Benvenutti Kim LLP appeared for Defendant
Wayne Nicholson ("Defendant" or "Nicholson").  For the reasons set
forth below, the Court GRANTS the Second MSJ.

Complex and multi-faceted as the issues presented in this
matter are, on the most basic level, the parties simply "view" this
matter through completely different lenses.  These differing views
pertain throughout the matter, dictate the scope and nature of the
parties' disputes and their arguments, and explain the conclusion
the Court reaches in this Opinion.

For Defendant, this is a simple case that may be resolved,
simply, from his view of what he believes to be the relevant facts
concerning his transaction:  Defendant purchased expensive, highly
sought-after wines from Premier Cru (also referred to as, the
"Debtor") on a pre-arrival basis; and, though there were delays and
anomalies in delivery, each of which he duly noted, in messages to
Premier Cru and to its principal, John Fox, of increasing intensity
and increasingly threatening tone and content, at the end of the
day, he got the wine he paid for.  End of story.

The Trustee surveys, and describes to the Court, a much
broader and, in the Court's mind, more legally relevant landscape:
upon filing bankruptcy, Premier Cru was massively insolvent, having
"sold" to numerous customers wines that it not only did not have,
or have any right to obtain, but, as set forth in a plea agreement
entered into by Fox (hereinafter, the "Plea Agreement" or "Fox's
Plea Agreement"), in large part never had any intention of

obtaining. Rather, as Fox's Plea Agreement describes, Premier Cru knowingly solicited orders it never intended to fulfill, diverted the funds obtained to personal uses of its principal, and "satisfied" the demands of insistent and suspicious customers by delivering "their" wines not via pre-arrival orders from famous chateaux, but by obtaining the wines in a "catch as catch can," ad hoc basis.

Against this narrative of overarching fraud, the Trustee, no longer relying on establishing a "Ponzi Scheme Presumption," as set forth in his initial attempt to obtain summary judgment, seeks to establish that particular transfers of wine to Defendant exhibited anomalies that take them outside the ordinary course of the Debtor's business as publicly represented, and which correspond to the conditions described in Fox's Plea Agreement. Each of these transfers, which occurred after Defendant had noted the same abnormalities, concluded that Premier Cru and Fox were engaged in a fraud, and threatened to reveal the scheme to the authorities, were made with actual intent to defraud.

Having reviewed the evidence and the arguments presented, which include the Plea Agreement and evidence establishing that the transfers he seeks to avoid were made under circumstances that constitute badges of fraud as contemplated by the relevant statutes, and having concluded that Defendant has neither presented facts that would demonstrate the existence of a genuinely disputed question of fact, nor effectively questioned the inferences that the Trustee seeks to have the Court draw, nor asserted any counter-inferences that would have the slightest plausibility, the Court concludes that the Trustee has met his burden of demonstrating that

-3-

the transfers identified were made by Premier Cru (acting through its principal John Fox) with actual intent to hinder, delay, and defraud creditors of the Debtor, and summary judgment is appropriate.

Moreover, in light of the existence of the circumstances that demonstrate the fraudulent nature and intent of the transfers, and the fact that Defendant was not only aware of essentially all of these circumstances but also had concluded from those circumstances that the Debtor's business was fraudulent, and had used that information to demand prompt delivery of his wine, the Trustee has also satisfied any reasonable burden to show that Defendant had not acted "in good faith" with respect to the transfers, and summary judgment is appropriate on that ground as well.

**I.     PROCEDURAL AND FACTUAL BACKGROUND**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(H), and the General Order of Reference promulgated by the United States District Court for the Northern District of California (G.O. 24).[1] Venue is appropriate in this district pursuant to 28 U.S.C. § 1409(a).

_____

[1] The Court intends to enter an Order Granting Motion for Partial Summary Judgment, contemporaneous with this Opinion. The Court is mindful of Defendant's declination to consent to this Court entering a final order or judgment in this proceeding. Answer Compl. 2, ECF No. 10. Pursuant to Bankruptcy Local Rule 7016-2, this Court hereby determines that the Court may enter a final order or judgment herein based upon (a) the Court's conclusion that there are no genuinely disputed issues of material fact as to the claims for which summary judgment is sought in this matter; the Court is therefore not making determinations of disputed issues of fact that would implicate a deferential standard of review by an Article III tribunal, and (b) an order granting summary judgment will be subject to de novo review upon appeal in any event. *United States v. Phattey*, 943 F.3d 1277, 1280 (9th Cir. 2019)(citation omitted). Moreover, though Defendant has asserted a right to a jury trial in this action to recover a fraudulent transfer, that right is only applicable to the extent that the matter need be decided via trial, and is not subject to summary disposition. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 63–64 (1989); *Johnson v. Neilson (In re Slatkin)*, 525 F.3d 805, 811 (9th Cir. 2008).

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 4 of 79

This Opinion constitutes the Court's Findings of Fact and Conclusions of Law as set forth in Federal Rule of Bankruptcy Procedure 7052.

Some procedural and factual background is necessary fully to understand this factually and legally complex matter, and to explain the Court's disposition.

**A.   The Trustee's Complaint**

This adversary proceeding was commenced by the Trustee's filing of a Complaint on January 5, 2018.  The Complaint contained five causes of action based on 11 U.S.C. § 548(a)(1)(A) (transfer made with actual intent to hinder, delay, or defraud), 11 U.S.C. §§ 544 and 550, and California Civil Code section 3439.04(a)(1)[2] ((1) transfers made with actual intent to hinder, delay, or defraud, state law via trustee's strong arm powers, and (2) obligations incurred with actual intent to hinder, delay, or defraud, state law via trustee's strong arm powers), and 11 U.S.C. §§ 544 and 550, and CUVTA section 3439.04(a)(2) ((1) constructively fraudulent transfers made, state law via trustee's strong arm powers, and (2) constructively fraudulent obligations incurred, state law via trustee's strong arm powers), and sought to avoid as actually and constructively fraudulent, transfers of wine made to and obligations incurred to Defendant.

---

[2] California Civil Code section 3439.01 et seq. is known as the California Uniform Voidable Transactions Act, hereinafter referred to as CUVTA.  CUVTA is California's adoption of the Uniform Fraudulent Transfer Act, renamed the Uniform Voidable Transactions Act in 2014.  It has been adopted by 43 states, the District of Columbia, and the U.S. Virgin Islands.  *Fraudulent Transfer Act*, Uniform Law Commission, https://www.uniformlaws.org/committees/community-home?CommunityKey=4226ae7c-91c0-4ce9-b488-8520dbc39ea3 (last visited April 20,2021).  For convenience, the Court will mainly discuss the claims using the term "fraudulent transfer" as opposed to "voidable transfer."

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 5 of 79

Defendant filed an Amended Answer to Complaint on July 20, 2018, contesting the Trustee's assertions.

**B.   The Initial Summary Judgment Motion and Defendant's Responses**

On January 29, 2019, the Trustee filed his Motion for Summary Judgment or, Alternatively, for Order Adjudicating Facts Existing Without Controversy, and supporting pleadings and documents (collectively, the "Initial MSJ").  Initial MSJ, ECF Nos. 24-25, 27-29, 32.  The Initial MSJ sought relief on the bankruptcy-law based and state-law based claims that Defendant had received transfers of wine that were voidable (and recoverable) as actually fraudulent to a creditor of this estate, and targeted specifically and solely transfers that had been made to Defendant after Defendant had sent an email to the Debtor accusing the Debtor of running a Ponzi Scheme, and threatening action (hereinafter, the "Ponzi Email").

The Initial MSJ sought relief based on the assertion that Debtor's business operation was a Ponzi Scheme, based primarily on the Plea Agreement.  The Trustee further asserted that if the Court so found, governing case law established that such a finding would entitle the Trustee to utilize the Ponzi Scheme Presumption, which would conclusively establish that the transfers were made with actual intent to hinder, delay, or defraud.  Alternatively, the Trustee asserted that the transfers were made with the presence of numerous "badges of fraud," as set forth in CUVTA section 3439.04(b), that would support inferences that the transactions were made with actual intent to defraud.  In addition, the Trustee relied on Defendant's emails as both supporting one of the badges

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 6 of 79

of fraud, as well as negating any good faith defense by Defendant under CUVTA section 3439.08(a).

In response, Defendant filed both an Opposition to the Initial MSJ (the "Opp to Initial MSJ") and a Motion for Summary Judgment on the Pleadings, etc. (the "MSJOP"). Opp to Initial MSJ, ECF No. 39; MSJOP, ECF No. 40. In brief, Defendant's Opp to Initial MSJ argued that (a) it would be inappropriate to use CUVTA to determine that the subject transfers were in aid of a Ponzi Scheme, based on what Defendant alleged other state courts had concluded in allegedly similar circumstances, (b) as a matter of law, a Ponzi Scheme could not be found outside of the fraudulent securities-based investment scheme scenarios, and (c) the Trustee's pleading failed to establish that he was entitled to the Ponzi Scheme Presumption, based on a failure to demonstrate that the Debtor's business was in fact a Ponzi Scheme or, at a minimum, that, given the limited scope of the Ponzi Scheme, as asserted by Defendant, that the subject transfers were made in aid of such a scheme. Defendant further asserted that the subject transfers were made in good faith within the meaning of CUVTA section 3439.08(a), and that the Trustee had failed to establish that the transfers were not made in good faith, because they were made for value, because Defendant acted in good faith and without knowledge of the voidability of the transfers.

The MSJOP reiterated the arguments regarding the insufficiency of the Trustee's pleadings, and argued that (a) the Complaint should be dismissed as not having provided adequate specificity concerning fraud claims, (b) the Complaint should be dismissed and/or the Initial MSJ should be denied and relief granted to Defendant based on the arguments that relief was not available

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 7 of 79

under CUVTA on a Ponzi Scheme theory, (c) the Trustee's Complaint and the Initial MSJ failed to allege competently or to demonstrate the existence of a Ponzi Scheme, and (d) Defendant was entitled to judgment as a matter of law on his good faith defense.

Defendant's pleadings were also accompanied by objections to the Trustee's evidence for the Initial MSJ, and the pleadings were interspersed with critiques of the relevancy or the sufficiency of the Trustee's evidence, and complaints about the Trustee's alleged failure to respond to Defendant's discovery requests.  Objs. Evid. Initial MSJ, ECF No. 39-1.  Most prominently, Defendant urged the Court to exclude Fox's Plea Agreement from admission, or at the least not to consider it probative on the question whether the Debtor was actually operating a Ponzi Scheme.

**C.    The Court's September 5 Memo Ruling on the Motions**

After a lengthy oral argument on April 3, 2019, and supplemental post-hearing briefing by the parties on certain issues, the Court took the matter under submission.  On September 5, 2019, the Court issued its seventy-nine page Amended Memorandum of Decision (the "September 5 Memo").  Sept. 5 Mem., ECF No. 76.  In brief, the September 5 Memo essentially denied all of the relief requested in the Initial MSJ and the MSJOP, with the exception of ruling that there was no genuine dispute but that the subject transfers were made to Defendant after Defendant had delivered numerous angry and threatening email messages to Debtor, culminating in the Ponzi Email.

The September 5 Memo is quite lengthy and represented the Court's attempt not only to deal comprehensively with the issues presented, but also to provide as comprehensive an explanation as

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 8 of
79

possible of the Court's rulings and its reasoning, particularly in light of the fact that the September 5 Memo resolved very little of the disputes between the parties, and it was obvious to the Court that most, if not all, of these issues would be revisited in subsequent pleadings, as is indeed the case.

The Court hereby incorporates, but will not restate in this Opinion, all of the background facts and reasoning contained in its September 5 Memo. Rather, in the interests of brevity, the Court will refer to the September 5 Memo for background as necessary in this disposition. However, the Court believes that it is appropriate and it should assist in the disposition of this matter quickly to summarize the holdings from the September 5 Memo.

As an initial matter, in the September 5 Memo, the Court declined Defendant's request to exclude the Plea Agreement from evidence and essentially rejected the insufficient evidence and discovery-related arguments set forth in the MSJOP.

The Court declined to determine that the Trustee had established that the Debtor's business was a Ponzi Scheme to such an extent that the Trustee would be entitled to the Ponzi Scheme Presumption, which would have established that all of the subject transactions were fraudulent and were made with actual intent to hinder, delay, or defraud. Sept. 5 Mem. 23–24, 44. The Court made this determination based on review of case law that required greater certainty than the Trustee had provided with respect to the scope of the Ponzi Scheme activity in the Debtor's business. Stated differently, although the Court accepted into evidence and considered the Plea Agreement as setting forth, generally, the fact that at least a portion of the Debtor's business was run as a Ponzi

Scheme, it was not clear from the evidence before the Court that the subject transfers were made in furtherance of that scheme.[3]

The Court also rejected the more sweeping assertions in the MSJOP and the Opp to Initial MSJ, that the Trustee was precluded from using CUVTA to determine that the subject transfers were part of a Ponzi Scheme, and that a Ponzi Scheme determination must be limited to fraudulent securities-based investment schemes, as not supported by the case law.

The Court also declined to determine on summary judgment that the subject transfers were made with actual intent to defraud based on the Trustee's assertions of the presence of numerous "badges of fraud," based on the Court's conclusion that the evidence provided by the Trustee on these points either did not establish that there was no genuine issue of disputed fact, and that granting the Initial MSJ would have required the Court impermissibly to indulge inferences in favor of the Trustee, that would have run afoul of the rule that, on a motion for summary judgment, the Court may not "weigh evidence," or grant the motion where a counter inference might have been accepted by the trier of fact.

The Court declined to grant the MSJOP based on its view that Defendant's arguments about the applicability of CUVTA and the scope of Ponzi Schemes were not well-taken, and that Defendant's

---

[3] As the Court noted in the September 5 Memo: "Were the Court to apply the Ponzi Scheme Presumption, the Court would find that Premier Cru's fraudulent business was specifically a Ponzi Scheme, and that because it was a Ponzi Scheme any transfers made by Premier Cru were inherently fraudulent and made with the intent to hinder, delay, or defraud creditors. The Ponzi Scheme Presumption renders unnecessary analyses of individual transfers, because the Presumption recognizes that the Ponzi Scheme had no legitimate business purpose and that the only point of the Scheme was to perpetuate the fraud." Sept. 5 Mem. 13, ECF No. 76.

arguments concerning the facts that the Trustee might establish were, at best, premature and inappropriate at that stage of the litigation. The Court also determined that the Trustee's Complaint and subsequent pleadings set forth claims of fraud with sufficient particularity, and denied the MSJOP on that basis.

Finally, the Court denied the MSJOP's request that the Court determine, essentially as a matter of law, that Defendant was entitled to assert the "good faith defense" set forth at CUVTA section 3439.08(a) against recovery of the subject transfers, based on the Court's reading of the relevant California case law, and the undisputed statements in Defendant's emails concerning his suspicions about and allegations against the Debtor. And while the Court did not rule as a matter of law that Defendant could not have been acting in good faith, in light of the uncertainty concerning the Trustee's allegations concerning badges of fraud, the Court indicated that if the Trustee actually established the existence of the badges of fraud that he had asserted, it appeared highly unlikely that the Court could simultaneously determine that Defendant had acted in good faith.

While the Court affirmatively decided only one issue in the Trustee's favor in the Initial MSJ, it is important to note that the Court also declined to decide any issues in the negative. In other words, the Court did not conclude that the Trustee could not establish issues critical to his case, or even foreclose the possibility that the Trustee, on a different showing, and under differently framed criteria, might establish some of his claims via a motion for summary judgment. For example, while the Court declined to agree that the Trustee was entitled to wield the Ponzi

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 11 of
79

Scheme Presumption in the Initial MSJ, the Court neither concluded
that Premier Cru's business was not, to a significant extent, a
Ponzi Scheme, nor that the admissions in the Plea Agreement could
not support a finding of actual fraud in fact throughout Premier
Cru's business, and provide a further basis to demonstrate the
existence of badges of fraud in the transactions and the intent
behind them.  This clarification demonstrates further that the
question in this matter is not so much whether the Debtor's
business was, at least in part, a Ponzi Scheme, but whether the
aspects of the business that were so tainted extended to the
subject transactions.

**II.   THE TRUSTEE'S SECOND MOTION FOR SUMMARY JUDGMENT**

    **A.   The Trustee Reasserts Claim for Actual Fraudulent Transfers**

On November 10, 2020, the Trustee filed a Motion for Partial
Summary Judgment or, Alternatively, for Order Adjudicating Facts
Existing Without Controversy, and supporting declarations and
pleadings (collectively, the "Second MSJ").  Pl.'s Second MSJ, ECF
Nos. 114 through 114-8.  In filing this Second MSJ, the Trustee
shifts focus from establishing an entitlement to rely on the Ponzi
Scheme Presumption to demonstrating that transfers of wine were
made with actual fraudulent intent through reference to badges of
fraud.  The Trustee still relies on Debtor's Plea Agreement to set
the fraudulent background of the transfers, and that document
provides a highly relevant and valuable road map to the fraud
perpetrated here.  But in this Second MSJ, the Trustee analyzes
each of the subject transfers, i.e., each post Ponzi Email delivery
of wine to Defendant, to show why and how the transfers fit within
the Debtor's admitted scheme.

The Trustee's Second MSJ seeks to avoid, as transfers made with actual intent to hinder, delay, and defraud under (a) §§ 548(a)(1)[4] and 550 of the Bankruptcy Code and (b) section 3439.04(a)(1)[5] of CUVTA, made applicable by §§ 544 and 550 of the Bankruptcy Code, the transfer of 140 bottles of wine (plus a replacement bottle) valued at $154,306.60 (collectively, the "Subject Transfers"). These claims correspond to the first and second claims for relief as set forth in the Complaint.[6] The Subject Transfers are made up of five different types of wine: 2007 Chateauneuf da Capo, Pegau ("Capo"), 2009 Latour ("Latour"), 2009 Cheval Blanc ("Cheval Blanc"), 2009 Chateau d'Yquem 1/2 ("d'Yquem"), and 2009 Lafite Rothschild ("Lafite").

To demonstrate that the Subject Transfers fall within Debtor's admitted fraudulent scheme, the Trustee attempts to show that:

- Premier Cru overpromised or oversold each type of wine that was transferred to Defendant;

---

[4] "The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." 11 U.S.C. § 548(a)(1).

[5] "A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
(1) With actual intent to hinder, delay, or defraud any creditor of the debtor." CUVTA § 3439.04(a)(1).

[6] Although the Trustee's Second MSJ seeks to avoid the transfer of 141 bottles, that quantity includes a bottle of Lafite that was used to replace one of the Subject Transfers that was broken. The Trustee has subsequently agreed that the replacement bottle does not need to be counted as an extra transfer. Pl.'s Statement Re Second MSJ 2, ECF No. 149.

-13-

- After Defendant in several emails accused Debtor and Premier Cru of operating a Ponzi Scheme and fraud, Debtor scrambled to fulfill Defendant's orders through retail purchases, ahead of other customers that had placed their orders in advance of Defendant;

- In his scrambling efforts to fulfill Defendant's orders, Debtor consistently paid more for the wine than Defendant had paid.

In order to establish that the Subject Transfers are linked to the various badges of fraud, the Trustee primarily relies upon the Declaration of Brian Nishi, a former employee of Premier Cru for approximately 20 years, and its accompanying exhibits (collectively, the "Nishi Declaration"). Nishi Decl., ECF No. 114-5. The Nishi Declaration, which includes supporting materials, is based upon Mr. Nishi's personal knowledge and reconstruction of Premier Cru's records based on his review of the company's MAS500 software and physical records.

The Trustee asserts a good faith defense is not possible due to the long trail of emails between Defendant and Premier Cru in which Defendant complains about delays, Premier Cru's inability to respond to Defendant's complaints, delayed refunds, and, most notably, Defendant's August 15, 2013 email in which he accuses Premier Cru of fraud and running a Ponzi Scheme and threatens to report the entity to the authorities. The Trustee argues that these emails demonstrate that Defendant had actual knowledge of facts that demonstrated Premier Cru's fraudulent intent, rendering the good faith defense inapplicable.

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 14 of 79

## B. **Defendant's Opposition**

Defendant filed an Opposition[7] that challenges the Trustee's Second MSJ on the bases that the underlying factual support is unreliable and inadmissible and that, even if the underlying support is accepted by the Court, there are holes in the Trustee's badges of fraud theory and material disputes of fact for a jury to decide. Def.'s Opp'n Second MSJ 7, ECF No. 126. Further, Defendant asserts that there are disputed facts as to what Defendant knew, in regard to Debtor's intent, and therefore,

---

[7] Following the Court's September 5 Memo, both parties indicated that they might need to supplement their prior disclosures and discovery responses. Joint Status Conf. Statement, ECF No. 95. By April 2020, the Trustee had provided supplemental documents and responses to Defendant and informed Defendant that he may perform additional discovery and was evaluating filing a new summary judgment motion. Stip. Cont., ECF No. 101. The Trustee proceeded to conduct discovery over the next couple of months. *See* Stip. Cont. Status Conf., ECF No. 104; Joint Status Conf. Report, ECF No. 107. In a Joint Status Conference Statement in August, Defendant stated that he understood fact discovery to be closed until he received Requests for Admission from the Trustee, and he reserved the right to conduct his own fact discovery. ECF No. 107.

On November 3, 2020, the parties filed a Stipulation Continuing Hearing, later made an order of the Court, in which it was revealed that the Trustee anticipated imminently filing a motion for partial summary adjudication. ECF No. 111. The stipulation stated that the parties agreed to meet and confer with respect to a briefing schedule and date for the motion to be heard by the Court and requested that the status conference scheduled for November 4 be continued to December 9. *Id.*

On November 10, the Trustee filed his Second MSJ and set the hearing on the motion for December 9. ECF No. 114. Defendant did not timely file an opposition to the Trustee's Second MSJ. Instead, on December 7, just two days prior to the scheduled status conference and hearing on the Second MSJ, the parties filed a Joint Status Conference Statement in which the Trustee argued that discovery was closed and that the Second MSJ was to be heard on December 9, while Defendant sought to conduct further discovery and claimed he had understood that December 9 was only intended to be a status conference per the prior stipulation. ECF No. 117.

After a hearing and additional pleading on the discovery issue by Defendant, the Court held that no further discovery would be allowed, finding that it would be inappropriate for Defendant to conduct discovery after the Trustee filed his motion, where Defendant had more than a year to conduct further discovery, was on notice that a new summary judgment motion was going to be filed for more than six months, and was aware of the contested basis for that motion.

The Court permitted Defendant to file an opposition to the Second MSJ and set a briefing schedule and a hearing date therefor. Order Hr'g, ECF No. 124. The Court ultimately heard lengthy argument on the Trustee's Second MSJ on February 3.

Case: 18-04019    Doc# 150    Filed: 04/23/21    Entered: 04/23/21 16:41:58    Page 15 of 79

summary judgment on whether Defendant received the transfers in good faith is inappropriate.

The Court will note here that Defendant's Opposition is accompanied by a thirteen-page "Exhibit A" that is really just additional argument, in that it provides a transfer-by-transfer analysis in response to the Trustee's Second MSJ. The Trustee requested that the Court strike Exhibit A because with that document Defendant significantly exceeded the permitted page limit (which had already been increased by Court order, based upon Defendant's statement that he would limit his pleading to thirty pages). The Trustee's Reply 15, ECF No. 131; Order Authorizing Oversize Briefing Def.'s Resp., ECF No. 130. The Court agrees with the Trustee that Defendant's inclusion of Exhibit A, which really was just additional argument, was inappropriate, but for reasons stated on the record at the February 3 hearing and in the Order at docket number 143, and to allow for full and complete argument of the matter, the Court accepts Nicholson's Exhibit A and the Trustee's counter exhibit, at docket number 131, and will consider them in this Opinion.

Furthermore, in a footnote, Nicholson continues to object to the Court taking judicial notice of the Fox Plea Agreement. However, the Court overrules this objection as it has already found the Plea Agreement admissible under Federal Rules of Evidence 807, and sees no reason to vary that ruling in this context. Sept. 5 Mem. 22, ECF No. 76.

Case: 18-04019    Doc# 150    Filed: 04/23/21    Entered: 04/23/21 16:41:58    Page 16 of
79

III. **RELEVANT LEGAL STANDARDS**

    A.   **Summary Judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The Court is to look to substantive law to determine which facts are material, and those facts that affect the ultimate outcome, under the substantive law, are material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over material facts is genuine where a reasonable jury could return a verdict for the non-moving party based on the evidence presented. *Id.*

The parties must support their position by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). A motion for summary judgment may not be defeated "by evidence that is merely colorable or is not significantly probative." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Anderson*, 477 U.S. at 249-50). While the Court needs only to consider the cited materials, it may consider other materials in the record, in determining whether to grant summary judgment. Fed. R. Civ. P. 56(c)(3).

When the moving party would not bear the burden of proof at trial, the burden on the moving party may be discharged by "'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S.

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 17 of 79

317, 325 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In the September 5 Memo, the Court provided a caveat regarding the question of whether relying on inferences was appropriate at summary judgment. Sept. 5 Mem. 53-54, ECF No. 76. There, the Court noted that the weighing of evidence is prohibited at summary judgment, and accordingly, applying inferences is inappropriate where there are two permissible inferences to be made. *Id*. As will be explored more fully below at section V.B., Defendant has neither raised nor pointed to any facts that effectively challenge the Trustee's proposed inferences, nor identified any genuinely disputed issues of fact on the matters for which summary judgment is sought, nor asserted any counter-inferences from the facts presented that are appropriate or sufficiently plausible. Accordingly, the Court is left with the firm conviction that no rational trier of fact could reach a different outcome at trial, and the Court's use of what are essentially irrefuted inferences is appropriate to grant summary judgment.

## IV.  ADMISSIBILITY OF THE TRUSTEE'S SUPPORTING EVIDENCE

Before examining the Trustee's asserted badges of fraud, and Defendant's challenges to them, the Court must address issues raised by Defendant regarding the admissibility and reliability of

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 18 of 79

the evidence upon which the Trustee supports his case, primarily
the Nishi Declaration.

The exhibits attached to the Nishi Declaration include sales
orders, purchase orders, pick lists, pack lists, and transaction
spreadsheets. The sales orders are documents generated by Premier
Cru's software showing transactions between Premier Cru and
Defendant, while the purchase orders are also generated by Premier
Cru's software but evidence transactions between Premier Cru and
other vendors. *See* Nishi Decl. Exs. 4, 8, 12-13, 15, 18, 20-21,
26, 31-32, ECF No. 114-5. The pick lists are documents that show
which bottles were pulled from inventory in preparation for
shipment. *See id*. at Exs. 6, 10, 16, 22, 24. The pick lists have
handwritten notes regarding the particular shipment and the
initials of the employee that pulled the wines, inspected the
wines, and packed the wines for shipment. *Id*. The pack lists, or
packslips, are documents included with the shipments that describe
the contents of the shipment. *See id*. at Exs. 7, 11, 17, 23, 25,
27, 29.

Finally, Nishi's Declaration is accompanied by spreadsheets
associated with each of the subject types of wine. These
spreadsheets provide a chronological summary of Premier Cru's
running totals of bottles in inventory, on purchase orders, and
pre-sold. *See id*. at Exs. 5, 9, 14, 19, 30. The spreadsheets
provide a summary accounting for Premier Cru's inventory totals as
wine was purchased, sold, received, and delivered. *Id*. The data
presented in the spreadsheets was generated from Premier Cru's
MAS500 software system, which recorded the running totals of
incoming and outgoing transactions, and the other documents

Case: 18-04019    Doc# 150    Filed: 04/23/21    Entered: 04/23/21 16:41:58    Page 19 of
79

described above.  *Id*. at 2.  Aside from the spreadsheets, which
provide a global view of inventory related to the subject wines
during the subject time period, all of the supporting documents
relate specifically to Defendant's transactions.

Defendant makes several arguments attacking the sufficiency
and admissibility of the Trustee's evidence in support of the
Second MSJ.  However, as the Court remarked during oral argument on
this motion, Defendant did not present his objections in the form
of a separate pleading setting forth the factual and legal bases in
which proffered pieces of evidence should be excluded from
admission; nor did Defendant provide, even in the Opposition, any
relevant legal authorities that would support his broad-based
assertions that most if not all of the Trustee's proffered evidence
should be excluded.  Such a generalized argument is not persuasive.

Defendant's first argument respecting the Trustee's evidence
is that the spreadsheets should not be admitted because they, and
their supporting documents, were not provided to Defendant in
discovery.  The Trustee asserts that the data cited in the
spreadsheets, as well as the supporting documents, was provided to
Defendant through written discovery responses and document
production.  Based on the record and statements at oral argument,
this Court has no basis to dispute the Trustee's assertion.  At
oral argument, Defendant did clarify that while he did receive the
data and supporting documents to the transactions highlighted in
the spreadsheets by the Trustee, he did not receive the data or
supporting documents for the other customer transactions that
contributed to the formulation of the running totals.  Tr. Hr'g
60:1-8, ECF No. 144.  However, seeing that discovery is closed and

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 20 of
79

Defendant had not previously requested the data or documents in question, the Court sees no basis to block admission of the spreadsheets into evidence, and their consideration for the Second MSJ.

Second, Defendant argues that the spreadsheets are not records kept in the ordinary course of business and, therefore, are not admissible. While the spreadsheets themselves are clearly not Premier Cru's business records, the spreadsheets are based upon data that was generated by Premier Cru's MAS500 software system in the ordinary course of business, such as total sales orders, total purchase orders, identities of customers and suppliers, and total inventory. Furthermore, the areas of the spreadsheets that the Trustee has highlighted are supported by pick and pack lists, purchase orders, and sales orders, also kept in the ordinary course of business, and demonstrably so, in this instance. For example, the pick lists include handwritten notes by the employees involved in preparing wine for shipment and the pack lists identify which bottles were packed for shipment. For these reasons, the Court does not find this argument to be meritorious.

Third, Defendant argues that the Nishi Declaration is not based on personal knowledge and, therefore, is inadmissible or, at least, unreliable. Defendant comes to this conclusion because Mr. Nishi uses language "reflecting conjecture." Specifically, in his declaration, Mr. Nishi uses the phrase "it appears" and "it seems" in making observations about Premier Cru's records.

However, it has been established in the Nishi Declaration that he worked for Premier Cru for approximately 20 years, including roughly eight years as Premier Cru's "IT Technician." Nishi Decl.

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 21 of
79

2:8-9. Furthermore, Mr. Nishi's employment was authorized by the Court to act as an IT consultant and technician in this case. *Id.* at 2:10-14. Mr. Nishi does not purport to have personal knowledge of the individual transactions in the sense that he was present and personally observed the fulfilling of orders. Rather, Mr. Nishi is the person most familiar with Debtor's software and operations, such that he can attest to what the records, made in the ordinary course of business, show. In this sense, Mr. Nishi does qualify to testify as to what the records show under Federal Rule of Evidence 803(6) and, therefore, this objection must also be rejected.

Finally, Defendant argues that Premier Cru's business records are unreliable. Defendant points to the Court's own statements about gaps in Premier Cru's inventory system, as well as the Plea Agreement, where Mr. Fox admitted to falsifying purchase orders and financial records. More specifically, Mr. Fox's admission refers to falsely creating purchase orders for wine that he did not actually contract to buy.

On this front, Defendant raises, generally, a valid concern regarding the reliability of Premier Cru's records. In light of this concern, the Trustee has attempted to build the core of his case upon records that fall outside of the scope of Fox's admitted record falsification. Although it is not clear what exactly "financial records" includes, aside from falsely inflated purchase orders, the Trustee does not rely on Premier Cru's accounting records, profit and loss reports, or other types of information indicating the financial health of the organization. To the extent that "financial records" would include documents similar to those relied on by the Trustee, the documents that the Trustee does rely

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 22 of 79

upon are records created in the regular course of business that can
be traced to actual transactions. For example, the Trustee relies
on purchase orders from third parties that are specifically tied to
a retailer or the credit card used to make a purchase. As
discussed previously, the Trustee also relies upon the pick and
pack lists created by Premier Cru staff contemporaneously with
fulfillment of the Subject Transfers. It is also worth noting that
there is no dispute between the parties as to which wines were
transferred to Defendant on what dates and in what quantities.

Finally, to the extent that Mr. Fox may have falsified
purchase orders, one would expect that such falsities would work in
Defendant's favor here and not the Trustee's favor. In the Plea
Agreement, Fox admits that he either falsely inflated the number of
bottles shown on purchase orders or he actually contracted to buy
the wine but knew that Premier Cru would not be able to pay for it,
so that buyers would believe that Premier Cru had contracted to buy
the wine and would eventually deliver. For all these reasons, the
Court finds the documents that the Trustee relies upon, attached to
the Nishi Declaration, to be reliable and admissible.

**V.    ACTUAL FRAUDULENT TRANSFERS**

In his Second MSJ, the Trustee again asserts that there is no
genuine dispute as to the facts that demonstrate Premier Cru
transferred wines to Defendant, after receipt of Defendant's Ponzi
Email, with actual fraudulent intent. A transfer is actually
fraudulent when made "with actual intent to hinder, delay, or
defraud any creditor of the debtor." 11 U.S.C.A. § 548(a)(1)(A);
CUVTA § 3439.04(a)(1).

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 23 of
79

Section 548 of the Bankruptcy Code permits the trustee to avoid any fraudulent transfer of an interest of the debtor in property that was made within two years before the date of the filing of the bankruptcy petition, while § 544(b)(1) allows the trustee to turn to state law to avoid transfers outside the two-year window that would be avoidable by a creditor holding an allowable unsecured claim. There is no shortage of such creditors here, so the Trustee is able to use § 544 to invoke the four-year look back period of CUVTA. CUVTA § 3439.09(a). Whether a transfer is avoidable under CUVTA is a question of California law for which the California Supreme Court is the final authority. *Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221, 232 (B.A.P. 9th Cir. 2007).

Once a transfer is avoided under §§ 548 or 544, the trustee can recover the property transferred, or value of such property, from the initial transferee. 11 U.S.C. § 550(a)(1). Here, Defendant was the initial transferee and there is no question that the Subject Transfers were made within one or both of the relevant look back periods, so the only question is whether the Subject Transfers were made with the actual intent to defraud, etc.

**A.    Ponzi Schemes and Fox's Plea Agreement**

The September 5 Memo contained a description of Ponzi Schemes in general, and the history of Premier Cru's business in particular. Sept. 5 Mem. 36-44, ECF No. 76. While the Court doesn't wish to repeat that discussion at length, it is worthwhile to restate the nature of Ponzi Schemes, and why they are a particularly insidious type of fraud.

While there is not one universal definition of a "Ponzi Scheme," it is a type of fraud made famous by its namesake,

-24-

Charles Ponzi.  Ponzi Schemes have two important characteristics
which distinguish them from other types of fraud:  (1) the promise
of profit that is disconnected from any legitimate business
activity, such as no actual investments being made in the stock
market[8], or no actual purchase of postal orders[9], and (2) use of new
investor funds, instead of legitimate profit, to provide a return
to earlier investors.

Ponzi Schemes typically involve a promise of return upon
investment, or profit or financial advantage to clients, but in
reality are scams in which moneys advanced are not used to purchase
whatever the alleged product of the investment scheme or business
may be, but are substantially diverted improperly to the personal
use of the fraudster.  *See Alexander v. Compton (In re Bonham)*, 229
F.3d 750, 759 n.1 (9th Cir. 2000); *Plotkin v. Pomona Valley*
*Imports, Inc. (In re Cohen)*, 199 B.R. 709, 717 n.9 (B.A.P. 9th Cir.
1996).  And it is the particular feature of Ponzi Schemes that the
ruse of legitimate business activity, and profitability for the
investors, is perpetuated by using the funds supplied by current
investors or purchasers to pay the "profits" or deliver the product
to prior investors.  Where these circumstances are found, courts
may conclude that the transactions subject to such a scheme are
made with actual fraudulent intent, not merely because there is no
legitimate commercial purpose to the transactions, but, critically,

---

[8] As happened in the Bernie Madoff scandal, see James Bandler & Nicholas
Varchaver, *How Bernie did it*, Fortune,
http://archive.fortune.com/2009/04/24/news/newsmakers/madoff.fortune/index.htm
(last updated April 30, 2009).

[9] As happened in the scheme concocted by Charles Ponzi, see Mary Darby, *In
Ponzi We Trust*, Smithsonian Mag. (December 1998),
https://www.smithsonianmag.com/history/in-ponzi-we-trust-64016168/.

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 25 of
79

because the purpose of soliciting new funds and using them to pay older claims is precisely to conceal the fraud, and to allow it to continue. *See, e.g., Barclay v. MacKenzie (In re AFI Holding, Inc.)*, 525 F.3d 700, 702 (9th Cir. 2008); *Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp.)*, 916 F.2d 528, 531 (9th Cir. 1990)[hereinafter *Agritech*].

Thus, the critical distinction between Ponzi Schemes and other types of fraud is the continuing and self-perpetuating nature of Ponzi Schemes. To wit, any single transaction that is made based upon a knowing misrepresentation by the party seeking goods, services or moneys, that is made with intent to defraud, and that is entered into with reasonable or justifiable reliance by the victim, and that results in damages to the victim, is fraudulent. *See Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996). But as the Supreme Court reminded us, "actual fraud" is a broader concept, and need not be limited to false representations, or even false pretenses. *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581 (2016). As the Court stated:

> "Actual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that involves moral turpitude or intentional wrong. "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that may exist without the imputation of bad faith or immorality. Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Id.* at 1586.

To be sure, a Ponzi Scheme is fraudulent in the traditional sense: it has elements both of representational fraud, in the sense that victims are induced to part with money to "invest" or purchase assets that the schemer promises to deliver, but neither

has at the time of the representation, nor has any intention of
acquiring in the manner promised, as well as actual fraud, in the
sense that once the "music stops" the result is, inevitably, no
assets, or very few, to satisfy the claims of those who had parted
with funds.  And the enterprise's victims/creditors are, with the
exception of a lucky few who have been paid some amount, whether by
happenstance or because, as here, they were aggressive in their
collection efforts, invariably left holding a very large and empty
bag.

But Ponzi Schemes differ from simpler instances of fraud
precisely because they are ongoing schemes--they rely for their
"success" upon the illusion of a return, whether fake profits or
goods delivered out of the ordinary course, that is funded not from
actual commercial activity, but by continuing contributions
typically from newer victims, that continues the illusion of
legitimacy by "paying" the claims of earlier investors/victims.  *In
re Cohen*, 199 B.R. at 717 n.9.  And, eventually (and inevitably),
the scheme collapses because the fraudster cannot continue to
attract new victims and funds sufficient to "pay" the ever
increasing base of victims/investors.  *See Donell v. Kowell*, 533
F.3d 762, 779 (9th Cir. 2008); *In re Cohen,* 199 B.R. at 717.  While
the Ponzi Scheme is ongoing, the fraudster has two overriding
goals:  (1) find new sources of moneys via fraudulent solicitations
to pay the earlier investors, and (2) continue to "pay returns" as
necessary to continue the illusion of legitimacy and to avoid
exposure of the fraud by suspicious and unsatisfied investors.
*See, e.g., Agritech*, 916 F.2d at 537.  Hence, the fraudster most

frequently pays or satisfies the claim, by any means available, of the most aggressive and outspoken of the "investors." *Id.*

To the extent that the fraud in a Ponzi Scheme relies on continuing deception, it is not only ongoing, but also it is a fraud that necessarily expands and deepens. And, for precisely these reasons, in the broadest sense all of the "investors" or customers are victims of, and participants in, the fraud, in the sense that every customer parted with moneys under false pretenses, and is paid, if at all, via further fraud; and no victim is any more entitled to payment than any other. *See Donell*, 533 F.3d at 779-80. For this reason, those victims of a Ponzi Scheme who by luck or by aggression receive some or all of their promised consideration before the collapse of the scheme are not simply "paid up"--rather, because they had no greater entitlement to "payment" than any of the numerous victims who were not paid, in the context of a scheme that, by definition, could not ever have paid all of the victims, they are merely the beneficiaries of the fraudster's intentionally fraudulent transfers. *See id.* at 771.

With this context, the Court turns to examination of the admissions in Fox's Plea Agreement. As an initial matter, it is, of course, highly unusual in any fraud case to have a confession of guilt with respect to the fraudulent nature of the transactions as well as the actual fraudulent intent of the perpetrator. And it is striking how closely the admissions in the Plea Agreement track and describe the elements of a Ponzi Scheme.

In the Plea Agreement, Fox admits to having taken orders for "pre-arrival wine," and cash in payment thereof, without having used the funds received to purchase wine; and, when customers

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 28 of 79

complained about non-delivery or delayed delivery of wine, to having obtained "their" wine via spot purchases from other retailers, Fox also states that upon filing this bankruptcy case, and for some material time before, the assets of the Debtor (i.e., bottles of wine or rights to receive wine) were grossly inadequate to satisfy the orders of wine customers.

In Fox's own words:

> First, in many instances, I falsified purchase orders for wine that I had not contracted to purchase and entered them into Premier Cru's inventory for sale. These falsified purchase orders took two forms-either purchase orders that were entirely false, wherein I had not contracted to purchase any of the wine, or purchase orders that were partially false, wherein I had contracted to purchase some of the wine but I fraudulently increased the number of bottles covered by the contract. I priced these wines at prices below market price, knowing that I had not and would not need to actually pay for this wine from any vendors. . . . Customers paid Premier Cru for these phantom wines, believing, based on my various representations, that Premier Cru had actually contracted to purchase them and would eventually deliver them. I agree that I sold or attempted to sell approximately $20 million worth of such phantom wine from 2010 to 2015.

> Second, in other instances, I actually did contract with Premier Cru's foreign suppliers on behalf of Premier Cru to purchase wine, generally with the promise to pay those foreign suppliers within 30 days. In many of these instances, I knew that Premier Cru would not be able to make payment in 30 days, or ever, because (1) I embezzled money from Premier Cru's business accounts that I should have used to pay Premier Cru's suppliers or (2) I diverted money coming in from current customers to obtain wine for prior customers who had never received their wine.

> . . . With respect to diversion of funds to purchase wine for prior customers, over time, many customers complained to Premier Cru about not receiving wine for which they had paid. Directly or indirectly, I lied to these customers, offering various falsified excuses and promises for wine that I knew was not going to be delivered, and I instructed my salespeople or other employees to tell customers things I knew to be false. When customers complained repeatedly or forcefully, I arranged to deliver wine to them even if I had never actually contracted to buy the wine for which they had paid. I often did this by delivering to those customers

wine for which other customers had paid or, in many
cases, by purchasing the wine from other suppliers,
usually at prices much higher than those for which I had
sold the wine in the first place.  A substantial amount
of money in Premier Cru's bank accounts went to purchase
wine in this manner.

I took these and other actions to conceal my ongoing
fraud, to lull customers into a false sense that Premier
Cru was a legitimate business, to cause these customers
to continue to purchase wine from Premier Cru, and to
prevent them from complaining to law enforcement
authorities. . . . and that, at the time of Premier Cru's
bankruptcy, approximately 4,500 customers had not
received pre-arrival wine for which they had paid.  I
agree that these individuals are victims of my scheme.  I
agree that, at the time of Premier Cru's bankruptcy,
customers had paid at least $45 million for wine that
they had not received.

Request Judicial Notice Ex. 2, at 3-6, ECF No. 114-3.

Ponzi Schemes may not be precisely defined, but the fraudulent

scheme detailed in Fox's Plea Agreement clearly is entirely

consistent with the description of such schemes in the case law.

The only remaining question is whether Defendant's transactions

were sufficiently similar to those set forth in the Plea Agreement.

**B.**   **Badges of Fraud**

Subsection (b) of CUVTA section 3439.04 provides a

non-exhaustive list of factors or badges of fraud that may be

considered in determining actual fraudulent intent:

(1) Whether the transfer or obligation was to an insider.
(2) Whether the debtor retained possession or control of
the property transferred after the transfer.
(3) Whether the transfer or obligation was disclosed or
concealed.
(4) Whether before the transfer was made or obligation
was incurred, the debtor had been sued or threatened with
suit.
(5) Whether the transfer was of substantially all the
debtor's assets.
(6) Whether the debtor absconded.
(7) Whether the debtor removed or concealed assets.
(8) Whether the value of the consideration received by
the debtor was reasonably equivalent to the value of the
asset transferred or the amount of the obligation
incurred.

-30-

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.
(11) Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

CUVTA § 3439.04(b).

There is no minimum number of factors that are required to demonstrate fraudulent intent, and only one or two badges of fraud may suffice to find a transfer was made with actual fraudulent intent. *Ezra v. Seror (In re Ezra)*, 537 B.R. 924, 931 (B.A.P. 9th Cir. 2015); *Filip v. Bucurenciu*, 129 Cal. App. 4th 825, 834 (2005). In fact, fraudulent intent may be found even where no badges of fraud are found, when otherwise supported by the evidence. *In re Beverly*, 374 B.R. at 236. Therefore, this Court must review the badges of fraud together with all other evidence in the record to determine whether the evidence and appropriate inferences establish an overall impression of fraudulent intent.

**1.  Transfers Made After Threat of Litigation Already Found as a Badge of Fraud in the September 5 Memo**

In the September 5 Memo, this Court found the fourth enumerated factor in the list of badges of fraud, transfer after threat of litigation, to have been demonstrated and to be without genuine dispute.  Sept. 5 Mem. 52, ECF No. 76.  This finding was based on the fact that all 140 bottles of wine, i.e., the Subject Transfers, were delivered to Defendant after Defendant's Ponzi Email sent on August 15, 2013.  The Ponzi Email was the culmination of years of frustration, delay, and poor communication, as shown through prior emails.

-31-

In February 2011, Defendant followed up on an email that had gone almost a month without response from Premier Cru, "[s]till never had any response to this issue, you were going to check with one of the owners and get back to me." Decl. of Karen K. Diep Supp. Summ. J. Ex. 41, ECF No. 114-6. Later, in May 2013, Defendant sent a long, frustrated email to a Premier Cru employee regarding a refund for an unauthorized insurance charge:

> Under normal circumstances I would not have any problem with leaving it as a store credit with any other store with which I do business. But at this point I am already feeling very much overextended to Premier Cru as it is, and I am not comfortable with the amount of money the store already owes me, so please instead credit my card back this amount.
> . . . I truly wish the firm would clean up its act, and not subject customers like me to the extreme stress, anxiety and aggravation that these utterly unacceptable, unprofessional, inexcusable and deceitful practices that ensnared me into these future purchases have caused.
> . . . I truly did not need this betrayal of trust and the additional mental anguish. I had trusted Premier Cru, due to longstanding business going back to 1986. Yours was the last firm I would have expected to have these futures problems with, which explains why the bulk of my 2009 Bordeaux purchases were with you. To be essentially be [sic] defrauded into parting with hundreds of thousands of dollars, under false pretenses that your firm had already purchased and owned these wines, is a position that I am absolutely not enjoying being in, and I look for this utter nightmare to end.

*Id.* at Ex. 34, at 14-15, ECF No. 114-6. Defendant followed up on this email at the end of May, "I have not yet received the credit back to my card for these unwanted insurance charges, and it has been almost three weeks." *Id.* at Ex. 42, ECF No. 114-6. And, again in June:

> . . . I'm getting very tired, extremely tired in fact, of having to repeatedly call or email your outfit.
> And what now, you believe that if you just ignore me, I'll go away? The credit has STILL not appeared on my bank statement. What, is Premier Cru so desperate for funds they are hesitant to process a refund?

> This is the last time I will ask politely for the refund.  Again, no, I do NOT want a "store credit".
> Given the appallingly sleazy conditions surrounding the monies your outfit already owes me, to suggest I should add to that yet additional debt I'm due is rather absurd, don't you think?

*Id.*

Finally, Defendant's frustration boiled over in the August 15, 2013 Ponzi Email, titled "WARNING: LAWSUIT AND CRIMINAL FRAUD CHARGES PENDING":

> PLEASE BE ADVISED THAT IN ADDITION TO A CIVIL SUIT FOR DAMAGES DUE TO FRAUD AND BREACH OF CONTRACT, I\*\*\*\*\*\*WILL\*\*\*\*\*\* BE PRESSING CRIMINAL CHARGES AGAINST YOU AND \*\*\*ALL\*\*\* OF YOUR STAFF THAT HAVE AIDED AND ABETTED THIS LITTLE PONZI SCHEME OF YOURS.
> YOU HAVE UNTIL 11:00 AM TODAY, THURSDAY AUGUST 15, 2013 TO TELEPHONE ME AT [REDACTED] TO DISCUSS MAKING ME WHOLE IMMEDIATELY, OR I WILL INITIATE THE COMPLAINT WITH THE ALAMEDA COUNTY DISTRICT ATTORNEY'S OFFICE.
> CONTINUE TO IGNORE ME AT YOUR VERY, VERY GREAT PERIL.

Request Judicial Notice Ex. 2, 3-6, ECF No. 114-3.  In finding that the above Ponzi Email was a badge of fraud, the Court found that there was no dispute as to whether Defendant sent the email on the indicated date and that Defendant received the subject wines thereafter.  Sept. 5 Mem. 47, ECF No. 76.

This particular badge of fraud, i.e., a transfer made after threat of litigation, has been found to, "strongly suggest that a transaction's purpose is to defraud creditors unless some other convincing explanation appears."  *Emmett Valley Assocs. v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518 (9th Cir. 1992).  As will be discussed infra, a convincing, alternative explanation has failed to appear.

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 33 of 79

## 2. __The Trustee's Badges of Fraud__

The Trustee further asserts three additional circumstances demonstrating the existence of fraud, not specifically listed in the statute, which are summarized into the following three categories:

- Overpromised and oversold:  Premier Cru overpromised and oversold each type of wine that was transferred to Defendant;
- Scramble to fulfill orders:  After Defendant's emails accused Premier Cru of operating a Ponzi Scheme and fraud, Debtor scrambled to fulfill Defendant's orders through retail purchases, ahead of other customers that had placed their orders in advance of Defendant; and
- Overpaid for wine:  In his scrambling efforts to fulfill Defendant's orders, Debtor often paid more for the wine than Defendant had paid to Premier Cru for the same wine, resulting in a loss.

Essentially, what the Trustee is arguing through these badges of fraud is that the Subject Transfers each fall outside the ordinary course of business, in ways that are consistent with Ponzi Schemes, in general, and the Plea Agreement, in particular. Further, because the transactions were conducted in commercially unreasonable ways, and in response to a threat of litigation or prosecution, there is a strong inference that the transactions were made with the fraudulent intent to keep Defendant quiet so that the fraudulent scheme could continue.

By demonstrating these badges of fraud, the Trustee asks the Court to infer that the subject transactions were made pursuant to

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 34 of 79

the fraudulent scheme described in the Plea Agreement.  Because direct evidence of fraudulent intent is rarely available, courts infer intent from the totality of the circumstances.  *In re Ezra*, 537 B.R. at 930; *In re Beverly*, 374 B.R. at 235.  This is also true on summary judgment, where the counter evidence does not raise a genuine issue of material fact.  *See In re Beverly*, 374 B.R. at 236-239.

Although Defendant vigorously challenges the badge of fraud inferences that the Trustee would like the Court to make, Defendant does not challenge the facts, aside from the admissibility and credibility claims rejected above, or offer alternative inferences for the Court to make.  Instead, Defendant's arguments are dedicated to persuading the Court that the Trustee has offered unreasonable inferences and that the transactions took place in the ordinary course of business.

As noted in the September 5 Memo, there is no dispute between the parties as to which bottles of wine were ordered or delivered or as to when those orders and deliveries took place.  Sept. 5 Mem. 12, ECF No. 76.

While both parties do a transfer-by-transfer analysis in their briefing, each party asks the Court to view the sequence of events through fundamentally different perspectives.  The Trustee wants the Court to consider the events globally, in light of the admitted fraud and Ponzi Email.  On the other hand, Defendant asks the Court to focus on what Defendant maintains is the legitimacy of the individual transactions--Defendant got the wine that he paid for-- in spite of the fraudulent background.

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 35 of
79

### a.  <u>Overpromised or Oversold</u>

The Trustee's first asserted badge of fraud is that Premier Cru overpromised or oversold each of the subject wines.  The significance of this allegation is that it ties the Subject Transfers to Fox's Plea Agreement, as Fox admitted selling wines to customers under the false representation that Premier Cru had purchased enough wine to fulfill their orders, when the reality was that Premier Cru either didn't have as many purchase orders as it claimed or it would not be able to maintain the purchase orders it had placed due to its inability to pay for them.  Request Judicial Notice Ex. 2, 3-4, ECF No. 114-3.

These wines were "highly desirable" and "limited-production," with the pre-arrival format as "the only way to source the wine before they sell out (and at optimal prices)."  Initial MSJ 2, ECF No. 25.  When Premier Cru failed to secure contracts for the wine, it knew it would have to resort to buying the wine at retail prices from other sellers.  To demonstrate this asserted badge of fraud, the Trustee relies on the running totals of the respective wines on purchase orders, pre-sold to customers, and in inventory, as demonstrated through the Nishi Declaration.

Examining the record, the undisputed facts show that four out of the five subject wines were oversold at the time of delivery to Defendant, and for years thereafter.  Most clearly, both Capo and Latour bottles were oversold prior to Defendant placing his orders and at all times thereafter through the eve of Premier Cru's bankruptcy in 2016.  *See* Nishi Decl. Exs. 5, 9, ECF No. 114-5.

The Court does note that there is one discrepancy in the Nishi Declaration as to the Latour wines that are part of the Subject

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 36 of 79

Transfers: Defendant's Latour order was shipped in two separate shipments and, as noted by Defendant, the second shipment to Defendant is missing from the spreadsheet at Exhibit 9 of the Nishi Declaration, which sets forth inventory transactions for Latour bottles. *See id*. at Ex. 9. Rather, Exhibit 9 shows a shipment of twelve bottles on November 14 to another customer, Jeffrey Edwards. *Id*. The record does not clarify why Defendant's second shipment is not accounted for on the Exhibit 9 spreadsheet. Nonetheless, it is undisputed that Premier Cru shipped twelve bottles of Latour to Defendant on or about November 14, that Premier Cru only had twelve bottles in inventory at that time, and that pick and pack lists show the twelve bottles of Latour were prepared for shipment to Defendant on November 13. *See id*. at Exs. 9-11. Further, the undisputed facts show that when the twelve bottles were shipped November 14, there were 279 bottles on purchase orders and 1,103 bottles pre-sold. *Id*. at Ex. 9. This leaves the Court with the only reasonable inference that the twelve bottles were in fact shipped to Defendant and that Latour bottles were significantly oversold at that time.

In the case of Cheval Blanc, Debtor's order actually placed Premier Cru into an oversold position. After Defendant placed his order, Premier Cru had ordered 456 bottles of Cheval Blanc but had pre-sold 480 bottles. *Id*. at Ex. 14. Further, from the point of Defendant's order on through at least December 2015, the Cheval Blanc remained significantly oversold, including as of October 31, 2013, when Premier Cru shipped all forty-eight bottles to Defendant. *See id*. So, despite having enough purchase orders in place to cover the pre-sold wine prior to Defendant's order,

Premier Cru did not have enough bottles on purchase order to fulfill all of Defendant's order once placed or at any point thereafter, including the date of delivery.

In the case of the Lafite wines, while Premier Cru was not oversold at the time Defendant placed his order, it was oversold as of April 2013, when Defendant received his first shipment (which is not one of the Subject Transfers), and remained oversold throughout the time that Defendant received his second shipment in November 2013, his replacement bottle in January 2014, and on through the eve of bankruptcy. *See id*. at Ex. 30.

Finally, d'Yquem bottles were the only subject bottles of wine delivered to Defendant that were not oversold at any point prior to, or at the time of, Defendant's order or delivery. However, even d'Yquem bottles were eventually oversold as of 2015. *See id*. at Ex. 19.

> (1) **The Fact that Some Wines Were Not Oversold or Overpromised at the Time Defendant Placed His Order Does Not Undermine this Badge of Fraud**.

Defendant correctly points out that, under the Trustee's own evidence, three out of the five wines at issue were not oversold or overpromised at the time that Defendant placed his order. There were sufficient purchase orders of Cheval Blanc, d'Yquem, and Lafite in place to cover the bottles pre-sold, according to the spreadsheets in the Nishi Declaration. However, the significance of this fact is minimal, if not wholly irrelevant--whether the wine was oversold at the time Defendant placed his order is not the legally significant point. Per both the Bankruptcy Code and CUVTA, fraudulent intent is determined at the time the property is

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 38 of 79

transferred to a third party.  11 U.S.C. § 548(a)(1)(A); CUVTA § 3439.04(a); *see In re AFI Holding*, 525 F.3d at 703; *Christian Brothers High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group), LLC*, 439 B.R. 284, 304 (Bankr. S.D.N.Y. 2010); *Filip*, 129 Cal. App. 4th at 829.  Here, the transfer of the wine did not take place until Premier Cru shipped the bottles to Defendant.

As described above, all of the subject wines were oversold at the time they were shipped to Defendant, aside from the bottles of d'Yquem.  For these reasons, the Court does find this badge of fraud to apply to four out of the five types of wine shipped to Defendant.  To the extent the Trustee shows that Premier Cru was oversold at other points in the relevant timeline, although not the legally significant point for determining intent, it would only add further support that the subject wines fit with the fraudulent scheme described in the Plea Agreement, as it shows the wines were oversold for an extended period of time, and this problem often deepened as time went on.

Although the d'Yquem wines were eventually significantly oversold, they were not oversold at any point prior to, or at, the time of delivery to Defendant.  The fact that they were ultimately oversold does suggest that even they were eventually part of the fraudulent scheme described in the Plea Agreement.  However, the fact that they were not oversold at the time Defendant's bottles were shipped does render the "oversold and overpromised" badge of fraud inapplicable.  The inapplicability of this badge of fraud does not mean that other badges of fraud could not bring the d'Yquem bottles within the fraudulent scheme.  Badges of fraud create an inference of fraud, in the aggregate.  *In re Ezra*, 537

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 39 of 79

B.R. at 931; *In re Beverly*, 374 B.R. at 235; *Filip*, 129 Cal. App. 4th at 834.  The mere failure of one badge of fraud in regard to one transaction, among many, does not create a reasonable inference to the contrary.  *Id*.

Defendant contends that a wine being oversold does not constitute a badge of fraud, which the Court also does not find convincing.  Defendant argues that in some cases Premier Cru already had wines in inventory when he placed his order and, therefore, the wine was not "pre-arrival."  The fact that Premier Cru may have already had some wine in inventory when Defendant placed his order is insignificant, because the customer is unaware of that fact.  If Defendant was led to believe that the wine he purchased was not yet available and he would need to wait for several months, or longer, for it to arrive, based on a purchase contract with the supplier, then the purchase still fits within and supports the fraudulent scheme.

Defendant also argues that Premier Cru continued to buy and deliver more wines to customers both before and after the transfers to Defendant, as proof that the wines were not a part of the fraudulent scheme.  However, this is not surprising in the least, as the Plea Agreement explains that Premier Cru would use funds received from some buyers to fulfill the orders of other complaining customers, like Defendant.  And Premier Cru completely failed to fulfill all of the placed orders with any of the varieties of wine included in the Subject Transfers.

Finally, Defendant argues that Premier Cru had pre-existing purchase orders for wines in greater amounts than what Defendant ordered in each case.  This argument completely ignores the fact

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 40 of 79

that the fraud entailed taking orders from customers that Premier
Cru had no intention or ability of fulfilling.  The fact that there
were enough wines on purchase order or in inventory to fulfill any
of a number of customers' individual orders was by design, as
Premier Cru would satisfy a few disgruntled customers to keep the
fraudulent scheme alive.

### b. Scramble to Fulfill Order

The Trustee's second badge of fraud is that Premier Cru
scrambled to fulfill Defendant's orders after the Ponzi Email was
sent.  This badge of fraud is meant to tie the transactions to the
Plea Agreement by showing that Premier Cru was acting desperately
to keep Defendant from exposing the fraudulent scheme.  As evidence
of Premier Cru's "scramble," the Trustee points to Premier Cru
making piecemeal purchases of the wine from various retailers,
often at costs above what Defendant paid.

The Trustee shows that Premier Cru did not have any bottles of
Capo in inventory when it received a shipment of fifty-four bottles
from European merchant Cellier-des-Producteurs on September 6,
2013.  Nishi Decl. Ex. 5, ECF No. 114-5.  A little more than a
month later, on October 15, Premier Cru shipped Defendant his six
bottles, leaving forty bottles in inventory.  *Id.*

Turning to the Latour wines, Premier Cru received thirty-six
bottles of Latour from Barriere Freres on October 14, 2013, adding
to its inventory of thirteen bottles.  *Id.* at Ex. 9.  By the next
day, Premier Cru shipped thirty-six bottles to Defendant.  *See id.*
at Exs. 6–7, 9.  The remaining thirteen bottles were shipped to
another customer on November 5, leaving Premier Cru with no bottles
in inventory, despite still owing twelve bottles to Defendant.  *Id.*

-41-

at Ex. 9.  As of November 13, Premier Cru still had no bottles of Latour in inventory, when it received a shipment of twelve bottles from a third-party vendor.  *Id*.  Premier Cru then shipped those twelve bottles to Defendant by the next day.  *Id*. at Exs. 9-11.

As to the Cheval Blanc wine, Premier Cru did not have any bottles in inventory in the weeks before Defendant's Ponzi Email. *Id*. at Ex. 14.  In order to fulfill Defendant's forty-eight bottle order, Premier Cru ordered twenty-four bottles from McAdam Buy Rite, a New York retailer, and thirty bottles from Jim Viner, a Kentucky broker.  *See id*. at Exs. 14-15; Pl.'s Mem. Supp. Second MSJ 9, ECF No. 114-2.  Premier Cru received those orders on October 30, 2013, and shipped all forty-eight bottles to Defendant by the next day.  *See id*. at Exs. 14, 16-17.  The remaining six bottles were held in inventory until January 2014, when they were shipped to another customer.  *Id*. at 14.

Similarly, as of a few days before the Ponzi Email, Premier Cru no longer had any bottles of d'Yquem in inventory.  In order to fulfill Defendant's order, it ordered twelve bottles from Beltramo's, a wine retailer in Menlo Park, California, which were received into inventory on November 13, 2013, an additional three bottles from Beltramo's, which were received into inventory on December 19, and nine bottles from Wally's Wine and Spirits, which were also received into inventory on December 19.  *See id*. at Exs. 19-21.  Premier Cru shipped each of these orders to Defendant within a day of receiving them.  *See id*. at Exs. 19, 22-25.

Finally, with respect to the Lafite wines, Premier Cru had a running inventory of Lafite from the time of the Ponzi Email until Defendant's fourteen bottles were shipped.  *See id*. at Ex. 30.

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 42 of 79

However, as of October 10, 2013, it only had eleven bottles in inventory, three short of what was needed to fulfill Defendant's open order. *Id*. On November 13, Premier Cru received fourteen bottles into inventory that were purchased from an unidentified third-party vendor. *See id*. at Exs. 30, 32. Within a day of receiving that shipment, Premier Cru shipped Defendant's fourteen bottles of Lafite. *See id*. at Exs. 28, 30. Afterward, Premier Cru maintained a running inventory of Lafite at least until January 24, 2014, when it shipped the replacement bottle to Defendant due to a broken or leaking bottle in the previous shipment. *See id*. at Exs. 29–30.

**(1)** **The Record Demonstrates Numerous Logistical Challenges in Satisfying Defendant's Orders in Support of the Inference that Premier Cru "Scrambled."**

In regard to the Trustee's second badge of fraud, that Premier Cru "scrambled" to fulfill Defendant's orders after the Ponzi Email, Defendant first argues that the Trustee has not sufficiently traced the bottles used to fulfill Defendant's orders sufficiently to show such a scramble.

The Court acknowledges that there is no evidence on the record that reflects personal knowledge of which bottles were shipped to Defendant and from which supplier they were sourced. However, Premier Cru's business records, as provided through the Nishi Declaration, do demonstrate the business's running inventory as well as when, how many, and from what supplier bottles were received. These records establish the exact source of the bottles delivered to Defendant in most cases and the partial source in the others.

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 43 of 79

In the cases of Capo, Cheval Blanc, d'Yquem, and second shipment of Latour bottles, there were no bottles in inventory before Premier Cru received a shipment of bottles from which it was able to satisfy Defendant's, and in some cases others', orders.

Tracing the source of the bottles used to fulfill Defendant's orders is less transparent in the case of Latour and Lafite wines. With the first Latour shipment, Premier Cru already had thirteen bottles in inventory when it received thirty-six bottles of Latour from Barriere Freres on October 14, 2013. *See* Nishi Decl. Ex. 9. Immediately after receiving the shipment from Barriere Freres, Premier Cru shipped thirty-six bottles to Defendant. *See id.* A few weeks later the remaining thirteen bottles were sent to another customer. *See id.*

One reasonable inference from this record is that the thirty-six bottles received from Barriere Freres, the exact amount needed to fulfill Defendant's order, were intended for Defendant. Another reasonable inference would be that the thirty-six bottles were used to supplement the inventory already in stock and, therefore, Defendant's shipment included bottles from both inventory and the Barriere Freres shipment. However, for purposes of the badge of fraud, which inference is applied wouldn't matter either way, because Premier Cru did not have sufficient bottles to fulfill Defendant's order and needed bottles from the incoming shipment from a retail source. In any event, Defendant had to rely on the order from Barriere Freres to satisfy Defendant.

Similarly, prior to Defendant's order of fourteen Lafite bottles being shipped, Premier Cru had twenty-five bottles in inventory. *See id.* at Ex. 30. Fourteen of the bottles were

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 44 of 79

received into inventory a day prior to Defendant's shipment and eleven bottles had previously been in inventory. *See id*. Again, it does not really matter what the composition of bottles sent to Defendant was, for purposes of the badge of fraud, since the order could not have been fulfilled without the freshly received inventory.

> **(2)** **Premier Cru's Delivery of All 140 Bottles to Defendant Within Four Months Still Constitutes a Scramble Under the Circumstances.**

Defendant next argues that the delivery of 140 bottles of wine to Defendant in a matter of two to four months from the time of the Ponzi Email does not constitute a scramble, or, more specifically, a frantic effort to satisfy Defendant in order to keep him quiet. As further support, Defendant points to the fact that after the Ponzi Email Defendant continued to fulfill the orders of other customers before fulfilling Defendant's. However, the Court does not find such an inference, in light of the circumstances, to be a reasonable one.

First of all, at the time Defendant sent the Ponzi Email, he had already been waiting in excess of two years for his orders, even though pre-arrival wines were represented to take only six to eighteen months. *See* Pl.'s Supp. Second MSJ 2, 7-9, 11-12, ECF No. 114-2. It was only after Defendant threatened to contact the authorities that Premier Cru delivered the subject wines to Defendant.

Second, as described in the Plea Agreement, Premier Cru had cash flow issues due to Fox's misappropriation of funds, requiring Premier Cru to use payment from one customer to pay for another

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 45 of 79

customer's product. Request Judicial Notice Ex. 2, at 4-5, ECF No. 114-3. Premier Cru's cash flow issues were demonstrated in its apparent inability to promptly refund Defendant for unauthorized insurance charges, as described in section V.B.1. Decl. Karen K. Diep Ex. 42, ECF No. 114-6. Further, the Plea Agreement shows that Premier Cru would focus on fulfilling the orders of agitated customers in order to keep them quiet and the scheme alive. Request Judicial Notice Ex. 2, at 4-5, ECF No. 114-3.

Third, email exchanges with Defendant show that once he received reassurance that his orders would be satisfied, he relented. When advised that a Latour shipment had arrived on August 26, 2013, Defendant replied, "[w]onderful, the weather will probably be safe for you to ship to me here in Las Vegas in about 3-4 weeks . . . ." Decl. Karen K. Diep Ex. 40, at 83-84, ECF No. 114-6. In another email sent that same day, Defendant asked, "when to expect the rest of the stuff?" *Id*. at 82. To which Fox replied, "[s]hould all be in by mid-September, in about 3 weeks[.]" *Id*.

Several weeks later, on October 11, Defendant sent an email to Fox letting him know he would be returning to his home and requested the wine be shipped overnight on October 14. *Id*. Fox replied that the Latour and Capo bottles were ready to ship, but the Cheval Blanc and d'Yquem would arrive late the next week. *Id*. at 81. The record shows thirty-six bottles of Latour and six bottles of Capo were shipped on or about October 14, as Defendant had requested. *See id*. at 82; Nishi Decl. Exs. 5-7, 9, ECF No. 114-5. So, even though it took almost two months for the Latour to

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 46 of 79

arrive at Defendant's site, the shipment was delayed at least
several weeks at Defendant's request.

Fourth, other email exchanges with Defendant, when viewed in
light of the undisputed facts, do show Premier Cru to be scrambling
to satisfy Defendant. In an October 29, 2013 email, Defendant asks
Fox, "where is the rest of my stuff? Below, on Oct. 11, you said
they would be here around Oct. 18." Decl. Karen K. Diep Ex. 40, at
81. The record, as discussed previously, shows that Premier Cru
received thirty bottles of Cheval Blanc from a Kentucky wine broker
and twenty-four bottles from a New York wine retailer on October
30, forty-eight of which were shipped to Defendant by the next day.
Nishi Decl. Exs. 14-15, ECF No. 114-5; Pl.'s Mem. Supp. Second MSJ
9, ECF No. 114-2. The record does not show when those orders were
placed. However, the undisputed facts show that Defendant was
applying pressure to Premier Cru to get his wine, that Premier Cru
kept delaying delivery beyond its own estimates, and it ultimately
satisfied one of Defendant's orders by purchasing wine from two
different retailers.

Fifth, it is undisputed that Defendant received some of his
wines before customers that had ordered the same wine before him.
The Trustee provides four such examples. The first two, customers
Clarets and Weintraub, purchased bottles of Capo 412 days and 392
days, respectively, before Defendant placed his order, yet customer
Clarets received their wine 269 days after Defendant and customer
Weintraub received their wine 549 days after Defendant. Pl.'s Mem.
Supp. Second MSJ 21, ECF No. 114-2. The other two examples,
customers No Limit Fine Wines and Patterson, purchased bottles of
Lafite 30 days and 95 days, respectively, before Defendant but

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 47 of
79

received their wine 36 days and 24 days after Defendant. *Id.*
While the Trustee has not argued that customers that ordered their
wine prior to Defendant had a greater right to that wine than
Defendant, it is telling that Premier Cru preferred fulfilling
Defendant's order first, in light of the Ponzi Email. Tr. Hr'g
45:24–47:7, ECF No. 144.

Finally, the record shows that Premier Cru did not receive
large shipments directly from chateaux abroad, or from local
suppliers, that were sufficient to fulfill multiple customers'
orders at once. Instead, it received piecemeal shipments, often
from various suppliers, that were only sufficient to fulfill, or
partially fulfill, in the cases of Latour and d'Yquem, Defendant's
order. Even Defendant was able to recognize irregularities with
the source of the wine, as expressed in an email to Mr. Fox on
October 15, 2013, about the second shipment of Latour:

> John, I am not happy with this Latour. It is AGAIN
> the goddamned gray-market importer Kirkcrest product,
> with their import sticker plastered all over the back
> label. See attached.
> . . . Kindly arrange to have legitimately-sourced,
> non-defaced set of 4 cases shipped to me promptly . . . .
> . . . It is additionally disturbing to get this info
> that somehow you have the OWC's but didn't ship. This
> makes absolutely no sense, as I'm sure you can see, and
> the logic to withhold shipment till next week is
> inexplicable to anyone with any experience at all in
> buying wine. It instead seems clear the OWC's for these
> bottles don't exist, and you're scrounging some up in the
> meantime.

Decl. Karen K. Diep Ex. 39, at 47, ECF No. 114-6.

Against this backdrop, the only reasonable inference that can
be made is that Premier Cru was scrambling to fulfill Defendant's
orders so that Defendant would not report Premier Cru's fraudulent
enterprise, while juggling other customers' competing interests and

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 48 of
79

Premier Cru's limited resources. The wines that Defendant ordered were expensive, rare, and limited production, with origins in Europe--difficult to obtain even through the traditional channels-- and Premier Cru was struggling, financially and logistically, to satisfy thousands of open orders it had. Despite being vastly oversold in regard to four out of the five types of wine Defendant ordered, at the time of delivery to Defendant, Premier Cru was able to fulfill all 140 of Defendant's bottles on order, even though other customers had been waiting longer, in roughly a two-month window, through at least seven different retailers. Ninety out of Defendant's 140 bottles were delivered within a two-week period and 128 out of the 140 bottles delivered within a four-week period.

The Court notes that the record does not contain evidence that confirms when Premier Cru ordered the wine that was ultimately delivered to Defendant. The evidence appears to show when Premier Cru received shipments and when those shipments were shipped to Defendant. But, they do not show when the orders were placed with suppliers. While this missing detail could further strengthen the Trustee's case, it does not weaken it. Even if the orders were placed prior to the Ponzi Email, the fact that the inventory was diverted to satisfy Defendant rather than another customer would similarly support the badge of fraud.

Based on all of these undisputed facts and a Plea Agreement admitting to such behavior, the Court finds Premier Cru's "scramble" to fulfill Defendant's orders to serve as a badge of fraud.

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 49 of
79

### c. **Overpaid**

The Trustee's third badge of fraud is that Premier Cru often paid more for the wine delivered to Defendant than Defendant paid for his orders. This badge of fraud supports the Trustee's second badge of fraud in that Premier Cru was forced to pay higher prices for wine in order to satisfy Defendant's orders and keep him quiet. When the Court reviews the prices Premier Cru paid for wine that was shipped to Defendant, it finds that Premier Cru made a profit on Capo bottles and the first shipment of Latour bottles. However, the undisputed facts show that Premier Cru suffered a loss on all of the Cheval Blanc and d'Yquem bottles, the second shipment of Latour, and at least three bottles of the Lafite shipment.

Defendant paid $325.00 per bottle for the six bottles of Capo. Nishi Decl. Ex. 4, ECF No. 114-5. As described above at section V.B.2.b., Premier Cru fulfilled Defendant's order with a purchase order from Cellier-des-Producteurs for fifty-four bottles at $267.10 per bottle. *See id*. at Ex. 5. Therefore, Premier Cru appears to have made a profit on Capo bottles.

Similarly, Premier Cru did not overpay for the first shipment of Latour. As described in section V.B.2.b., the first shipment of thirty-six bottles of Latour was satisfied from an inventory of forty-nine bottles. *See id*. at Ex. 9. Of those forty-nine bottles, thirty-six were derived from Barriere Freres and twelve were sourced from a George Zicarelli, all at a cost of $934.85 per bottle. *See id*. The remaining bottle was part of a running inventory and it is not clear at which price it was acquired. *See id*. Nonetheless, as Defendant paid $1,099 per Latour bottle,

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 50 of 79

Premier Cru made more than $165 per bottle on all but, possibly, one of these thirty-six bottles.

However, the second shipment of twelve Latour bottles to Defendant was satisfied through a third-party purchase order at a cost of $1,895 per bottle, meaning Premier Cru paid nearly double what Defendant paid through his order. *See id*. at 4, Ex. 32. Therefore, Premier Cru would still appear to have taken, in the aggregate, a significant, several-thousand dollar loss on the Latour wines delivered to Defendant.

Similarly, Defendant only paid $995 per bottle for forty-eight bottles of Cheval Blanc, but Premier Cru paid $1,299.99 per bottle for one shipment of twenty-four bottles and $1,270 per bottle for another twenty-four bottle shipment. *See id*. at 4, Exs. 12-15. In regard to d'Yquem wines, Defendant paid only $355 per bottle for twenty-four bottles, but Premier Cru paid $599.99 for fifteen of the bottles delivered to Defendant, and $549.99 per bottle for nine of the bottles delivered. *See id*. at 5, Exs. 18-21. Therefore, Premier Cru also took a significant loss on all twenty-four bottles of d'Yquem and all forty-eight of Defendant's Cheval Blanc bottles.

Finally, Defendant purchased fourteen bottles of Lafite from Premier Cru at $1,264.29 per bottle. *Id*. at Ex. 26. Premier Cru had a running inventory of Lafite sourced from various retailers, prior to shipment of these fourteen bottles, with costs ranging from $1,000 to $1,395 per bottle, making tracing particular costs to Defendant's bottles unclear. *See id*. at Exs. 30-31; Pl.'s Mem. Supp. Second MSJ 13, ECF No. 114-2 However, as described in V.B.2.b.(1), at least three of the bottles delivered to Defendant were purchased from a third-party vendor at a cost of $1,395 per

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 51 of
79

bottle, more than $130 above what Defendant paid. *See id*. at Ex. 30.

The undisputed facts show that Premier Cru overpaid for at least eighty-seven of the 140 bottles of wine delivered to Defendant. While it is undisputed that Premier Cru made a profit on some of the wines sold to Defendant, it is also undisputed that overall Premier Cru took a significant loss on the 140 bottles sold to Defendant, which is clearly a result that falls outside the ordinary course of business. These facts lend further support to the Trustee's "scramble" badge of fraud in that it shows Premier Cru paid prices higher than those Defendant paid for his orders to promptly procure Defendant's wine.

### (1)  Defendant's Challenge to the Overpaid Badge of Fraud

In defending against the Trustee's claim that Premier Cru overpaid for the wine shipped to Defendant, Defendant again resorts to its claim that the Trustee cannot trace which wines were sent to Defendant. As explained above at section V.B.2.b.(1), that is only true with regard to a portion of the first shipment of Latour, at least twenty-three, if not all, of thirty-six bottles can be traced to Barriere Freres, and Lafite orders, at least three of fourteen bottles can be traced to a third-party vendor. As to the other three types of wine, all of the bottles can be traced to the supplier and the associated cost determined.

### C.  Totality of the Circumstances

The parties agree that, notwithstanding whether any particular badge of fraud is established, a finding of actual fraudulent intent requires consideration of the totality of the circumstances.

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 52 of 79

*In re Ezra*, 537 B.R. at 931; Pl.'s Mem. Supp. Second MSJ 18, ECF No. 114-2; Def.'s Opp'n Second MSJ 19, ECF No. 126. To grant summary judgment, the Court must find that upon consideration of the totality of the circumstances a rational trier of fact could not find for the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 587. Unfortunately for Defendant, the only reasonable inference to take from the totality of the circumstances in this case is that Premier Cru acted with fraudulent intent in making the Subject Transfers to Defendant.

The Court may utilize inferences at summary judgment so long as it views the evidence in a light most favorable to the non-moving party, acknowledging alternative inferences and fair critiques of the moving party's inferences. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255. Further, the Court is entitled to use inferences, per CUVTA section 3439.04(b), because of the difficulty of demonstrating fraudulent intent--if simple tracing were available then inferences wouldn't be necessary. *See Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 805-06 (9th Cir. 1994) (citation omitted); *In re Ezra*, 537 B.R. at 930; *In re Beverly*, 374 B.R. at 236; *Filip*, 129 Cal. App. 4th at 834. As shown supra, Defendant has failed to provide a reasonable, alternative inference here that Premier Cru made the Subject Transfers without the fraudulent intent admitted in the Plea Agreement.

The Trustee has demonstrated an overall picture of fraudulent transactions that is consistent with the Plea Agreement. The Trustee has demonstrated that, after Defendant sent an email threatening to expose Premier Cru's Ponzi Scheme, Premier Cru

Case: 18-04019    Doc# 150    Filed: 04/23/21    Entered: 04/23/21 16:41:58    Page 53 of 79

scrambled to fulfill all of Defendant's 140 bottles (plus a replacement) in only a few months, after years of inaction, and ahead of customers that had placed their orders prior to Defendant, by purchasing the bottles from various retailers, often at retail prices above what Defendant paid. Further, the Trustee has demonstrated that four out of the five types of wine transferred to Defendant were oversold, often significantly, at the time of delivery to Defendant.

To the extent that not all of the badges of fraud apply to all of the Subject Transfers--i.e., d'Yquem bottles were not oversold at the time of delivery--the Court is nonetheless convinced that it is appropriate to find that all of the Subject Transfers were made with fraudulent intent due to the fact that all of the Subject Transfers were delivered after receipt of the Ponzi Email, all such deliveries were made in an apparent scramble by Premier Cru to fulfill Defendant's orders, and all were made in the face of on-going badgering from Defendant.

Although there has been no showing as to why other customers' orders were also fulfilled during the latter portion of 2013, the fulfillment of some orders is expected as part of the general scheme to keep up the appearance of a legitimate business. However, with all of the facts and badges of fraud discussed supra, it is very hard to see how a reasonable juror, in considering the totality of the circumstances, could find the Subject Transfers were made without fraudulent intent. The only reasonable inference the Court can make from the evidence before it is that Premier Cru made the Subject Transfers because it was threatened by Defendant and did not want its on-going, fraudulent scheme to be exposed.

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 54 of 79

**D. Amount of Recovery**

As explained in section V., under § 550, once a transfer is voided, the trustee can recover the property transferred, or the value of such property, from the initial transferee. 11 U.S.C. § 550(a). The Trustee may recover the entire amount transferred to Defendant, unless Defendant can show that the good faith defense applies, in which case Defendant would only be required to turn over their "profits," and not the entire amount of the transfer. *Donell*, 533 F.3d at 771.

"The purpose of § 550(a) is 'to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred.'" *Aalfs v. Wirum (In re Straightline Invs.)*, Inc., 525 F.3d 870, 883 (9th Cir. 2008) (quoting *In re Acequia, Inc.*, 34 F.3d at 812). "A bankruptcy court ordinarily determines the value of the property to be the value at the time of the transfer, but has discretion on how to value the property so as to put the estate in its pretransfer position." *USAA Fed. Sav. Bank v. Thacker (In re Taylor)*, 599 F.3d 880, 890 (9th Cir. 2010).

The Trustee asserts that the value of the Subject Transfers is $154,306.60. Pl.'s Mem. Supp. Second MSJ 19, 24, ECF No. 114-2. The Trustee arrived at this value by summing up the amounts that Premier Cru paid for the Subject Transfers, based on the "tracing" methodology previously described. *See id.* at 19. While the Trustee's approach generally appears to be a fair and reasonable method of determining the fair market value, and Defendant has not proposed an alternative, the Court sought clarity on a few discrete issues regarding the valuation, at a hearing set by the Court on April 9, 2021.

Case: 18-04019    Doc# 150    Filed: 04/23/21    Entered: 04/23/21 16:41:58    Page 55 of 79

First, the Court inquired as to whether it was appropriate to include the replacement bottle of Lafite within the transfer valuation. In response, the Trustee has agreed that the replacement bottle should not be counted as an extra transfer. Pl.'s Statement Re Second MSJ 2, ECF No. 149. Therefore, the Court will only include 140 bottles in the valuation.

Second, the Court sought clarification for the Trustee's methodology in applying a cost of $1,395 to all fourteen bottles of Lafite. As described in V.B.2.b., only three of those bottles can be traced to a cost of $1,395. In response, the Trustee conceded that only three of the Lafite bottles should be valued at $1,395, while the other eleven should be valued at $1,299.88, which is what Premier Cru paid for the replacement bottle delivered in January 2014. Pl.'s Statement Re Second MSJ 2, ECF No. 149.

Finally, the Court inquired as to the valuation of the twenty-four bottles of d'Yquem. As described in V.B.2.b., fifteen of the d'Yquem bottles can be traced to a cost of $599.99 per bottle, while nine can be traced to a cost of $549.99 per bottle. However, in the Trustee's valuation, the twenty-four bottles are divided evenly between the two different costs, generating a lesser overall value for those transfers. In response to this inquiry, the Trustee agreed to concede to this lesser valuation. Pl.'s Statement Re Second MSJ 2, ECF No. 149.

Although the Court only sought clarification as to the Trustee's valuation theory, the Trustee's concessions are well-taken, and the Court otherwise finds the Trustee's method of valuing the Subject Transfers to be a reasonable basis for fair market value. Accordingly, the Court finds the appropriate value

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 56 of 79

for recovery, in consideration of the Trustee's concessions described above, to be as follows:

| Wine | Quantity | Per Bottle Value | Total Value |
|------|----------|------------------|-------------|
| Capo | 6 | $267.10 | $1,602.60 |
| Latour | 36 | $934.85 | $33,654.60 |
| Latour | 12 | $1,895.00 | $22,740.00 |
| Cheval Blanc | 24 | $1,299.99 | $31,199.76 |
| Cheval Blanc | 24 | $1,270.00 | $30,480.00 |
| d'Yquem | 12 | $599.99 | $7,199.88 |
| d'Yquem | 12 | $549.99 | $6,599.88 |
| Lafite | 3 | $1,395.00 | $4,185.00 |
| Lafite | 11 | $1,299.88 | $14,298.68 |
| **TOTAL** | **140** | | **$151,960.40** |

Table 1.

In addition to value of the property transferred, the Trustee asserts that he can recover prejudgment interest at the rate of seven percent, payable from the date the transfers were made. Based on that calculation, the Trustee asserts that it is entitled to $75,177.91 of prejudgment interest through October 31, 2020, plus a per diem interest of $29.47 accruing each day thereafter.

The Trustee's method of calculation, including the point in time from which the interest begins to accumulate, the interest rate, and the total amount, does not appear to be contested, and the Court finds it to be appropriate. Although, the Court must adjust the values upon which interest is calculated, in consideration of the Trustee's concessions described above, as demonstrated in Table 1. Using the values provided in Table 1, the

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 57 of 79

Court find the appropriate amount of prejudgment interest, as of April 23, 2021, to be as follows:

| Wine | Value | Ship Date | Interest | Per Diem % |
|------|-------|-----------|----------|------------|
| Capo | $1,602.60 | 10/14/2013 | $851.88 | $.31 |
| Latour | $33,654.60 | 10/14/2013 | $17,724.60 | $6.45 |
| Latour | $22,740.00 | 11/13/2013 | $11,846.12 | $4.36 |
| Cheval Blanc | $31,199.76 | 10/30/2013 | $16,337.36 | $5.98 |
| Cheval Blanc | $30,480.00 | 10/30/2013 | $15,954.88 | $5.84 |
| d'Yquem | $7,199.88 | 11/13/2013 | $3,749.46 | $1.38 |
| d'Yquem | $6,599.88 | 12/19/2013 | $3,404.87 | $1.27 |
| Lafite | $4,185.00 | 11/13/2013 | $2,173.60 | $.80 |
| Lafite | $14,298.68 | 11/13/2013 | $7,444.58 | $2.74 |
| **Total** | | | **$79,487.35** | **$29.13** |

Table 2.

Based on the above, the amount of recovery for the Trustee, as of April 23, 2021, is $231,447.75, with a per diem amount of $29.13 accruing thereafter.

## VI.   DEFENDANT'S DEFENSES

### A.   The Trustee Is Entitled to Summary Judgment on the Issue of Defendant's "Good Faith" Under CUVTA Section 3439.08(a).

The Trustee seeks summary judgment on the issue whether Defendant is entitled to invoke the good faith defense under CUVTA section 3439.08(a)[10].  That section provides a defense to a finding of liability on transfers made with actual fraudulent intent, upon a showing that the transferee took "in good faith" *and* for reasonably equivalent value.  The test is conjunctive, i.e., the

---

[10] "A Transfer or obligation is not voidable under paragraph (1) of subdivision (a) of Section 3439.04, against a person that took in good faith and for reasonably equivalent value given the debtor or against any subsequent transferee or obligee."  CUVTA § 3439.08(a).

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 58 of 79

party asserting the defense must establish both elements, and failure to meet either is fatal to the assertion of the defense. The Trustee focuses on the good faith element.

Defendant asserts that since the Trustee is the moving party on a motion for summary judgment, the Trustee has the burden of proof on this issue, even though Defendant would have the burden of proof on this issue at trial. Def.'s Opp'n Second MSJ 23 n.13, ECF No. 126. It is neither clear whether the Trustee concedes this point, nor that Defendant is correct. *See, e.g., Celotex*, 477 U.S. at 325 ("[T]he burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case."); *In re Oracle Corp. Securities Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) ("[M]oving party need only prove that there is an absence of evidence to support the non-moving party's case. . . . the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial."). In any event, this question is not issue determinative; for the reasons set forth below, the Court believes that the Trustee has carried any burden that would be assigned to him as the moving party on this Motion.

In what he argues is another gating issue, Defendant has cited to several cases for the proposition that it is not appropriate to determine issues of good faith under CUVTA section 3439.08(a) on summary judgment. *See Banks v. Bethlehem Steel Corp.*, 870 F.2d 1438, 1444 (9th Cir. 1989); *Hotel & Rest. Emps. & Bartenders Int'l Union v. Rollison*, 615 F.2d 788, 793 (9th Cir. 1980); *Nakao v. Rushen*, 542 F. Supp. 856, 860 (N.D. Cal. 1982). While certainly mindful of the admonitions against either weighing evidence or

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 59 of 79

indulging inferences too freely at the summary judgment stage, the Court agrees with the Trustee that Defendant's reliance on the cases cited is misplaced. The cases cited do not deal with good faith in the context of CUVTA section 3439.08(a), rather they arose in the context of civil rights cases and labor disputes, and do not appear in any way apt or helpful in the analysis the Court must perform on this matter. Moreover, in light of the lengthy, if admittedly sometimes confusing, line of cases addressing the good faith standard in the CUVTA context, there appears to be no good reason to look to other substantive areas of law to resolve the appropriateness of deciding good faith issues at summary judgment in this matter. And, there is certainly no hard and fast rule under the California cases stating that summary judgment is invariably inappropriate on this point.[11]

The term "good faith" is not defined in CUVTA, and courts have struggled to agree on a definition that fairly captures the legislative intent in enacting this statute, in large part because the Legislative Comment (1) thereto, to which the courts seeking to interpret good faith have resorted, contains a lengthy "explanation" of the requisite state of mind that is, to say the least, ambiguous. In relevant part, the comment provides that:

> "[G]ood faith" means that the transferee acted without actual fraudulent intent and that he or she did not

---

[11] If anything, the opinion of the California Court of Appeal in *Nautilus, Inc. v. Yang*, 11 Cal. App. 5th 33 (2017), on which Defendant principally relies for his argument that he lacked requisite knowledge of the Debtor's fraudulent intent, would allay such fears—that case's invocation of a more heightened standard than had been applied in previous case law, and that requires a party objecting to another's good faith to establish "actual knowledge of facts that demonstrate the transferor's fraudulent intent," would indicate an openness to a ruling on summary judgment, which is after all an exercise in determining whether there are genuine disputes about any material facts.

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 60 of 79

> collude with the debtor or otherwise actively participate
> in the fraudulent scheme of the debtor. The transferee's
> knowledge of the transferor's fraudulent intent may, in
> combination with other facts, be relevant on the issue of
> the transferee's good faith of the transferor [sic] or of
> the transferor's insolvency.

CUVTA § 3439.08(a), comment (1).

In the September 5 Memo, the Court noted this difficulty and undertook a lengthy review of the case law as it developed on the question of the appropriate meaning of good faith in CUVTA section 3439.08(a). Sept. 5 Mem. 57–65, ECF No. 76. Since this is a question of interpreting California law, federal courts must defer to the decisions of California courts on this point. *Sec. Pac. Nat'l Bank v. Kirkland (In re Kirkland)*, 915 F.2d 1236, 1238 (9th Cir. 1990). And given that the California Supreme Court has not yet ruled on this issue, it is incumbent on federal courts to look to the opinions of intermediate courts of appeal to determine the state of the law in California on this point, and to determine whether the highest level state court would necessarily follow the decisions of the intermediate court. *Id.* at 1239.

Accordingly, the Court engaged in a lengthy discussion of the facts, the holdings and the rationales from the *Nautilus, Inc. v. Yang*, 11 Cal. App. 5th 33 (2017) case, which appears to be the most recent statement by a California Court of Appeal on the good faith issue, and attempted to apply the rule set forth in *Nautilus* to the somewhat unusual facts presented here. That discussion need not be repeated here in its entirety, but some points bear review and analysis, particularly in light of the Court's determinations concerning "badges of fraud" and whether the Subject Transfers were made with actual intent to hinder, delay, or defraud.

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 61 of 79

The *Nautilus* case contains a useful discussion of the history of California courts' struggles to articulate a comprehensive and accurate statement of the requirements for the good faith defense under section 3439.08(a).

First, *Nautilus* correctly observes that two California Court of Appeal cases analyzing a defendant's invocation of the good faith defense had been determined solely on the basis that the party claiming the good faith defense had not colluded with the transferor or actively participated in the fraud. *Nautilus*, 11 Cal. App. 5th at 42-43; *see Annod Corp. v. Hamilton & Samuels*, 100 Cal. App. 4th 1286, 1299-1300 (2002); *Lewis v. Superior Court*, 30 Cal. App. 4th 1850, 1858-59 (1994). The *Nautilus* court observed that while the rule that the transferee's participation in a fraudulent transfer would surely negate a good faith defense, the analysis in neither case directly addressed the issue whether the applicability of the good faith defense may be based on the transferee's actual knowledge that the transferor had fraudulent intent. *See Nautilus*, 11 Cal. App. 5th at 42. The *Nautilus* court concluded that the appropriate standard would have to address the question of the extent of the transferee's knowledge of the fraudulent intent of the transferor. *Id.* at 42-43.

Second, the *Nautilus* court noted that, post-*Lewis*, some cases, largely in the bankruptcy courts, appeared to endorse a more inquiry type of notice. *Nautilus*, 11 Cal. App. 5th at 43-44; *see In re Cohen*, 199 B.R. at 719. And *Nautilus* does reject the holdings in these cases that a transferee could be held to an inquiry notice standard, such that irregularities in a transaction would require further inquiry by the transferee, and the deemed

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 62 of
79

discovery of whatever such inquiry would have revealed. *Nautilus*, 11 Cal. App. 5th at 46.

Third, the *Nautilus* court noted judicial attempts to "merge" the holdings in *Lewis* and *Cohen* to state a more comprehensive standard that would also take into account the language from the Legislative Comment to CUVTA section 3439.08(a), i.e., "[k]nowledge of the facts rendering the transfer voidable would be inconsistent with the good faith that is required of a protected transferee." *Nautilus*, 11 Cal. App. 5th at 44; *see CyberMedia, Inc. v. Symantec Corp.*, 19 F. Supp. 2d 1070, 1075 (N.D. Cal. 1998). Attempting to resolve that issue, the court in *Cybermedia* articulated the good faith test as follows:

> Accordingly, this Court holds that, for purposes of the UFTA, a transferee lacks good faith if he or she (1) colludes with the debtor or otherwise actively participates in the debtor's fraudulent scheme, or (2) has *actual knowledge* of facts which would suggest to a reasonable person that the transfer was fraudulent.

*Cybermedia*, 19 F. Supp. 2d at 1075. And the *Nautilus* court noted that many federal courts appeared to have accepted the test set forth in *Cybermedia*, though the exact language used might have differed slightly. *See Nautilus*, 11 Cal. App. 5th at 45-46.

But the *Nautilus* court found the test from *Cybermedia* still faulty, for two reasons.

First, the court noted that the Legislative Comment contained additional language not quoted by *Cybermedia* that raised concerns with the test set forth by that court: "Knowledge of the voidability of a transfer would seem to involve a legal conclusion. Determination of the voidability of the transfer ought not to require the court to inquire into the legal sophistication of the

Case: 18-04019    Doc# 150    Filed: 04/23/21    Entered: 04/23/21 16:41:58    Page 63 of
79

transferee." *Id*. at 44 (quoting CUVTA § 3439.08(a), Comment (1)). This additional language raised concerns with the language in the *Cybermedia* good faith test that depended on the transferee's "actual knowledge of facts that would suggest to a reasonable person that the transfer was fraudulent," because that test both appeared to depend on the transferee making a legal determination about the character of the transaction, which is very difficult to discern, and to ignore the issue of the transferor's fraudulent intent, which is what the statute properly addressed. *See id*. at 46.

Second, the court noted that the *Cybermedia* test's reference to actual knowledge of facts "which would *suggest to a reasonable person*" that the transfer was fraudulent, appeared to revert to an inquiry notice standard. *Id*. (emphasis added).

To address these difficulties and to articulate a standard consistent with the language in the Legislative Comment (and mindful of the concerns expressed therein), the *Nautilus* court stated: "Accordingly, we hold that a transferee does not take in good faith if the transferee had actual knowledge of facts showing the transferor had fraudulent intent." *Id*.

The test set forth by the *Nautilus* court attempts to address two problems from prior articulations of the standard--the requirement that a transferee be held to an unrealistic inquiry and imputed knowledge standard, and the requirement that the transferee determine a matter that may involve a legal conclusion. While these concerns by the *Nautilus* court are no doubt well-taken--we should avoid a rule that, in order to avoid liability for what are eventually determined to be fraudulent transfers, transferees must

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 64 of 79

be a combination of Sherlock Holmes and Professor Kingsfield--the exact contours of this doctrine, and the range of its protections, may be difficult to determine with precision. That notwithstanding, this Court is convinced that the rule announced in *Nautilus* would not prevent, but rather would confirm, a ruling that the Defendant in this matter is not entitled to the good faith defense of section 3439.08(a).

As an initial matter, remember that in this inquiry, as with the inquiry whether a transfer was made with actual intent to defraud, we are not typically given direct evidence of a party's bad intent. Put slightly differently, transferees of allegedly fraudulent transfers are no more likely to admit their culpability, or the extent of their knowledge that would deny them a good faith defense, than the fraudster is likely to admit his fraud. Thus, in both instances, courts are forced to rely on inferences from circumstances surrounding a transaction to determine the question whether a transferor acted with fraudulent intent, or a transferee acted in good faith. And the *Nautilus* court's emphasis on "actual knowledge of facts" does not change that reality--even if we lack facts that would directly support liability, such as an admission by the transferor, we may still find facts that support an inference of fraudulent intent or bad faith, and even one that, viewed fairly, admits of no other conclusion. And *Nautilus* itself makes clear that one may demonstrate the requisite actual knowledge of facts showing transferor's fraudulent intent via badges of fraud, and that such a showing should be made on a "totality of the circumstances" basis. *See Nautilus*, 11 Cal. App. 5th 46-49.

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 65 of 79

The Trustee alleges that Nicholson's emails setting forth his increasing and continuing concerns regarding the inexplicable delay in getting delivery of his wine, Premier Cru's failure to respond, or to respond credibly about the issue, the delay in processing refunds, and Nicholson's accusations of fraud and invocation of the term Ponzi Scheme and threats to go to the authorities, establish that he had requisite knowledge of the fraud at Premier Cru, as well as the transferor's fraudulent intent in making the Subject Transfers, and he cannot have taken the wines in good faith.

Nicholson does not dispute having sent the emails, or the accuracy of the Trustee's rendition of them. Rather, he argues that the Trustee has misstated the relevant legal standard for a finding of good faith.

The Court engaged in a lengthy application of the facts of this matter to the rule set forth in *Nautilus* in the September 5 Memo, and observed that it would be highly unlikely that the Court would be convinced that the Subject Transfers were made with actual intent to hinder, delay, or defraud creditors based on a badges of fraud analysis, while also concluding that Defendant could claim to have taken the transfers in good faith. Sept. 5 Mem. 55-65, ECF No. 76. That analysis depended largely on the overlap between, if not the complete congruence of, the badges of fraud exhibited in the Subject Transfers and the information clearly known to Defendant, and which he himself confirmed in his recitations in a series of escalating emails to Premier Cru.

The Court has performed a similar exercise in this Opinion at section V.B., which addresses the "badges of fraud" asserted by the Trustee in the Second MSJ and Defendant's attempts to dispute the

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 66 of 79

Trustee's assertions, as well as the history of Defendant's increasingly accusatory and inflammatory emails that resulted in delivery of his wine, and concludes that there is no genuine disputed issue of material fact concerning whether those transfers were undertaken with actual intent to hinder, delay, or defraud creditors.  Those analyses need not be repeated here.  Rather, the Court will address why those analyses demonstrate conclusively that the "actual knowledge of facts showing that the transferor had fraudulent intent" standard in *Nautilus* has unquestionably been met.

Indeed, it is precisely the significant overlap between the badges of fraud and irregularities in the Subject Transfers and the statements and accusations made by Defendant in the Ponzi Email, and others, that establish that the *Nautilus* standard has been met. In addition to the overwhelming number of facts that were actually known to Defendant, because he recited them to the Debtor (e.g., (i) unreasonable delays in wine delivery, (ii) unreasonable delays in responding to inquiries, (iii) inability to process refunds, (iv) sourcing wine in a manner clearly inconsistent with orders placed for pre-arrival wine, (v) delivery in a manner also inconsistent with the pre-arrival wines, (vi) lump sum deliveries that make it clear that the wine was not "arriving" in a manner consistent with typical pre-arrival deliveries, and (vii) delivery only after Defendant had identified the Debtor's business as a Ponzi Scheme and threatened to expose them), the overlap between the facts that demonstrate Debtor's fraudulent intent and Defendant's knowledge of those facts amply satisfies the requirement of the *Nautilus* case.

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 67 of 79

Stated more simply, with the exception of the later-obtained confession of guilt set forth in the Plea Agreement, Defendant knew, prior to delivery of the wine included in the Subject Transfers, literally every fact upon which the Court will base its conclusion that the Subject Transfers were made with actual intent to defraud.  This knowledge of facts required no additional sleuthing or imputed knowledge.  And this conclusion is also consistent with the statement in the Legislative Comment to section 3439.08(a):  "[k]nowledge of the facts rendering the transfer voidable would be inconsistent with the good faith that is required of a protected transferee."  CUVTA § 3439.08(a), comment (1).

And, addressing the *Nautilus* court's second concern, that a transferee not be required to make a judgment about the voidability or fraudulent nature of a transaction, Defendant's Ponzi Email and other previously cited emails, in which he identifies, *inter alia*, the Debtor's suspicious failure to deliver wines, suspicious failure to respond to inquiries, and suspicious illiquidity, and concludes that the Debtor is operating a Ponzi Scheme, demonstrate that Defendant had no uncertainty whatsoever about what the facts that he knew established about the Debtor's business and the Subject Transfers, and no hesitancy calling the Debtor out for its fraudulent conduct.

Indeed, Defendant didn't simply demonstrate the requisite knowledge under *Nautilus* to defeat his claimed good faith defense, he actually weaponized that knowledge by threatening to bring criminal and civil charges against Debtor, and expose the Ponzi Scheme.  As discussed previously at V.A., it is exactly the threat of exposure, typically by customers of longer standing, that is the

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 68 of
79

greatest peril to the operator of a Ponzi Scheme, and which ensures
that the threatening creditors are satisfied, by any means
necessary. And, demonstrably, so it was in this instance.

And, as also pointed out in the September 5 Memo, though the
Trustee does not seek to cast Defendant's actions as colluding or
participating in the fraudulent scheme, which would unquestionably
have destroyed his ability to assert a good faith defense, it would
not have been a great stretch so to have characterized Defendant's
threats. In fact, Defendant's culpability on this score is made
all the clearer by the fact that, not content with getting his own
wine delivered to him, and terminating his "exposure" to the
Debtor, he interceded on behalf of his friend Stewart McSherry,
demanding that he also receive all of his wine, and impliedly
threatening, again, to expose the Debtor's fraud if his friend is
not satisfied in full within ten days:

> I also mentioned to Michael that my very, very good
> friend Stewart McSherry in Los Angeles also needs to have
> ****ALL**** of the rest of his stuff with you shipped to
> him immediately, if not sooner.
> Ten business days is plenty, it is more than enough
> time for you to get to him his stuff which is by now
> readily available from multiple sources. And has been
> for a very long time.
> Me, I'm not so nice, not by any stretch of the
> imagination. And I know there's no point in taking your
> staff's entreaties to be "patient", because I'm fully
> aware by now that you and your people will only take
> advantage of it.
> Ten days. Kindly make sure he has all his stuff and
> nothing more left with your outfit by this coming Friday,
> January 24, 2014.

Decl. Karen K. Diep Ex. 36, at 111, ECF No. 114-6.

Against this litany of facts that demonstrate clearly Debtor's
fraudulent intent and Defendant's knowledge thereof, Defendant
offers a laundry list of things that he didn't actually know, as

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 69 of
79

evidence that he lacked the requisite knowledge under *Nautilus*.
Def.'s Opp'n Second MSJ 19-20, ECF No. 126. However, this position
is unavailing--as *Nautilus* and other cases make clear, good faith
is measured on a totality of the circumstances basis, and is
dependent on facts that may support inferences. Thus, no one fact
or collection of facts is necessarily determinative of the
requisite knowledge, and Defendant's ignorance of particular facts
is by definition not conclusive, and is in reality neither here nor
there. Moreover, Defendant's protestations of ignorance are of
little import, considered against the contents of the Ponzi Email,
and other cited emails, which in this instance function as the
equivalent of the Plea Agreement, i.e., an admission of what
Defendant knew, and how probative those facts were to him.

Defendant's remaining objections to the Trustee's challenge to
the good faith defense are really nothing more than challenges to
the "badges of fraud" put forth by the Trustee. As previously
discussed, Defendant largely does not dispute the facts presented
and when he does dispute the facts, the objections are essentially
irrelevant in light of the unique nature of this case. In truth,
Defendant disputes the inference that the Trustee urges the Court
adopt to conclude that the Subject Transfers were made with actual
intent to defraud. But the substantial amount of evidence supplied
by the Trustee concerning the irregularities of the Subject
Transfers, coupled with the admissions contained in the Plea
Agreement, state a powerful case in support of the Trustee's claim.

And the Court is convinced that no reasonable juror, properly
instructed and exercising her duties faithfully, could conclude

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 70 of
79

that Defendant did not have actual knowledge of facts showing Debtor's fraudulent intent.

The Court is also aware of Defendant's repeated statements that he should be entitled to testify to the jury that would be the ultimate trier of fact were this matter to proceed to trial, presumably to explain to them why, when he accused Premier Cru of running a Ponzi Scheme, he did not mean that they were, well, running a "Ponzi Scheme." But as is readily apparent, Defendant's principal difficulty in this matter is not that he will not be allowed to testify on the question of his good faith--rather it is that through numerous animated messages to the Debtor, culminating with the Ponzi Email, he already has.

**B.   California Civil Code Section 3432 Does Not Provide a Defense in This Matter.**

In footnote 15 of its Opposition to the Second MSJ, Defendant cited to the case *Ferdman v. Ferdman (In re Ferdman)*, No. B226116, 2012 Cal. App. Unpub. LEXIS 3755, at *15 (Ct. App. May 18, 2012) for the proposition that "California courts have repeatedly held that even an insolvent debtor's decision to prefer one creditor over another, through a transfer made for proper consideration is not a transfer made to hinder, delay or defraud." Def.'s Opp'n Second MSJ 20, ECF No. 126. In addition, a recent California Court of Appeal decision, *Universal Home Improvement, Inc. v. Robertson*, 51 Cal. App. 5th 116 (2020) appears to state the proposition even more directly, that because section 3432 of the California Civil Code expressly provides that a debtor may prefer one creditor over another, the "'badges of fraud' do not matter when value is given, such as satisfaction of an antecedent debt." *Id*. at 127 (citing

1  *Annod*, 100 Cal. App. 4th 1286 (2002)*; Wyzard v. Goller*, 23 Cal.
2  App. 4th 1183 (1994)).

3      The Court apprised the parties of the recent opinion by the
4  Court of Appeals in *Universal Home*, and asked for the parties'
5  views on the potential application of the doctrine set forth in
6  *Ferdman* and *Universal Home*.  More specifically, the Court offered
7  the parties the opportunity to brief this issue prior to the
8  hearing on the Second MSJ, and also offered to continue the hearing
9  to accommodate the parties' desire to brief the issue.  Both
10  parties declined the offer to provide further briefing, but these
11  issues were discussed at length during the February 3 oral argument
12  on the Second MSJ.[12]

13      During oral argument, Defendant argued that *Ferdman* and
14  *Universal Home* established a rule that where the transferee paid
15  value for the transfer, the badges of fraud utilized in connection
16  with the inquiry whether a transfer was made with actual fraudulent
17  intent are irrelevant, and that this rule provided him a defense on
18  the facts in this matter.  Defendant further argued that, similar
19  to the analysis above at section VI.A., when a federal court is
20  applying substantive state law, as the Trustee is asking the Court
21  to do in this instance via the Trustee's "strong arm" powers as set
22  forth in 11 U.S.C. § 544, the federal court must apply state law as
23  the state courts have done, as reflected by the decisions of that

24

25      [12] Notwithstanding his declination to provide pretrial briefing on the
26  issue, the lengthy discussion of the issue at oral argument on the Second MSJ,
   and the Court's decision not to request any post-trial briefing on the issue,
   Nicholson first filed a post-trial brief on the issue, and then sought leave to
27  do so.  Mot. Suppl. Br., ECF No. 142.  The Court issued an Order on February 12,
   2021, denying leave to file the post-hearing brief, and has not considered it in
28  connection with this disposition.  Order Mot. Suppl. Br., ECF No. 143.

state's highest court. *In re Kirkland*, 915 F. 2d at 1238. If the state's highest court has not opined, as Defendant argued was the case here, then a federal court must attempt to determine what the state's highest court would do, mindful of the holdings of intermediate appellate courts, i.e., this Court should essentially follow *Universal Home*. *Id*. at 1239.

After review, the Court is convinced that the California Supreme Court would not apply section 3432 to provide a defense to Defendant in this matter, because the facts in this matter differ markedly from those relied upon by the courts in *Ferdman* and *Universal Home*. The facts in this matter provide a basis for a finding of liability in this case that is different from the scenarios in *Ferdman* and *Universal Home*. Moreover, the Court is concerned that the argument being urged by Defendant in this matter, taken to its logical end, would render superfluous or even negate numerous provisions of CUVTA, in a manner that would be contrary to well-established principles of statutory construction, and which the Court believes the California Supreme Court would be unlikely to adopt.

In *Universal Home*, a defendant in litigation, prior to entry of judgment in favor of the plaintiff in her action, but mindful of the likelihood thereof, transferred assets to her sister in satisfaction of an old but otherwise valid claim that exceeded the amount transferred. The trial court ruled that the sister had a valid claim, and that while payment of that claim was probably a

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 73 of 79

preference, the preference doctrine is irrelevant under California law.[13]  *Universal Home*, 51 Cal. App. 5th at 126.

Nor was the alleged presence of seven badges of fraud sufficient to convince the trial court that the subject transaction was made with actual intent to hinder, delay, or defraud creditors: the trial court concluded, and the Court of Appeal agreed, that the badges of fraud analysis should not be determined as a "scorecard" test, but rather on a totality of the circumstances basis, and that, properly understood, the badges of fraud are nothing more than inferences that a court may use to determine the existence or absence of a factor that is infrequently admitted, and must almost always be shown by inferences, i.e., the intent of the transferor. *Id*. at 126-27, 128.

The trial court and appellate court in *Universal Home* relied on longstanding California precedent for the proposition that, since a creditor may prefer one valid creditor over another, the payment of an existing claim constitutes value, and, absent fraud, does not constitute a transfer to hinder, delay, or defraud the unfortunate creditor whose claim was not paid.  *Id*. at 126.

But this Court believes that this state court result neither sets an absolute rule against applying badges of fraud analysis to what might also be a preference claim, nor forecloses a different result based on facts closer to those presented here.  Stated

---

[13]  The defendant made this transfer notwithstanding the fact that her sister's claim was subject to a statute of limitations defense.  The trial court noted that the statute of limitations defense was waivable by the Defendant, and that the statute of limitations defense did not render the claim invalid. *Universal Home*, 51 Cal. App. 5th at 127-28.  Other cases, including at least one Ninth Circuit case, have agreed that even a stale claim, if otherwise valid, remains an obligation.  *See, e.g., Maddox v. Robertson (In re Prejean)*, 994 F.2d 706 (9th Cir. 1993).

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 74 of 79

differently, the somewhat anodyne observation that satisfying a valid claim may constitute "value," does not support the broad proposition that Defendant would like the Court to take from these cases, i.e., that paying value for an alternate claim must always defeat a claim of fraud by the holder of an unsatisfied claim.

As an initial matter, there is no support for the proposition that paying some value for satisfaction of a claim invariably defeats a fraudulent transfer claim. As one of the cases cited by Defendant, *Kemp v. Lynch*, 8 Cal. 2d 457 (1937), and moreover, the only California Supreme Court case cited, demonstrates, the presence of fraud in a transaction, for example transferring an asset, even to pay a valid claim, for less than fair value, will support a claim for fraudulent transfer. *Id.* at 460–62.

The *Kemp* opinion clearly supports the Trustee's assertions during oral argument that Defendant's approach ignored the limitation on section 3432's application to an alleged fraudulent transfer, i.e., that the cases that have applied section 3432 to allegations of actually fraudulent transfers have each acknowledged that the section may apply only in the absence of fraud. This approach is consistent with the case law, makes sense, and avoids a potential disharmony in the cases that would, if Defendant's position is followed to its end, result in the courts excusing fraudulent conduct.

Because what is manifestly clear from *Universal Home* and its predecessors is that the courts are simply not finding fraud in the totality of the circumstances presented, and efforts to point to badges of fraud that are meant to indicate a fraudulent intent are simply unavailing absent the plaintiffs' demonstration, and the

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 75 of 79

courts' overall sense, of some deceptive statements or practices that have harmed the objecting creditor, other than the circumstance that one creditor got paid and another didn't.

The situation presented in the case before us could not be more starkly different. In this case, we know from the Plea Agreement that, at least on a general level, there is no doubt that John Fox, as the principal of the debtor, intended to commit and did in fact commit fraud. In fact, based on the Plea Agreement, there were at least two types of fraud that are consistent with an enterprise identified as a Ponzi Scheme. First, Fox sent out solicitations for orders of pre-arrival wine at attractive prices, knowing at the time of the solicitation that he neither had the wines or pre-orders sufficient to satisfy the customer orders he was soliciting, nor did he intend to use, or in fact use, the funds received to order or to purchase such wines in the future. Request Judicial Notice Ex. 2, at 3-4, ECF No. 114-3. This conduct is classic representational fraud, and would also almost certainly render any debts attributed thereto non-dischargeable in the case of an individual debtor. 11 U.S.C. § 523(a)(2).

Then, in classic Ponzi Scheme fashion, per Fox, when he needed to satisfy an order for a threatening customer, he would not be able to satisfy the order from wines on hand or being delivered per the fictional pro-order process, and he would use funds on hand from subsequent revenues to purchase wines for the older customers, frequently at retail.

There is no question but that, in this scenario where, by definition and by design, a significant number of the pre-orders of wine could not be satisfied, and Fox knew that, yet continued to

-76-
Case: 18-04019    Doc# 150    Filed: 04/23/21    Entered: 04/23/21 16:41:58    Page 76 of
79

appear to satisfy wine orders from other sources, primarily to
avoid exposure of the scheme, and thereby deepen the fraud, this
conduct constitutes "actual fraud" within the meaning of *Husky*.
136 S. Ct. 1581.

The question in this case is whether the fraud extended to the
Subject Transfers, which the Trustee now seeks to demonstrate
through the Debtor's accounting records and certain badges of
fraud.  Accordingly, the question who actually received the under-
supplied wines, and why, is directly related to the fraud alleged
in this case, and is not "incidental," as the state courts
concluded in the litigation contexts before them.

And, to the extent that CUVTA section 3439.04(a)(1) prohibits
transactions with actual intent to "hinder, delay or defraud"
creditors, if the Trustee can demonstrate that Defendant received
his wine under the badges of fraud that would link those
transactions to a Ponzi Scheme, that finding would be highly
material in this instance, where the effect of the Ponzi Scheme is
to provide one creditor the benefit of his transaction, while
knowing that others will not be receiving theirs.  In such cases,
the hindrance or delay suffered by other creditors is not just
foreseeable, it is certain, and is a direct consequence of the
scheme, which makes this situation markedly different from the
scenario in which, per the state courts, if Creditor A doesn't
receive the transfer, Creditor B will.

Further, the Court is concerned that adopting the rule urged
by Defendant concerning the inapplicability of badges of fraud
where a party satisfies an otherwise valid debt would elevate one
badge of fraud (receipt of reasonably equivalent value) over all

Case: 18-04019   Doc# 150   Filed: 04/23/21   Entered: 04/23/21 16:41:58   Page 77 of
79

others as an inference of fraudulent intent (and actually negate all of the other badges of fraud), and destroy the conjunctive aspect of the good faith defense of CUVTA section 3439.08(a), which requires both that the transferee have paid reasonably equivalent value, and taken in good faith.

In light of all of these factual and legal differences between this matter and the scenarios confronted by the courts in *Universal Home* and its forebears, it is inconceivable to this Court that the California Supreme Court would "follow" *Universal Home*, and conclude that (a) a significant underlying fraud was not described in this case, and (b) the fact that the transfers to Defendant were not made with actual intent to hinder, delay, or defraud creditors, simply because the Debtor was satisfying a "valid" claim due to Defendant. Rather it is highly likely that the California Supreme Court would recognize the numerous bases on which to distinguish *Universal Home* from this scenario.

### CONCLUSION

For all of the foregoing reasons, the Trustee's Second MSJ is GRANTED. The Court will enter an Order Granting Trustee's Motion for Partial Summary Judgment concurrent with the filing of this Opinion.

**\*\*\*END OF OPINION\*\*\***

Case: 18-04019    Doc# 150    Filed: 04/23/21    Entered: 04/23/21 16:41:58    Page 78 of 79

1                       **COURT SERVICE LIST**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28